**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**



| | | |
|---|---|---|
| MONTE WELCH, Derivatively on Behalf of SAIC, INC., | : | Civil Action No. |
| Plaintiff, | : | |
| vs. | : | |
| WALTER P. HAVENSTEIN, A. THOMAS YOUNG, FRANCE A. CÓRDOVA, JERE A. DRUMMOND, THOMAS F. FRIST, JOHN J. HAMRE, MIRIAM E. JOHN, ANITA K. JONES, JOHN P. JUMPER, HARRY M.J. KRAEMER, JR., LAWRENCE C. NUSSDORF, EDWARD J. SANDERSON, JR., LOUIS A SIMPSON, MARK W. SOPP, KENNETH C. DAHLBERG, CARL BELL, and GERARD DENAULT, | : | **JURY TRIAL DEMANDED** |
| Defendants, | : | |
| – and – | : | |
| SAIC, INC., | : | |
| Nominal Party. | : | |



## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1.      Plaintiff Monte Welch ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of SAIC, Inc. ("SAIC" or the "Company") against certain of its current and former executive officers, members of its Board of Directors (the "Board") and other personnel, seeking to remedy Defendants' (defined herein) breaches of fiduciary duties from 2003 to the present (the "Relevant Period"). Plaintiff also brings a claim seeking to remedy Defendants' violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

## NATURE OF THE ACTION

2.      According to its public filings, SAIC focuses its business on providing defense, intelligence, homeland security, logistics, energy, environment, and heath solutions and services to

1

federal, state and local government agencies, foreign governments and customers in select commercial markets.

3.      Commencing in 2000, the City of New York ("NYC") began to develop and implement a modernization of its payroll system for NYC employees, known as "CityTime." CityTime's initial expense was budgeted at $63 million, but to date, it has cost over $600 million, with more expenses to come.

4.      During the Relevant Period, Defendants perpetrated a scheme whereby they caused or permitted SAIC to overbill NYC for time recorded by the CityTime program manager. As part and parcel of this scheme, Defendants caused millions of dollars of illegal kickbacks to be paid to certain individuals deemed to be necessary for the continuance of the scheme.

5.      On August 31, 2011, Management Defendants (defined herein) caused SAIC to issue a press release announcing the Company's financial results for the 2012 second quarter, the period ended July 31, 2011.  For the quarter, the press release reported an approximate 6% decline in revenue and a 23% decline in operating margin.  Following the Company's 2012 fiscal second quarter earnings announcement, Company insiders held a conference call with analysts and investors, wherein it was disclosed that the Company's revenues were, in part, adversely impacted by the "wind[ing] down" of the CityTime contract and that, while the Company could not quantify the amount, it believed that it was "probable" that SAIC would have to make restitution to NYC for wrongful conduct on CityTime.

6.      Following these revelations, SAIC stock fell nearly 14%, from $15.00 per share on August 31, 2011 to $12.97 per share on September 1, 2011.

7.      On December 8, 2011, Management Defendants caused SAIC to file a Form 10-Q with the SEC.  The Form 10-Q revealed that as a result of Defendants' breaches, they expected that

the Company's loss relating to CityTime would be at least *$232 million*.  As such, Defendants caused the Company to record a loss provision in that amount, consisting of a $52 million reduction in revenue and a $180 million charge to selling, general and administrative expenses.

8.     On March 14, 2012, it was announced that the Company had agreed to pay NYC *$500.4 million* to resolve the CityTime probe, consisting of $370.4 million in restitution and a $130 million penalty. U.S. Attorney Preet Bharara ("Bharara") stated that the resolution was "*the largest in history* for any city or state fraud."

9.     The true facts, which were known by Defendants, but not disclosed during the Relevant Period, were: (a) that Defendants caused or permitted SAIC to overbill NYC by hundreds of millions of dollars on the CityTime Project; (b) that, as a result of these overbilling practices, Defendants caused the Company's operating results during the Relevant Period to be materially misstated; (c) that the overbilling practices subjected the Company to numerous undisclosed risks, including monetary risks and reputational risks, particularly because government agencies are SAIC's primary customers and any harm to the Company's reputation and/or relationships with such agencies would adversely affect its future revenues and growth prospects; (d) that Defendants caused SAIC to violate applicable accounting standards associated with the recognition of revenue and the disclosure and accounting for loss contingencies; and (e) that Defendants caused the Company's financial statements to not be fairly presented in conformity with generally accepted accounting principles ("GAAP") and to be materially false and misleading.

10.     As a result of Defendants' actions, SAIC has been subjected to hundreds of millions of dollars in losses, harm to its reputation and standing in the industry, and may be subjected to hundreds of millions of dollars more in potential costs.  Additionally, the price of the Company's stock still has not recovered, and currently trades for approximately $13 per share.

11.     Accordingly, as a result of defendants' breaches, the Company has been damaged.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

13.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein, occurred in this district.  One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## THE PARTIES

14.     Plaintiff currently holds 2,853 shares of SAIC stock, and has held SAIC stock continuously since March 2000.

15.     Nominal defendant SAIC is a Delaware corporation with its executive offices located at 1710 SAIC Drive, McLean, Virginia.  Sciences Applications International Corporation, the principal operating company and wholly-owned subsidiary of SAIC, is a Delaware corporation with its principal executive offices located at 10260 Campus Point Drive, San Diego, California.  In October 2006, in connection with becoming a publicly traded company, Science Applications International Corporation completed a reorganization merger in which it became a wholly-owned subsidiary of SAIC.  SAIC then completed an IPO of its common stock.  In connection with the merger agreement, holders of Science Applications International Corporation stock received Class A preferred shares of SAIC for their shares of Science Applications International Corporation.  From

October 2006 until November 2009, SAIC had both Class A preferred stock and common stock outstanding.  In November 2009, each share of SAIC Class A preferred stock was converted into one share of common stock, thus increasing the number of common shares outstanding and eliminating the preferred shares outstanding.  According to its public filings, SAIC focuses its business on providing defense, intelligence, homeland security, logistics, energy, environment, and heath solutions and services to federal, state and local government agencies, foreign governments and customers in select commercial markets.

      16.    Defendant Walter P. Havenstein ("Havenstein") served as the Chief Executive Officer ("CEO") of the Company from 2009 until March 1, 2012,  and as a director of the Company from 2009 until March 1, 2012.  In addition, defendant Havenstein served as a member of the Board's Ethics and Corporate Responsibility Committee ("Ethics Committee") during the Relevant Period.  On October 3, 2011, Defendants caused SAIC to announce that defendant Havenstein would retire as CEO for "personal reasons."  Upon information and belief, defendant Havenstein is a citizen of Virginia.

      17.    Defendant A. Thomas Young ("Young") has served as a director of the Company since 1995.  Upon information and belief, defendant Young is a citizen of Florida.

      18.    Defendant France A.  Córdova ("Córdova") has served as a director of the Company since 2008.  Upon information and belief, defendant Córdova is a citizen of Indiana.

      19.    Defendant Jere A. Drummond ("Drummond") has served as a director of the Company since 2003.  In addition, defendant Drummond served as a member of the Ethics Committee during the Relevant Period.  Upon information and belief, defendant Drummond is a citizen of North Carolina.

      20.    Defendant Thomas F. Frist ("Frist") has served as a director of the Company since

2009.  In addition, defendant Frist served as a member of the Board's Audit Committee (the "Audit Committee") during the Relevant Period.  Upon information and belief, defendant Frist is a citizen of Tennessee.

21.    Defendant John J. Hamre ("Hamre") has served as a director of the Company since 2005.  Upon information and belief, defendant Hamre is a citizen of Maryland.

22.    Defendant Miriam E. John ("John") has served as a director of the Company since 2007.  Upon information and belief, defendant John is a citizen of California.

23.    Defendant Anita K. Jones ("Jones") has served as a director of the Company since 1998.  In addition, defendant Jones served as a Chair of the Ethics Committee and as a member of the Audit Committee during the Relevant Period.  Upon information and belief, defendant Jones is a citizen of Virginia.

24.    Defendant John P. Jumper ("Jumper") has served as a director of the Company since 2007, and as the Company's President and CEO since March 1, 2012.  In addition, defendant Jumper served as a member of the Audit Committee during the Relevant Period.  Upon information and belief, defendant Jumper is a citizen of Virginia.

25.    Defendant Harry M.J. Kraemer, Jr. ("Kraemer") has served as a director of the Company since 1997.  In addition, defendant Kraemer has served as Chair of the Audit Committee during the Relevant Period.  Upon information and belief, defendant Kraemer is a citizen of Illinois.

26.    Defendant Lawrence C. Nussdorf ("Nussdorf") has served as a director of the Company since 1998.  In addition, defendant Nussdorf served as a member of the Audit Committee during the Relevant Period.  Upon information and belief, defendant Nussdorf is a citizen of the District of Columbia.

27.    Defendant Edward J. Sanderson, Jr. ("Sanderson") has served as a director of the

Company since 2010.  Upon information and belief, defendant Sanderson is a citizen of California.

28.     Defendant Louis A. Simpson ("Simpson") has served as a director of the Company since 2006.  Upon information and belief, defendant Simpson is a citizen of Florida.

29.     Defendant Mark W. Sopp ("Sopp") has served as the Chief Financial Officer ("CFO") of the Company since November 2005.  Upon information and belief, defendant Sopp is a citizen of Virginia.

30.     Defendant Kenneth C. Dahlberg ("Dahlberg") served as the CEO of the Company from November 2003 to September 2009.  In addition, defendant Dahlberg served as the Chairman of the Board from July 2004 to June 2010.  Upon information and belief, defendant Dahlberg is a citizen of California.

31.     Defendant Gerard Denault ("Denault") served as the Vice President and Operations Manager of the Company from October 2002 until he was placed on "administrative leave" in December 2010.  On or about May 25, 2011, defendant Denault's employment was terminated by SAIC.  On May 27, 2011, defendant Denault was arrested after the United States Department of Justice–Southern District of New York alleged he received millions of dollars in illegal kickbacks. Upon information and belief, defendant Denault is a citizen of Connecticut.

32.     Defendant Carl Bell ("Bell") served as the Company's Chief Systems Engineer during the Relevant Period.  On June 14, 2011, defendant Bell pled guilty in the Southern District of New York to multiple charges based on his participation in the CityTime scheme and his receipt of millions of dollars in kickbacks.  Upon information and belief, defendant Bell is a citizen of New York.

33.     Collectively, defendants Havenstein, Young, Córdova, Drummond, Frist, Hamre, John, Jones, Jumper, Kraemer, Nussdorf, Sanderson, Simpson, Sopp, Dahlberg, Denault and Bell

shall be referred to herein as the "Defendants."

34.     Defendants Frist, Jones, Jumper, Kraemer, and Nussdorf shall be collectively referred to as the "Audit Committee Defendants."

35.     Defendants Córdova, Drummond, Havenstein, and Jones shall be collectively referred to as the "Ethics Committee Defendants."

36.     Collectively, defendants Havenstein, Young, Córdova, Drummond, Frist, Hamre, John, Jones, Jumper, Kraemer, Nussdorf, Sanderson, Simpson, Sopp and Dahlberg shall be referred to hereinafter as the "Management Defendants."

## DEFENDANTS' DUTIES

37.     By reason of their positions as officers, directors, managers and/or fiduciaries of SAIC and because of their ability to control the business and corporate affairs of SAIC, Defendants owed SAIC and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage SAIC in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of SAIC and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to SAIC and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

38.     Defendants, because of their positions of control and authority as directors, officers and/or managers of SAIC, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with SAIC, each of the Defendants had knowledge of material non-public

information regarding the Company.

39.     To discharge their duties, the officers, directors and managers of SAIC were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers, directors and managers of SAIC were required to, among other things:

    a.   Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    b.   Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

    c.   When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

40.     Pursuant to the Charter of the Ethics Committee, the members of the Ethics Committee are required, *inter alia*, to:

    a.   Monitor procedures related to ethics and compliance, including overseeing the investigation of any alleged misconduct, unethical behavior, violation of the Company's policies or potential conflict of interest involving the CEO or an independent director;

    b.   Review the effectiveness of the Company's ethics, compliance and training programs and related policies, particularly with respect to their impact on the

likely treatment the Company would receive under Federal Sentencing Guidelines; and

c. Review political, social and environmental issues that may affect the business operations, performance, business continuity crisis planning, and public image or reputation of the Company.

41.     Pursuant to the Charter of the Audit Committee, the members of the Audit Committee are required, *inter alia*, to:

a. Review the Company's annual audited and quarterly financial statements;

b. Review critical accounting policies and such other accounting policies of the Company as are deemed appropriate for review prior to the filing of any annual or quarterly financial statements with the SEC;

c. Review the effect of regulatory and accounting initiatives on the financial statements of the Company;

d. Review the Company's earnings press releases, as well as financial information and earnings guidance provided by the Company to analysts and rating agencies;

e. Recommend to the Board whether to include the audited annual financial statements in the Company's annual report on Form 10-K to be filed with the SEC;

f. Review the effectiveness of the Company's system for monitoring compliance with laws and regulations; and

g. Review with management any significant deficiencies and material weaknesses in the design or operation of the Company's internal controls.

## SUBSTANTIVE ALLEGATIONS

A.      **Overview of the Company**

42.      According to its public filings, SAIC focuses its business on providing defense, intelligence, homeland security, logistics, energy, environment, and heath solutions and services to federal, state and local government agencies, foreign governments and customers in select commercial markets.  The Company conducts business in three reportable segments: 1) Government; 2) Commercial; and 3) Corporate and Other.  SAIC's operating business units are aggregated into Government or Commercial based on the nature of the customers served, the contractual requirements and the regulatory environment governing the business unit's operations.  The Corporate and Other segment includes the operations of the Company's internal real estate management subsidiary, various corporate activities and certain corporate expense items that are not reimbursed by the Company's U.S. Government customers.  The Corporate and Other segment does not contract with third-parties for the purpose of generating customer revenues.  Virtually all of SAIC's revenues and tangible long-lived assets are generated by, or owned by, entities located in the United States.

43.      In October 2006, in connection with becoming a publicly traded company, Science Applications International Corporation completed a reorganization merger in which it became a wholly-owned subsidiary of SAIC.  SAIC then completed an IPO of its common stock.  In connection with the merger agreement, holders of Science Applications International Corporation stock received Class A preferred shares of SAIC for their shares of Science Applications International Corporation.  From October 2006 until November 2009, SAIC had both Class A preferred stock and common stock outstanding.  In November 2009, each share of SAIC Class A preferred stock was converted into one share of common stock, thus increasing the number of common shares outstanding and eliminating the preferred shares outstanding.

**B.**   **Defendants' Illicit Scheme to Scam NYC**

44.   Commencing in 2000, NYC began to develop and implement a modernization of its payroll system for NYC employees, known as CityTime. CityTime's initial expense was budgeted at $63 million, but to date, it has cost over *$600 million*, with more expenses to come. SAIC was CityTime's primary contractor, and defendant Denault served as SAIC's Project Manager.

45.   Defendant Denault was an SAIC employee between 2003 and 2010, and his responsibilities included: 1) choosing and overseeing subcontractors hired by SAIC to help with CityTime; 2) submitting bills to NYC for payment for work supposedly performed on CityTime by SAIC employees and subcontractors; 3) developing proposed CityTime work orders; and 4) developing contract amendments seeking approval for SAIC to perform additional work on CityTime.

46.   Additionally, between 2003 and 2010, SAIC's Chief Systems Engineer in its New York Office was defendant Bell.

47.   During this period, NYC paid more than $600 million to SAIC in connection with CityTime. Virtually this entire amount was an overpayment by NYC, and the individuals responsible for CityTime collaborated in an effort to overbill NYC.

48.   For instance, defendant Denault caused consultants to be hired at artificially inflated rates, caused delays in the implementation of CityTime, and approved work orders for unnecessary increases in staff. Further, Company executives received millions of dollars in kickbacks with respect to work given to Technodyne LLC ("Technodyne"), CityTime's primary subcontractor.

49.   Specifically, defendants Bell and Denault were each paid five dollars for every hour worked by every consultant hired by or through Technodyne. Denault received an additional two dollars for every hour worked by a consultant for both unauthorized company D.A. Solutions, and

for Prime View (another company that many CityTime consultants said had paid them).  In aggregate, Denault received over *$9 million* in kickbacks, and Bell received over *$5 million* in kickbacks.  Technodyne, for its part as the Company's primary subcontractor on CityTime, received at least *$450 million* from SAIC between 2003 and 2010.

50.     By 2005 or 2006, NYC had paid the Company approximately $85 million in connection with CityTime.  At this point, defendant Denault (and others) recommended that NYC change SAIC's contract from a "fixed price" contract to a "fixed price level of effort" contract.  Whereas SAIC initially bore the responsibility of absorbing cost overruns, NYC would now be responsible for future cost overruns.

51.     NYC then amended the contract as defendant Denault suggested, and following this, CityTime staffing drastically increased (from less than 150 consultants at the end of 2005 to over 300 consultants by the end of 2007), with Defendants causing the Company to pay Technodyne hundreds of millions of dollars.

52.     Notably, this is not the first time that the Company has come under fire on Defendants' watch for engaging in potentially illegal behavior.  For example, in 2006,[1] a qui-tam suit was filed against SAIC and certain other defendants in the Southern District of Mississippi, accusing the Company and other entities of improperly colluding with government officials to obtain a General Services Administration information technology contract worth $3.2 billion.  The United States Government intervened in 2009.[2]  It was alleged that SAIC violated various provisions of the

---

[1] Defendants Young, Drummond, Hamre, Jones, Kraemer, Nussdorf, Simpson and Dahlberg served on the Board in 2006, and defendant Sopp served as CFO in 2006.

[2] *United States of America, ex rel. David Magee v. Lockheed Martin Corporation et al.*, No.: 1:09-cv-00324-HSO-JMR (S.D.Miss. filed June 30, 2009).

False Claims Act in connection with this bid-rigging.  This expensive litigation proceeded for a number of years.   On September 29, 2011, the United States Department of Justice ("DOJ") announced that SAIC paid $20.4 million to settle the claims.

## C.      Defendants' False and Misleading Statements During the Relevant Period

53.      On April 16, 2004, Management Defendants caused the Company to file its Form 10-K for the year ended January 31, 2004 (the "2004 Form 10-K") with the SEC.  The 2004 Form 10-K reported that for the year ended January 31, 2004, revenues totaled $6.72 billion, operating income totaled $540 million, and net income totaled $351 million.   The 2004 Form 10-K included representations about the Company's disclosure and internal controls, as well as Sarbanes-Oxley ("SOX") required certifications, signed by defendant Dahlberg and then-CFO Thomas E. Darcy ("Darcy"), which stated as follows:

> *Evaluation of disclosure controls and procedures.* We carried out an evaluation, under the supervision and with the participation of our Disclosure Committee and management, including Kenneth C. Dahlberg (Chief Executive Officer) and Thomas E. Darcy (Chief Financial Officer), of the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) or 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this report. Disclosure controls and procedures are designed to ensure that information required to be disclosed by us in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported on a timely basis. Based upon that evaluation, Kenneth C. Dahlberg and Thomas E. Darcy concluded that our disclosure controls and procedures were effective in timely alerting them to material information relating to the Company (including its consolidated subsidiaries) required to be included in our periodic SEC filings.

> *       *       *

> I, [Dahlberg/Darcy], certify that:

> 1.      I have reviewed this Annual Report on Form 10-K of SAIC, Inc.;

> 2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

> 3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

*    *    *

In connection with the Annual Report of Science Applications International Corporation (the "Company") on Form 10-K for the period ending January 31, 2004 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, [Dahlberg/Darcy], [CEO/CFO] of the Company, certify, pursuant to 18

U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that to the best of my knowledge:

> (1) The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

> (2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

54.     In addition, the 2004 Form 10-K represented, in part, that the financial statements contained therein, the Company' financial statements for the year ended January 31, 2004, were presented in conformity with GAAP, and stated:

> The preparation of these financial statements in accordance with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingencies at the date of the financial statements, as well as the reported amounts of revenues and expenses during the reporting period. Management evaluates these estimates and assumptions on an on-going basis. Our estimates and assumptions have been prepared on the basis of the most current reasonably available information.

55.     On April 4, 2005, Management Defendants caused the Company to file its Form 10-K for the year ended January 31, 2005 (the "2005 Form 10-K") with the SEC.  The 2005 Form 10-K reported that for the year ended January 31, 2005, revenues totaled $7.187 billion, operating income totaled $488 million, and net income totaled $409 million.  The 2005 Form 10-K included representations about the Company's disclosure and internal controls, as well as SOX required certifications that were substantially similar to those contained in the 2004 Form 10-K.

56.     In addition, the 2005 Form 10-K represented, in part, that the financial statements contained therein, the Company' financial statements for the year ended January 31, 2005, were presented in conformity with GAAP, and stated:

> The preparation of these financial statements in accordance with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingencies at the date of the financial statements, as well as the reported amounts of revenues and expenses during the reporting period. Management evaluates these estimates and assumptions on an on-going basis. Our estimates and assumptions have been prepared on the basis of the most current reasonably available information.

57.     On May 1, 2006, Management Defendants caused the Company to file its Form 10-K for the year ended January 31, 2006 (the "2006 Form 10-K") with the SEC.  The 2006 Form 10-K reported that for the year ended January 31, 2006, revenues totaled $7.792 billion, operating income totaled $497 million, and net income totaled $927 million.  The 2006 Form 10-K included representations about the Company's disclosure and internal controls, as well as SOX required certifications, signed by defendants Dahlberg and Sopp, that were substantially similar to those contained in the 2004 Form 10-K.

58.     These representations about the Company's internal and disclosure controls, and defendants Dahlberg's and Sopp's certifications thereon, were repeated in all material respects in Forms 10-K and 10-Q that the Defendants subsequently filed with the SEC throughout the Relevant Period.

59.     In addition, the 2006 Form 10-K represented, in part, that the financial statements contained therein, the Company' financial statements for the year ended January 31, 2006, were presented in conformity with GAAP, and stated:

> The preparation of these financial statements in accordance with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingencies at the date of the financial statements, as well as the reported amounts of revenues and expenses during the reporting period. Management evaluates these estimates and assumptions on an on-going basis. Our estimates and assumptions have been prepared on the basis of the most current reasonably available information.

60.     On April 12, 2007, Management Defendants caused the Company to file its Form 10-K for the year ended January 31, 2007 (the "2007 Form 10-K") with the SEC.  The 2007 Form 10-K reported that for the year ended January 31, 2007, revenues totaled $8.3 billion, operating income totaled $585 million, and net income totaled $391 million.  The 2007 Form 10-K included representations about the Company's disclosure and internal controls, and defendants Dahlberg's and Sopp's SOX required certifications thereon.

61.     In addition, the 2007 Form 10-K represented, in part, that the financial statements contained therein, the Company' financial statements for the year ended January 31, 2007, were presented in conformity with GAAP, and stated:

> The preparation of these financial statements in accordance with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingencies at the date of the financial statements, as well as the reported amounts of revenues and expenses during the reporting period. Management evaluates these estimates and assumptions on an on-going basis. Our estimates and assumptions have been prepared on the basis of the most current reasonably available information.

62.     On March 28, 2008, Management Defendants caused the Company to file its Form 10-K for the year ended January 31, 2008 (the "2008 Form 10-K") with the SEC. The 2008 Form 10-K reported that for the year ended January 31, 2008, revenues totaled $8.94 billion, operating income totaled $666 million, and net income totaled $415 million. The 2008 Form 10-K included representations about the Company's disclosure and internal controls and defendants Dahlberg's and Sopp's SOX required certifications thereon.

63.     In addition, the 2008 Form 10-K represented, in part, that the financial statements contained therein, the Company' financial statements for the year ended January 31, 2008, were presented in conformity with GAAP, and stated:

> The preparation of these financial statements in accordance with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingencies at the date of the financial statements as well as the reported amounts of revenues and expenses during the reporting period. Management evaluates these estimates and assumptions on an on-going basis. Our estimates and assumptions have been prepared on the basis of the most current reasonably available information.

64.     On March 30, 2009, Management Defendants caused the Company to file its Form 10-K for the year ended January 31, 2009 (the "2009 Form 10-K") with the SEC. The 2009 Form 10-K reported that for the year ended January 31, 2009, revenues totaled $10.07 billion, operating income totaled $776 million, and net income totaled $452 million. The 2009 Form 10-K included representations about the Company's disclosure and internal controls and defendants Dahlberg's and

Sopp's SOX required certifications thereon.

65.     In addition, the 2009 Form 10-K represented, in part, that the financial statements contained therein, the Company' financial statements for the year ended January 31, 2009, were presented in conformity with GAAP, and stated:

> The preparation of these financial statements in accordance with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingencies at the date of the financial statements as well as the reported amounts of revenues and expenses during the reporting periods. Management evaluates these estimates and assumptions on an on-going basis. Our estimates and assumptions have been prepared on the basis of the most current reasonably available information.

66.     On April 29, 2009, Management Defendants caused the Company to file a Proxy Statement on Form DEF 14A with the SEC.  The Audit Committee Report contained in this Proxy Statement stated that the Audit Committee had "reviewed and discussed with management and Deloitte & Touche LLP, the Company's independent registered public accounting firm, the audited consolidated financial statements," and that "[b]ased on the reviews and discussions summarized in this Report and subject to the limitations on our role and responsibilities referred to above and contained in the Audit Committee charter, the Audit Committee recommended to the Board of Directors that the Company's audited consolidated financial statements referred to above be included in the Company's Annual Report on Form 10-K . . ."

67.     On April 1, 2010, Management Defendants caused the Company to file its Form 10-K for the year ended January 31, 2010 (the "2010 Form 10-K") with the SEC.  The 2010 Form 10-K reported that for the year ended January 31, 2010, revenues totaled $10.85 billion, operating income totaled $867 million, and net income totaled $497 million.   The 2010 Form 10-K included representations about the Company's disclosure and internal controls and defendants Havenstein's and Sopp's SOX required certification thereon.

68.     In addition, the 2010 Form 10-K represented, in part, that the financial statements

contained therein, the Company's financial statements for the year ended January 31, 2010, were presented in conformity with GAAP, and stated:

> The preparation of these financial statements in accordance with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingencies at the date of the financial statements as well as the reported amounts of revenues and expenses during the reporting periods. Management evaluates these estimates and assumptions on an on-going basis. Our estimates and assumptions have been prepared on the basis of the most current reasonably available information.

69.    On April 29, 2010, Management Defendants caused the Company to file a Proxy Statement on Form DEF 14A with the SEC. The Audit Committee Report contained in this Proxy Statement set stated that the Audit Committee had "reviewed and discussed with management and Deloitte & Touche LLP, the Company's independent registered public accounting firm, the audited consolidated financial statements," and that "[b]ased on the reviews and discussions summarized in this Report and subject to the limitations on our role and responsibilities referred to above and contained in the Audit Committee charter, the Audit Committee recommended to the Board of Directors that the Company's audited consolidated financial statements referred to above be included in the Company's Annual Report on Form 10-K . . ."

70.    On March 25, 2011, Management Defendants caused the Company to file its Form 10-K for the year ended January 31, 2011 (the "2011 Form 10-K") with the SEC. The 2011 Form 10-K reported that for the year ended January 31, 2011, revenues totaled $11.1 billion, operating income totaled $958 million, and net income totaled $618 million. The 2011 Form 10-K included representations about the Company's disclosure and internal controls and defendants Havenstein's and Sopp's SOX required certification thereon.

71.    In addition, the 2011 Form 10-K represented, in part, that the financial statements contained therein, the Company' financial statements for the year ended January 31, 2011, were presented in conformity with GAAP, and stated:

> The preparation of these financial statements in accordance with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingencies at the date of the financial statements as well as the reported amounts of revenues and expenses during the reporting periods. Management evaluates these estimates and assumptions on an on-going basis. Our estimates and assumptions have been prepared on the basis of the most current reasonably available information.

72.    On April 27, 2011, Management Defendants caused the Company to file a Proxy Statement on Form DEF 14A with the SEC. The Audit Committee Report contained in this Proxy Statement set stated that the Audit Committee had "reviewed and discussed with management and Deloitte & Touche LLP, the Company's independent registered public accounting firm, the audited consolidated financial statements," and that "[b]ased on the reviews and discussions summarized in this Report and subject to the limitations on our role and responsibilities referred to above and contained in the Audit Committee charter, the Audit Committee recommended to the Board of Directors that the Company's audited consolidated financial statements referred to above be included in the Company's Annual Report on Form 10-K . . ."

73.    On June 3, 2011, Management Defendants caused the Company to file its Form 10-Q for the quarter ended April 30, 2011 (the "2012 Q1 Form 10-Q") with the SEC, which was signed by defendant Sopp. For the period ended April 30, 2011, the 2012 Q1 Form 10-Q reported revenues of $2.69 million, operating income of $230 million, and net income of $131 million. The 2011 Q1 Form 10-Q included SAIC's financial statements for the quarter ended April 30, 2011, which were represented to have been presented in conformity with GAAP, and stated:

> The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingencies at the date of the financial statements, as well as the reported amounts of revenues and expenses during the reporting periods. Estimates have been prepared by management on the basis of the most current and best available information and actual results could differ from those estimates.

74.    The statements referenced above were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to

Defendants or recklessly disregarded by them:

(a)     that SAIC had overbilled NYC by hundreds of millions of dollars on CityTime since at least 2003;

(b)     that, as a result of SAIC's known, but undisclosed, overbilling practices, its operating results during the Relevant Period were materially misstated;

(c)     that SAIC's overbilling practices subjected the Company to numerous undisclosed risks, including monetary risks and reputational risks, particularly because government agencies are SAIC's primary customers and any harm to its reputation and/or relationships with such agencies would adversely affect its future revenues and growth prospects;

(d)     that, as a result of the foregoing circumstances, SAIC violated applicable accounting standards associated with the recognition of revenue and the disclosure and accounting for loss contingencies;

(e)     that the Company's financial statements were not fairly presented in conformity with GAAP and were materially false and misleading;

(f)     that certifications issued by defendants Dahlberg and Sopp associated with the Company's internal and disclosure controls were materially false and misleading; and

(g)     that, based on the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company and its business and prospects.

## D.     The Truth Begins to Emerge

75.     The truth about the CityTime project began to emerge in December 2010, when the U.S. Attorney's Office for the Southern District of New York filed a criminal complaint against six individuals, including principal members of staffing firms that provided personnel to CityTime as

subcontractors to the Company.[3]

76.     On or about December 21, 2010, the defendants caused SAIC to place defendant Denault on "administrative leave."

77.     On February 10, 2011, a grand jury indicted four of the individuals and added another defendant.

78.     On May 25, 2011, Defendants caused SAIC to inform NYC Comptroller John C. Liu ("Liu") that the Company had terminated Denault for his violation of SAIC's policies and standards, specifically with regard to his time billed to NYC.  Liu additionally informed NYC Mayor Michael Bloomberg ("Bloomberg") and held a press conference later that day.

79.     Then, on May 27, 2011, a criminal complaint was filed against Denault, alleging that he personally received kickbacks of *$5.6 million* and conspired to defraud NYC into overpaying and extending the CityTime project.[4]  Defendant Denault was arrested that day.

80.     On June 20, 2011, the *New York Times* published an article stating, "nearly all of the $600 million that New York City has paid to the main contractor for its troubled automated payroll project has been tainted by fraud, prosecutors said Monday in announcing a new indictment that charged two technology executives and their company in what a United States attorney called a 'massive and elaborate scheme.'"

81.     Similarly, the following day, *The Wall Street Journal* quoted Bharara as saying that "fraud permeated 'virtually every level' of the development of New York City's long-delayed and over-budgeted automated payroll system."

_____

[3] *U.S. v. Mark Mazer, et al.*, No.: 1:11-cr-00121-GBD (S.D.N.Y. filed Dec. 14, 2010).

[4] *U.S. v. Denault,* No.: 1:11-mj-01423-UA-1 (S.D.N.Y. filed May 26, 2011).

82.     Further, as revealed in SAIC's Form 10-Q filed on December 8, 2011, Bloomberg sent a letter to the Company on June 29, 2011 requesting that the Company reimburse NYC for approximately *$600 million* paid by NYC to SAIC on the CityTime project.

83.     On August 31, 2011, Management Defendants caused SAIC to issue a press release announcing the Company's financial results for the 2012 second quarter, the period ended July 31, 2011.  For the quarter, the press release reported an approximate 6% decline in revenue and a 23% decline in operating margin.

84.     Following the Company's 2012 fiscal second quarter earnings announcement, Defendants held a conference call with analysts and investors wherein Defendants disclosed that the Company's revenues were, in part, adversely impacted by the "wind[ing] down" of the CityTime contract and that, while the Company could not quantify the amount, it believed that it was "probable" that SAIC would have to make restitution to NYC for wrongful conduct on CityTime.

85.     The revelation that SAIC would incur a probable loss on CityTime was significant because, pursuant to applicable accounting rules, it served as an acknowledgement that, once the Company could reasonably estimate the amount, SAIC would incur a charge against its earnings for Defendants' wrongful conduct alleged herein on CityTime.  This also meant that throughout the Relevant Period, Defendants had caused SAIC to file financial statements with the SEC that violated GAAP and applicable accounting standards associated with revenue recognition and accounting loss for contingencies.

86.     Following these revelations, SAIC stock fell nearly 14%, from $15.00 per share on August 31, 2011 to $12.97 per share on September 1, 2011.

87.     Matters only got worse for the Company when, on September 14, 2011, Defendants caused SAIC to disclose that it had been the subject of a massive data breach.  Specifically, personal

and medical records of military patients and their families were compromised when the records were stolen out of a data contractor's car in San Antonio, Texas. The records were supposedly in the car because they were being transferred from one federal facility to another.[5]

88.     On October 24, 2011, Defendants caused the Company to announce in a memo to all employees that it had fired three individuals for their supposed failures of proper management during the CityTime kickback scheme: Deborah Alderson, Defense Solutions Group president; John Lord, deputy group president; and Peter Dube, general manager of the Enterprise and Mission Solutions business unit.

89.     Then, on December 8, 2011, Management Defendants caused SAIC to file a Form 10-Q with the SEC. The Form 10-Q revealed that they expected that the Company's loss relating to CityTime would be at least *$232 million*.

90.     As such, Management Defendants caused the Company to record a loss provision in that amount, consisting of a $52 million reduction in revenue and a $180 million charge to selling, general and administrative expenses.

91.     The Form 10-Q also revealed that "[a]n additional loss is reasonably possible, but an estimate of the maximum amount of such loss currently cannot be estimated given that no legal proceedings have been filed against the Company and the investigations are ongoing and involve complex matters with third parties outside the Control of the Company."

92.     On March 14, 2012, it was announced that the Company had agreed to pay NYC

---

[5] Defendants caused the Company to portray this as a freak incident, and maintained that there was no indication that the car thief was after the tapes or even knew what they were. On December 2, 2011, several members of the U.S. Congress sent a letter to SAIC expressing their "deep concern" about the breach. Most notably, the letter highlighted four (of "at least six") other data breaches involving SAIC records between 2005 and 2010. These breaches included one stemming from an SAIC office break-in, and one in which the Company stored unencrypted data on a non-secure server.

***$500.4 million*** to resolve the CityTime probe, consisting of $370.4 million in restitution and a $130 million penalty.  Bharara stated that the resolution was "***the largest in history*** for any city or state fraud."

93.     The true facts, which were known by Defendants, but not disclosed during the Relevant Period were: (a) that Defendants caused SAIC to overbill NYC by hundreds of millions of dollars on the CityTime Project; (b) that, as a result of these overbilling practices, Defendants caused the Company's operating results during the Relevant Period to be materially misstated; (c) that the overbilling practices subjected the Company to numerous undisclosed risks, including monetary risks and reputational risks, particularly because government agencies are SAIC's primary customers and any harm to the Company's reputation and/or relationships with such agencies would adversely affect its future revenues and growth prospects; (d) that Defendants caused SAIC to violate applicable accounting standards associated with the recognition of revenue and the disclosure and accounting for loss contingencies; and (e) that Defendants caused the Company's financial statements to not be fairly presented in conformity with GAAP and to be materially false and misleading.

94.     As a result of Defendants' breaches, the price of the Company's stock still has not recovered, and currently trades for approximately $13 per share.

95.     Accordingly, as a result of Defendants' breaches, the Company has been damaged.

## SAIC'S EXECUTIVES, INCLUDING CERTAIN INDIVIDUAL DEFENDANTS, WERE OVER-COMPENSATED AND UNJUSTLY ENRICHED DURING THE RELEVANT PERIOD

96.     Before the Individual Defendants' illicit activities at SAIC came to light, the Board's Human Resources and Compensation Committee (the "Compensation Committee") approved awards of valuable financial benefits, including salaries, bonuses, and other compensation, to the

Company's senior officers, including certain Individual Defendants, during the time in which the Individual Defendants caused the Company to report false financial results and performance.

97.     Indeed, per the Company's Relevant Period Proxy Statements, the Compensation Committee "considers the performance of the Company, including any corporate or operational units under an executive officer's management. In particular, Company performance determines the amount of any cash incentive awards to be paid at the end of the fiscal year, as such amounts are principally determined based upon the Company's achievement of financial and operational objectives set at the beginning of the fiscal year."

98.     According to the Company's Proxy Statement filed on April 27, 2011, defendant Havenstein (in 2010 and 2011) and defendant Sopp (in 2009, 2010 and 2011) were overcompensated as follows:

| Name and principal position | Year [1] | Salary ($) [2] | Bonus ($) | Stock awards ($) [3] | Option awards ($) [3] | Non-equity incentive plan compensation ($) [4] | All other compensation ($) [5] | Total ($) |
|---|---|---|---|---|---|---|---|---|
| Walter P. Havenstein [6] Chief Executive Officer | 2011 | 1,000,000 | — | 1,693,607 | 1,381,683 | 1,077,750 | — | 5,153,040 |
| | 2010 | 346,154 | — | 4,981,789 | 1,475,867 | 1,250,000 | — | 8,053,810 |
| Mark W. Sopp Executive Vice President and Chief Financial Officer | 2011 | 566,923 | — | 609,700 | 497,405 | 520,000 | 14,792 | 2,208,820 |
| | 2010 | 547,115 | — | 600,000 | 533,315 | 560,000 | 13,605 | 2,254,035 |
| | 2009 | 521,154 | — | 480,012 | 675,900 | 550,000 | 13,863 | 2,240,929 |

99.     According to the Company's Proxy Statement filed on April 18, 2008, defendants Dahlberg and Sopp were overcompensated in 2008 and 2007 as follows:

| Name and principal position | Year [1] | Salary [2] | Bonus [3] | Stock awards [4] | Option awards [4] | Non-equity incentive plan compensation | All other compensation [5] | Total |
|---|---|---|---|---|---|---|---|---|
| Kenneth C. Dahlberg Chairman and Chief Executive Officer | 2008 | 1,000,000 | — | 1,123,104 | 3,267,045 | 1,050,000 | 13,319 | 6,453,468 |
| | 2007 | 1,000,000 | — | 859,381 | 2,263,425 | 1,325,000 | 1,544,160[6] | 6,991,966 |
| Mark W. Sopp Executive Vice President and Chief Financial Officer | 2008 | 508,654 | — | 109,386 | 388,110 | 400,000 | 13,377 | 1,419,527 |
| | 2007 | 474,038 | 60,000 | 25,003 | 224,849 | 440,000 | 41,233[6] | 1,265,123 |

100.    According to the Company's Proxy Statement filed on May 31, 2006, defendant Dahlberg was overcompensated in 2004, 2005 and 2006 as follows:

| Name and Principal Position(s) | Year | Salary(1) | Bonus(2) | Other Annual Compensation(3) | Restricted Stock Awards(4) | Number of Securities Underlying Options | All Other Compensation(5) |
|---|---|---|---|---|---|---|---|
| K.C. Dahlberg Chairman, Chief Executive Officer and President | 2006 | $1,000,000 | $1,100,000 | $10,250 | $400,023 | 200,000 | $15,482 |
| | 2005 | 1,000,000 | 1,500,000 | 77,897(6) | 299,989 | 260,000 | — |
| | 2004 | 250,000(7) | 1,010,000(8) | 229,459(9) | 2,687,686 | 225,000 | — |

101.    Notably, from 2010 to 2011, defendant Havenstein received total compensation of $13,206,850.  From 2007 to 2011, defendant Sopp received total compensation of $9,388,434.  From 2004 until 2008, defendant Dahlberg received total compensation of $23,126,220.

102.    The compensation awarded to defendants Havenstein, Dahlberg and Sopp was improper when issued in light of the Company's complete lack of internal controls and false financial results reported throughout the Relevant Period.

### DERIVATIVE AND DEMAND ALLEGATIONS

103.    Plaintiff brings this action derivatively in the right and for the benefit of SAIC to redress the breaches of fiduciary duty and other violations of law by Defendants.

104.    Plaintiff will adequately and fairly represent the interests of SAIC and its shareholders in enforcing and prosecuting its rights.

105.    The Board currently consists of the following twelve (12) directors: defendants Young, Córdova, Drummond, Frist, Hamre, John, Jones, Jumper, Kraemer, Nussdorf, Sanderson and Simpson.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful and useless act, for the following reasons:

(a)    The Board's challenged misconduct at the heart of this case constitutes unlawful criminal activity or the facilitation of criminal activity, including the payment of illegal kickbacks.  In essence, as the "ultimate decision-making body" of the Company, the Board affirmatively adopted, implemented, and condoned a business strategy based on deliberate, widespread, and often criminal violations of law.  Breaking the law is not, however, a legally protected business decision and such conduct can in no way be considered a valid exercise of business judgment.  Accordingly, demand on the Board is excused;

(b)     During the Relevant Period, defendants Frist, Jones, Jumper, Kraemer and Nussdorf served as members of the Audit Committee.  Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee were and are responsible for, *inter alia*, reviewing the Company's annual and quarterly financial reports and reviewing the integrity of the Company's internal controls.  Defendants Frist, Jones, Jumper, Kraemer and Nussdorf breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted the Company to disseminate false and misleading statements in the Company's SEC filings and other disclosures and caused the above-discussed internal control failures. Therefore, defendants Frist, Jones, Jumper, Kraemer and Nussdorf each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile;

(c)     During the Relevant Period, defendants Córdova, Drummond and Jones were members of the Ethics Committee.  Pursuant to the Company's Ethics Committee Charter, the members of the Ethics Committee were charged with reviewing and recommending to management objectives, policies and procedures that best serve the Company's interest in maintaining a business environment committed to high standards of ethics and integrity, corporate responsibility and legal compliance. Defendants Córdova, Drummond, Havenstein and Jones breached their fiduciary duties of due care, loyalty, and good faith, because the Ethics Committee, *inter alia*, caused the Company to engage in illicit and illegal activities, including paying kickbacks and overbilling the City of New York.   Therefore, defendants Córdova, Drummond and Jones each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile; and

(d)     The principal professional occupation of defendant Jumper is his employment with SAIC as its President and CEO, pursuant to which he receives substantial monetary compensation and other benefits.  Thus, defendant Jumper lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.

## FIRST CAUSE OF ACTION
**(Against Defendants for Breach of Fiduciary Duty in Connection with the Issuance of False and Misleading Statements)**

106.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

107.    As alleged in detail herein, each of the Defendants (and particularly the Audit Committee Defendants) had a duty to ensure that SAIC disseminated accurate, truthful and complete

information to its shareholders.

108.    Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to SAIC shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings, press releases, conference calls, and other public statements and disclosures as detailed herein.  These actions could not have been a good faith exercise of prudent business judgment.

109.    As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## SECOND CAUSE OF ACTION
### (Against All Defendants for Breach of Fiduciary Duties for Failing to Maintain Internal Controls)

110.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

111.    As alleged herein, each of the Defendants (and particularly the Audit Committee Defendants) had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

112.    Defendants willfully ignored the obvious and pervasive problems with SAIC's internal controls and practices and procedures and failed to make a good faith effort to correct these problems or prevent their recurrence.

113.    As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

### THIRD CAUSE OF ACTION
**(Against All Defendants for Breach of Fiduciary Duties for Failing to Properly Oversee and Manage the Company)**

114.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

115.    Defendants owed and owe SAIC fiduciary obligations.  By reason of their fiduciary relationships, Defendants specifically owed and owe SAIC the highest obligation of good faith, fair dealing, loyalty and due care.

116.    Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

117.    As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, SAIC has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

118.    As a result of the misconduct alleged herein, Defendants are liable to the Company.

119.    Plaintiff, on behalf of SAIC, has no adequate remedy at law.

### FOURTH CAUSE OF ACTION
**(Against All Defendants for Unjust Enrichment)**

120.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

121.    By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of SAIC.

122.    Plaintiff, as a shareholder and representative of SAIC, seeks restitution from Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants, and each of them, as a result of their wrongful conduct and fiduciary breaches.

## FIFTH CAUSE OF ACTION
### (Against All Defendants for Abuse of Control)

123.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

124.    Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence SAIC, for which they are legally responsible.  In particular, Defendants abused their positions of authority by causing or allowing SAIC to misrepresent material facts regarding its financial position and business prospects.

125.    As a direct and proximate result of Defendants' abuse of control, SAIC has sustained significant damages.

126.    As a result of the misconduct alleged herein, Defendants are liable to the Company.

127.    Plaintiff, on behalf of SAIC, has no adequate remedy at law.

## SIXTH CAUSE OF ACTION
### (Against All Defendants for Gross Mismanagement)

128.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

129.    Defendants had a duty to SAIC and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of SAIC.

130.    Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of SAIC in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of SAIC's affairs and in the use and preservation

of SAIC's assets.

131.    During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused SAIC to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to SAIC, thus breaching their duties to the Company. As a result, Defendants grossly mismanaged SAIC.

## SEVENTH CAUSE OF ACTION
### (Against All Defendants for Violations of Section 14(a) of the Exchange Act)

132.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

133.    For purposes of this count, Plaintiff expressly disclaims any allegations of fraud. This count, therefore, does not sound in fraud and is based upon the negligent conduct by the Defendants named herein.

134.    Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

135.    In the Proxy Statements filed on Form DEF 14A on April 29, 2009, April 29, 2010, and April 27, 2011 (collectively, the "Proxies"), the Board issued the materially false and misleading statements in the Audit Committee Report that the Audit Committee had "reviewed and discussed with management and Deloitte & Touche LLP, the Company's independent registered public accounting firm, the audited consolidated financial statements," and that "[b]ased on the reviews and discussions summarized in this Report and subject to the limitations on our role and responsibilities

referred to above and contained in the Audit Committee charter, the Audit Committee recommended to the Board of Directors that the Company's audited consolidated financial statements referred to above be included in the Company's Annual Report on Form 10-K . . ."

136.    Defendants' statements in the Proxies were false and misleading because the Audit Committee "blessed" the Company's financial statements and internal controls even though a substantial portion of the Company's revenues were based on improper and illicit activities, which were unknown to shareholders.

137.    In the exercise of reasonable care, Defendants should have known that the statements contained in the Proxies were materially false and misleading.

138.    The misrepresentations and omissions in the Proxies were material to Plaintiff in voting the Proxies.  The Proxies were an essential link in the accomplishment of the continuation of Defendants' illicit scheme and misstated earnings.

139.    The Company was damaged as a result of Defendants' material misrepresentations in the Proxies.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.    Directing SAIC to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before

shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

    C.      Awarding to SAIC restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

    D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

    E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

    Plaintiff demands a trial by jury.

Dated:  March 30, 2012

**GLANCY BINKOW & GOLDBERG LLP**

By: _____

ELIZABETH M. GONSIOROWSKI
30 Broad St., Suite 1401
New York, NY 10004
Telephone: (212) 382-2221
Facsimile: (212) 382-3944
Email: egonsiorowski@glancylaw.com

-and-

LIONEL Z. GLANCY
EX KANO SAMS
ROBERT V. PRONGAY
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

**THE WEISER LAW FIRM, P.C.**
ROBERT B. WEISER
BRETT D. STECKER
JEFFREY J. CIARLANTO
DAVID M. PROMISLOFF
22 Cassatt Avenue
Berwyn, PA 19312
Telephone:  (610) 225-2677
Facsimile:  (610) 408-8062

Counsel for Plaintiff

### SAIC, INC. VERIFICATION

I, Monte Welch, hereby verify that I am familiar with the allegations in the Complaint, and that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: _3/26/2012_

_Monte H Welch_
Monte Welch

AO 440 (Rev. 12/09)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

**12 CIV 2437**

MONTE WELCH, Derivatively on Behalf of SAIC, INC., )
*Plaintiff*  )
)
v.  )      Civil Action No.   **JUDGE OETKEN**
)
WALTER P. HAVENSTEIN [See Attachment for Additional Defendants]  )
*Defendant*  )

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  **Please see Attachment**

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:    Elizabeth M. Gonsiorowski (Bar # 4655374) , Glancy Binkow & Goldberg LLP,
30 Broad Street, Suite 1401, New York, New York 10004,
Telephone:  (212) 382-2221

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

RUBY J. KRAJICK

CLERK OF COURT

Date:  APR 0 2 2012     _____
                         *Signature of Clerk or Deputy Clerk*

## ATTACHMENT TO SUMMONS

### ADDITIONAL DEFENDANTS

A. THOMAS YOUNG, FRANCE A.  CÓRDOVA, JERE A. DRUMMOND, THOMAS F. FRIST, JOHN J. HAMRE, MIRIAM E. JOHN, ANITA K. JONES, JOHN P. JUMPER, HARRY M.J. KRAEMER, JR., LAWRENCE C. NUSSDORF, EDWARD J. SANDERSON, JR., LOUIS A SIMPSON, MARK W. SOPP, KENNETH C. DAHLBERG, CARL BELL, and GERARD DENAULT, and SAIC, INC. as Nominal Party.

### DEFENDANT'S NAME AND ADDRESS

WALTER P. HAVENSTEIN, A. THOMAS YOUNG, FRANCE A.  CÓRDOVA, JERE A. DRUMMOND, THOMAS F. FRIST, JOHN J. HAMRE, MIRIAM E. JOHN, ANITA K. JONES, JOHN P. JUMPER, HARRY M.J. KRAEMER, JR., LAWRENCE C. NUSSDORF, EDWARD J. SANDERSON, JR., LOUIS A SIMPSON, MARK W. SOPP, KENNETH C. DAHLBERG, CARL BELL, and GERARD DENAULT, and SAIC, INC. as Nominal Party.

1710 SAIC DRIVE
McLEAN, VA 22102
TELEPHONE:  (703) 676-4300

AO 440 (Rev. 12/09)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____
was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify)*:


My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.


Date: _____

                                        _____
                                                    *Server's signature*

                                        _____
                                                  *Printed name and title*

                                        _____
                                                    *Server's address*

Additional information regarding attempted service, etc:

JUDGE OETKEN

12 CIV 2437   APR 0 2 201

JS 44C/SDNY
REV. 5/2010

**CIVIL COVER SHEET**

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

| PLAINTIFFS | DEFENDANTS |
|---|---|
| Monte Welch, Derivatively on Behalf of SAIC Inc. | Walter P. Havenstein [See Attachment for Additional Defendants] |

| ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Elizabeth M. Gonsiorowski (Bar # 4655874) Glancy Binkow & Goldberg LLP, 30 Broad Street, Suite 1401, New York, NY 10004, Telephone: (212) 382-2221 | |

CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)
(DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Please See Attachment

Has this or a similar case been previously filed in SDNY at any time? No? ☑ Yes? ☐   Judge Previously Assigned

If yes, was this case Vol.☐ Invol. ☐ Dismissed. No ☐ Yes ☐ If yes, give date _____ & Case No. _____

*(PLACE AN [x] IN ONE BOX ONLY)*   NATURE OF SUIT

ACTIONS UNDER STATUTES

**TORTS**

**CONTRACT**
[ ] 110 INSURANCE
[ ] 120 MARINE
[ ] 130 MILLER ACT
[ ] 140 NEGOTIABLE INSTRUMENT
[ ] 150 RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT
[ ] 151 MEDICARE ACT
[ ] 152 RECOVERY OF DEFAULTED STUDENT LOANS (EXCL VETERANS)
[ ] 153 RECOVERY OF OVERPAYMENT OF VETERAN'S BENEFITS
[X] 160 STOCKHOLDERS SUITS
[ ] 190 OTHER CONTRACT
[ ] 195 CONTRACT PRODUCT LIABILITY
[ ] 196 FRANCHISE

**PERSONAL INJURY**
[ ] 310 AIRPLANE
[ ] 315 AIRPLANE PRODUCT LIABILITY
[ ] 320 ASSAULT, LIBEL & SLANDER
[ ] 330 FEDERAL EMPLOYERS' LIABILITY
[ ] 340 MARINE
[ ] 345 MARINE PRODUCT LIABILITY
[ ] 350 MOTOR VEHICLE
[ ] 355 MOTOR VEHICLE PRODUCT LIABILITY
[ ] 360 OTHER PERSONAL INJURY

**PERSONAL INJURY**
[ ] 362 PERSONAL INJURY - MED MALPRACTICE
[ ] 365 PERSONAL INJURY PRODUCT LIABILITY
[ ] 368 ASBESTOS PERSONAL INJURY PRODUCT LIABILITY

**PERSONAL PROPERTY**
[ ] 370 OTHER FRAUD
[ ] 371 TRUTH IN LENDING
[ ] 380 OTHER PERSONAL PROPERTY DAMAGE
[ ] 385 PROPERTY DAMAGE PRODUCT LIABILITY

**FORFEITURE/PENALTY**
[ ] 610 AGRICULTURE
[ ] 620 OTHER FOOD & DRUG
[ ] 625 DRUG RELATED SEIZURE OF PROPERTY 21 USC 881
[ ] 630 LIQUOR LAWS
[ ] 640 RR & TRUCK
[ ] 650 AIRLINE REGS
[ ] 660 OCCUPATIONAL SAFETY/HEALTH
[ ] 690 OTHER

**LABOR**
[ ] 710 FAIR LABOR STANDARDS ACT
[ ] 720 LABOR/MGMT RELATIONS
[ ] 730 LABOR/MGMT REPORTING & DISCLOSURE ACT
[ ] 740 RAILWAY LABOR ACT
[ ] 790 OTHER LABOR LITIGATION
[ ] 791 EMPL RET INC SECURITY ACT

**BANKRUPTCY**
[ ] 422 APPEAL 28 USC 158
[ ] 423 WITHDRAWAL 28 USC 157

**PROPERTY RIGHTS**
[ ] 820 COPYRIGHTS
[ ] 830 PATENT
[ ] 840 TRADEMARK

**SOCIAL SECURITY**
[ ] 861 HIA (1395ff)
[ ] 862 BLACK LUNG (923)
[ ] 863 DIWC/DIWW (405(g))
[ ] 864 SSID TITLE XVI
[ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
[ ] 870 TAXES (U.S. Plaintiff or Defendant)
[ ] 871 IRS-THIRD PARTY 26 USC 7609

**OTHER STATUTES**
[ ] 400 STATE REAPPORTIONMENT
[ ] 410 ANTITRUST
[ ] 430 BANKS & BANKING
[ ] 450 COMMERCE
[ ] 460 DEPORTATION
[ ] 470 RACKETEER INFLU-ENCED & CORRUPT ORGANIZATION ACT (RICO)
[ ] 480 CONSUMER CREDIT
[ ] 490 CABLE/SATELLITE TV
[ ] 810 SELECTIVE SERVICE
[ ] 850 SECURITIES/ COMMODITIES EXCHANGE
[ ] 875 CUSTOMER CHALLENGE 12 USC 3410
[ ] 890 OTHER STATUTORY ACTIONS
[ ] 891 AGRICULTURAL ACTS
[ ] 892 ECONOMIC STABILIZATION ACT
[ ] 893 ENVIRONMENTAL MATTERS
[ ] 894 ENERGY ALLOCATION ACT
[ ] 895 FREEDOM OF INFORMATION ACT
[ ] 900 APPEAL OF FEE DETERMINATION UNDER EQUAL ACCESS TO JUSTICE
[ ] 950 CONSTITUTIONALITY OF STATE STATUTES

**ACTIONS UNDER STATUTES**

**CIVIL RIGHTS**
[ ] 441 VOTING
[ ] 442 EMPLOYMENT
[ ] 443 HOUSING/ ACCOMMODATIONS
[ ] 444 WELFARE
[ ] 445 AMERICANS WITH DISABILITIES - EMPLOYMENT
[ ] 446 AMERICANS WITH DISABILITIES -OTHER
[ ] 440 OTHER CIVIL RIGHTS

**PRISONER PETITIONS**
[ ] 510 MOTIONS TO VACATE SENTENCE 20 USC 2255
[ ] 530 HABEAS CORPUS
[ ] 535 DEATH PENALTY
[ ] 540 MANDAMUS & OTHER
[ ] 550 CIVIL RIGHTS
[ ] 555 PRISON CONDITION

**IMMIGRATION**
[ ] 462 NATURALIZATION APPLICATION
[ ] 463 HABEAS CORPUS-ALIEN DETAINEE
[ ] 465 OTHER IMMIGRATION ACTIONS

**REAL PROPERTY**
[ ] 210 LAND CONDEMNATION
[ ] 220 FORECLOSURE
[ ] 230 RENT LEASE & EJECTMENT
[ ] 240 TORTS TO LAND
[ ] 245 TORT PRODUCT LIABILITY
[ ] 290 ALL OTHER REAL PROPERTY

*Check if demanded in complaint:*

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $_____ OTHER _____

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y.? IF SO, STATE:

JUDGE _____ DOCKET NUMBER _____

*Check YES only if demanded in complaint*
JURY DEMAND: ☑ YES ☐ NO

NOTE: Please submit at the time of filing an explanation of why cases are deemed related.

(PLACE AN x IN ONE BOX ONLY)                    **ORIGIN**

[✓] 1 Original   [ ] 2a. Removed from   [ ] 3 Remanded from   [ ] 4 Reinstated or   [ ] 5 Transferred from   [ ] 6 Multidistrict   [ ] 7 Appeal to District
    Proceeding         State Court              Appellate Court      Reopened            (Specify District)      Litigation           Judge from
                   [ ] 2b. Removed from                                                                                              Magistrate Judge
                          State Court AND                                                                                            Judgment
                          at least one
                          party is pro se.

(PLACE AN x IN ONE BOX ONLY)                    **BASIS OF JURISDICTION**                    *IF DIVERSITY, INDICATE*
                                                                                             *CITIZENSHIP BELOW.*
[ ] 1 U.S. PLAINTIFF   [ ] 2 U.S. DEFENDANT   [✓] 3 FEDERAL QUESTION   [ ] 4 DIVERSITY      *(28 USC 1322, 1441)*
                                                  (U.S. NOT A PARTY)

CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)

(Place an [X] in one box for Plaintiff and one box for Defendant)

|  | PTF | DEF |  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ] 1 | [ ] 1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ] 3 | [ ] 3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ] 5 | [ ] 5 |
| CITIZEN OF ANOTHER STATE | [ ] 2 | [ ] 2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ] 4 | [ ] 4 | FOREIGN NATION | [ ] 6 | [ ] 6 |

PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)

Plaintiff Monte Welch - Wake County, North Carolina

DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)

Walter P. Havenstein, A. Thomas Young, France A. Córdova, Jere A. Drummond, Thomas F. Frist, John J. Hamre, Miriam E
John, Anita K. Jones, John P. Jumper, Harry M.J. Kraemer, Jr., Lawrence C. Nussdorf, Edward J. Sanderson, Jr., Louis A
Simpson, Mark W. Sopp, Kenneth C. Dahlberg, Carl Bell, And Gerard Denault, and Saic, Inc. as Nominal Party.
1710 SAIC DRIVE
McLEAN, VA 22102
TELEPHONE:  (703) 676-4300

DEFENDANT(S) ADDRESS UNKNOWN
    REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN THE
RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

Check one:   THIS ACTION SHOULD BE ASSIGNED TO:   [ ] **WHITE PLAINS**   [✓] **MANHATTAN**
             (DO NOT check either box if this a PRISONER PETITION.)

DATE 3/30/2012   SIGNATURE OF ATTORNEY OF RECORD          ADMITTED TO PRACTICE IN THIS DISTRICT
                                                          [ ] NO
                                                          [x] YES (DATE ADMITTED  Mo. 07  Yr. 2009 )
RECEIPT #                                                 Attorney Bar Code # 4655874

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____ is so Designated.

Ruby J. Krajick, Clerk of Court by _____ Deputy Clerk, DATED _____.

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)

## ATTACHMENT TO CIVIL COVER SHEET

## ADDITIONAL DEFENDANTS

A. THOMAS YOUNG, FRANCE A. CÓRDOVA, JERE A. DRUMMOND, THOMAS F. FRIST, JOHN J. HAMRE, MIRIAM E. JOHN, ANITA K. JONES, JOHN P. JUMPER, HARRY M.J. KRAEMER, JR., LAWRENCE C. NUSSDORF, EDWARD J. SANDERSON, JR., LOUIS A SIMPSON, MARK W. SOPP, KENNETH C. DAHLBERG, CARL BELL, and GERARD DENAULT, and SAIC, INC. as Nominal Party.

## CAUSES OF ACTION

First Cause of Action - Against Defendants for Breach of Fiduciary Duty in Connection with the Issuance of False and Misleading Statements

Second Cause of Action - Against All Defendants for Breach of Fiduciary Duties for Failing to Maintain Internal Controls

Third Cause of Action - Against All Defendants for Breach of Fiduciary Duties for Failing to Properly Oversee and Manage the Company

Fourth Cause of Action - Against All Defendants for Unjust Enrichment

Fifth Cause of Action - Against All Defendant for Abuse of Control

Sixth Cause of Action - Against All Defendants for Gross Mismanagement

Seventh Cause of Action - Against All Defendants for Violations of Section 14(a) of the Exchange Act