Mark Filip, *admitted pro hac vice*
Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois  60654
Telephone: (312) 862-2000
Facsimile:  (312) 862-2200
Mark.Filip@kirkland.com

W. Neil Eggleston, Bar No. WE7674
Beth A. Williams, Bar No. BA1221
Kirkland & Ellis LLP
655 15th Street, NW, Suite 1200
Washington, DC  20005
Telephone:    (202) 879-5000
Facsimile:    (202) 879-5200
Neil.Eggleston@kirkland.com
Beth.Williams@kirkland.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE SAIC INC. DERIVATIVE LITIGATION<br><br>This Document Relates to:<br><br>    ALL ACTIONS | Master File No. 1:12-CV-02437-JPO |

**DIRECTOR DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION TO DISMISS THE VERIFIED CONSOLIDATED
SHAREHOLDER DERIVATIVE COMPLAINT**

**TABLE OF CONTENTS**

**Page(s)**

PRELIMINARY STATEMENT ........................................................................1

STATEMENT OF FACTS ..............................................................................4

STANDARD OF REVIEW .............................................................................6

ARGUMENT ...............................................................................................7

I.      PLAINTIFFS' CLAIMS FOR BREACH OF FIDUCIARY DUTY SHOULD BE
        DISMISSED FOR FAILURE TO STATE A CLAIM AS A MATTER OF LAW. ...........7

        A.      SAIC's Exculpatory Clause Bars Any Duty of Care Claims....................7

        B.      Plaintiffs Fail to State a Claim for Breach of Fiduciary Duty in Connection
                with the Issuance of an Allegedly False or Misleading Statement. .........8

        C.      Plaintiffs' Own Theory Would Bar Much of Their Fiduciary Duty Claims..........19

        D.      Plaintiffs Fail to State a Claim for Breach of Fiduciary Duty for Failing to
                Maintain Internal Controls. ..................................................20

II.     PLAINTIFFS FAIL TO STATE A CLAIM FOR THEIR DUPLICATIVE
        STATE-LAW CLAIMS..........................................................................26

        A.      Plaintiffs Fail to State a Claim for Unjust Enrichment. ........................26

        B.      Plaintiffs Cannot and Do Not State a Claim for Abuse of Control or Gross
                Mismanagement...................................................................28

III.    PLAINTIFFS' SECURITIES EXCHANGE ACT SECTION 14(A) CLAIM
        FAILS. ..........................................................................................29

        A.      Rule 9(b) and the PSLRA's Heightened Pleading Requirements Apply to
                Plaintiffs' Section 14(a) Claim. ...............................................29

        B.      Plaintiffs Fail to Allege Any Material Misstatements. ..........................31

        C.      Plaintiffs Fail To Show that the Purported Misrepresentations Were an
                "Essential Link" to a Transaction Requiring Shareholder Approval....................33

        D.      Plaintiffs Fail to Allege Loss Causation. .......................................34

        E.      Plaintiffs' Section 14(a) Claims Are Time Barred. ..............................35

CONCLUSION...........................................................................................35

i

## **TABLE OF AUTHORITIES**

**Page(s)**

## **CASES**

*Arnold v. Soc'y for Sav. Bancorp, Inc.*,
650 A.2d 1270 (Del. 1994) ................................................................................ 9, 10

*Ash v. McCall*,
No. Civ. A. 17132, 2000 WL 1370341 (Del. Ch. Sept. 15, 2000) .......................... 21

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......................................................................................... 6, 32

*ATSI Commc'ns Inc. v. The Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007) ......................................................................... 6, 11, 37

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .............................................................................................. 6

*Berkman v. Rust Craft Greeting Cards, Inc.*,
454 F.Supp. 787 (S.D.N.Y. 1978) ......................................................................... 35

*Bond Opportunity Fund v. UniIab Corp.*,
No. 99 Civ. 11074(JSM), 2003 WL 21058251 (S.D.N.Y. May 9, 2003) ................ 42

*Brayton v. Ostrau*,
561 F. Supp. 156 (S.D.N.Y. 1983) ........................................................................ 41

*Carroll v. LeBoeuf, Lamb, Greene & MacRae, LLP*,
623 F. Supp. 504 (S.D.N.Y. 2009) .......................................................................... 7

*Desimone v. Barrows*,
924 A.2d 908 (Del. Ch. 2007) .................................................................. 12, 26, 28

*Diversified Grp., Inc. v. Daugerdas*,
139 F. Supp. 2d 445 (S.D.N.Y. 2001) ................................................................... 31

*DiVittorio v. Equidyne Extractive Indus., Inc.*,
822 F.2d 1242 (2d Cir. 1987) ............................................................................... 11

*Dodds v. Cigna Sec., Inc.*,
12 F.3d 346 (2d Cir. 1993) ................................................................................... 42

*ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009) ................................................................................. 15

*Emerald Partners v. Berlin*,
787 A.2d 85 (Del. 2001) ........................................................................ 8

*Fink v. Weill*,
No. 02 Civ. 10250, 2005 WL 2298224  (S.D.N.Y. Sept. 19, 2005) ........................................ 39

*Freuler v. Parker*,
Civ. A. No. H-10-3148, 2012 WL 896414 (S.D. Tex. Mar. 12, 2012) .................................... 33

*Frota v. Prudential-Bache Sec., Inc.*,
639 F. Supp. 1186 (S.D.N.Y. 1986) ........................................................ 11

*Grace v. Rosenstock*,
228 F.3d 40 (2d Cir. 2000) ................................................................ 41

*Graulich v. Dell, Inc.*,
Civ. A. No. 5846-CC, 2011 WL 1843813 (Del. Ch. May 16, 2011) ...................................... 23

*Guttman v. Huang*,
823 A.2d 492 (Del. Ch. 2003) ........................................................ 24, 25, 26

*Halpert Enters., Inc. v. Harrison*,
No. 02CIV9501SHS, 2005 WL 1773686 (S.D.N.Y. July 26, 2005) ...................................... 39

*In re ALH Holdings, LLC*,
675 F. Supp. 2d 462 (D. Del. 2009) ........................................................ 33

*In re Am. Express Co. S'holder Litig.*,
840 F. Supp. 260 (S.D.N.Y. 1993) ........................................................ 40

*In re Bank of Am. Corp. Sec., Derivative, and ERISA Litig.*,
757 F. Supp. 2d 260 (S.D.N.Y. 2010) ........................................................ 7, 32

*In re BH S & B Holdings LLC*,
420 B.R. 112 (Bankr. S.D.N.Y. 2009), *aff'd as modified*,
09 Civ. 10605 LAK, 2011 WL 3896249 (S.D.N.Y. Sept. 6, 2011) ...................................... 8, 9

*In re Caremark Int'l, Inc. Derivative Litig.*,
698 A.2d 959 (Del. Ch. 1996) ........................................................ 24, 25, 28

*In re Citigroup ERISA Litig.*,
662 F.3d 128 (2d Cir. 2011) ................................................................ 4

*In re Citigroup Inc. S'holder Derivative Litig.*,
964 A.2d 106 (Del. Ch. 2009) ........................................................ 10, 33

*In re Citigroup Inc. S'holders Litig.*,
No. 19827, 2003 WL 21384599 (Del. Ch. June 5, 2003) ................................................ 20, 22, 34

*In re Intel Corp. Derivative Litig.*,
    621 F. Supp. 2d 165 (D. Del. 2009) ..................................................................... 23

*In re ITT Corp. Derivative Litig.*,
    588 F. Supp. 2d 502 (S.D.N.Y. 2008) ............................................................ passim

*In re ITT Corp. Derivative Litig.*,
    653 F. Supp. 2d 453 (S.D.N.Y. 2009) .................................................................. 30

*In re JP Morgan Chase Sec. Litig.*,
    363 F. Supp. 2d 595 (S.D.N.Y. 2005) .............................................................. 35, 36

*In re Marsh & McLennan Cos. Sec. Litig.*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006) .............................................................. 18, 20

*In re Marsh & McLennan Cos. Sec. Litig.*,
    536 F. Supp. 2d 313 (S.D.N.Y. 2007) .............................................................. 35, 39

*In re Pfizer Inc. S'holder Derivative Litig.*,
    722 F. Supp. 2d 453 (S.D.N.Y. 2010) .................................................................. 32

*In re Recoton Corp. Sec. Litig.*,
    358 F. Supp. 2d 1130 (M.D. Fla. 2005) ................................................................ 20

*In re Stillwater Capital Partners Inc. Litig.*,
    853 F. Supp. 2d 441 (S.D.N.Y. 2012) ................................................................... 7

*In re Trinsum Grp., Inc.*,
    466 B.R. 596 (Bankr. S.D.N.Y. 2012) ............................................................... 9, 25

*Iotex Commc'ns, Inc. v. Defries*,
    No. 15817, 1998 WL 914265 (Del. Ch. Dec. 21, 1998) ....................................... 21

*Kamen v. Kemper Fin. Servs., Inc.*,
    500 U.S. 90 (1991) .................................................................................................. 8

*King v. Baldino*,
    648 F. Supp. 2d 609 (D. Del. 2009) ...................................................................... 27

*Koppel v. 4987 Corp.*,
    167 F.3d 125 (2d Cir. 1999) .................................................................................. 38

*Lentell v. Merrill, Lynch & Co., Inc.*,
    396 F.3d 161 (2d Cir. 2005) .................................................................................. 41

*Maldonado v. Flynn*,
    597 F.2d 789 (2d Cir. 1979) .................................................................................. 38

*Malone v. Brincat,*
    722 A.2d 5 (Del. 1998)................................................................................. 9, 10

*Malpiede v. Townson,*
    780 A.2d 1075 (Del. 2001).............................................................. 8, 9, 24, 26

*Marino v. Grupo Mundial Tenedora, S.A.,*
    810 F. Supp. 2d 601 (S.D.N.Y. 2011) ....................................................... 6, 11

*Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.,*
    854 A.2d 121 (Del. Ch. 2004) ...................................................................... 10

*Nappier v. PricewaterhouseCoopers LLP,*
    227 F. Supp. 2d 263 (D.N.J. 2002) ............................................................... 18

*Nemec v. Shrader,*
    991 A.2d 1120 (Del. 2010)....................................................................... 31, 33

*Pereira v. Farace,*
    413 F.3d 330 (2d Cir. 2005) ........................................................................... 7

*Pfeffer v. Redstone,*
    965 A.2d 676 (Del. 2009)............................................................................... 10

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Stumpf,*
    No. C 11-2369 SI, 2012 WL 424557 (N.D. Cal. Feb. 9, 2012) ................... 34

*Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.,*
    645 F. Supp. 2d 210 (S.D.N.Y. 2009) ........................................................... 40

*Rahbari v. Oros,*
    732 F. Supp. 2d 367 (S.D.N.Y. 2010) .............................................. 17, 27, 29

*Rahl v. Bande,*
    328 B.R. 387 (S.D.N.Y. 2005) ...................................................................... 11

*Red Ball Interior Demolition Corp. v. Palmadessa,*
    874 F. Supp. 576 (S.D.N.Y. 1995) ................................................................ 12

*Rombach v. Chang,*
    355 F.3d 164 (2d Cir. 2004) .................................................................... 13, 36

*Rosengarten v. Int'l Tel. & Tel. Corp.,*
    466 F. Supp. 817 (S.D.N.Y. 1979) ................................................................ 41

*Sheppard v. Manhattan Club Timeshare Ass'n, Inc.,*
    No. 11 Civ. 4362(PKC), 2012 WL 1890388 (S.D.N.Y. May 23, 2012)................... 12

*Sills v. Smith & Wesson Corp.*,
   No. Civ. A. 99C-09-283-FSS, 2000 WL 33113806 (Del. Super. Ct. Dec. 1, 2000) ................ 32

*Staehr v. Mack*,
   No. 07 Civ. 10368(DAB), 2011 WL 1330856 (S.D.N.Y. Mar. 31, 2011) ......................... 17, 21

*Steinman v. Levine*,
   No. Civ. A. 19107, 2002 WL 31761252 (Del. Ch. Nov. 27, 2002),
   *aff'd* 822 A.2d 397 (Del. 2003) ........................................................................... 11

*Stephenson v. PricewaterhouseCoopers, LLP*,
   768 F. Supp. 2d 562 (S.D.N.Y. 2011) ................................................................ 18, 22

*Stone ex rel. AmSouth Bancorporation v. Ritter*,
   911 A.2d 362 (Del. 2006) ................................................................ 25, 26, 28, 29

*Strong v. Taylor*,
   --- F. Supp. 2d ----, 2012 WL 2564907 (E.D. La. July 2, 2012) ............................. 21

*Taylor v. Kissner*,
   --- F. Supp. 2d ----, 2012 WL 4461528 (D. Del. Sept. 27, 2012) ........................... 31

*Tiberius Capital, LLC v. PetroSearch Energy Corp.*,
   09 CV 10270 GBD, 2011 WL 1334839  (S.D.N.Y. Mar. 31, 2011) ......................... 35

*U.S. Cellular Inv. Co. v. Bell. Atl. Mobile Sys., Inc.*,
   677 A.2d 497 (Del. 1996) ................................................................................... 24

*United Canso Oil & Gas Ltd. v. Catawba Corp.*,
   566 F. Supp. 232 (D. Conn. 1983) ...................................................................... 41

*United States v. Matthews*,
   787 F.2d 38 (2d Cir. 1986) ................................................................................. 40

*Wood v. Baum*,
   953 A.2d 136 (Del. 2008) ................................................................................... 17

## STATUTES

15 U.S.C. § 78n(a),
   Securities Exchange Act of 1934, Section 14(a) ............................................. passim

15 U.S.C. § 78u–4(b)(1)(B) ................................................................................. 35

15 U.S.C. § 78u-4(b),
   Private Securities Litigation Reform Act of 1995 (PSLRA) .................................. 1

8 Del. Code Ann. § 102(b)(7),
   Delaware General Corporation Law, Section 102(b)(7) .............................. 8, 9, 10

# **RULES**

17 C.F.R. § 240.14a-9,
   Securities Exchange Act of 1934, Rule 14a-9 ..................................................... 3, 34

Fed. R. Civ. P. 12(b)(6) ......................................................................................... 1, 6

Fed. R. Civ. P. 23.1 .................................................................................................... 1

Fed. R. Civ. P. 8 ........................................................................................................ 1

Fed. R. Civ. P. 9(b) ........................................................................................... passim

The Director Defendants[1] respectfully submit this Memorandum of Law in support of their Motion to Dismiss the Verified Shareholder Consolidated Derivative Complaint (the "Complaint")[2] pursuant to Federal Rules of Civil Procedure 8, 9(b) and 12(b)(6), and the Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u-4(b).   The Director Defendants incorporate by reference all briefing submitted in support of SAIC Inc.'s ("SAIC") Motion to Dismiss pursuant to Federal Rule of Civil Procedure 23.1.

## PRELIMINARY STATEMENT

Without making any demand on the Company, Plaintiffs purport to allege claims on behalf of SAIC against the Director Defendants and certain current and former employees, asserting that they are responsible for misconduct in connection with the CityTime project—one of SAIC's tens of thousands of contracts.   The Complaint must be dismissed because—as discussed fully in SAIC's brief and incorporated herein by reference—Plaintiffs fail to satisfy the requirements of Federal Rule of Civil Procedure 23.1 and Delaware law that they make a demand upon the Board of Directors or allege with particularity the reasons they are excused from doing so.   This failure is dispositive of the case and mandates dismissal.

Even if demand were somehow excused—and here it is not—Plaintiffs have failed to state a claim against the Director Defendants.   The gravamen of the Complaint is that, based on a series of supposed "red flags," the Board of Directors knew of problems with the CityTime contract, which was one of over 123,000 contracts awarded to the Company during the time period at issue, and which involved clandestine wrongdoing by two of SAIC's more than 41,000

---

[1]   The Director Defendants are Walter P. Havenstein, A. Thomas Young, France A. Córdova, Jere A. Drummond, Thomas F. Frist, John J. Hamre, Miriam E. John, Anita K. Jones, John P. Jumper, Harry M.J. Kraemer, Jr., Lawrence C. Nussdorf, Edward J. Sanderson, Jr., and Louis A. Simpson.   *See* Ex. A ¶¶ 36-48.

[2]   *See* Declaration of Beth A. Williams (Oct. 25, 2012), filed together with this motion ("Williams Decl."), at Ex. A.

employees.  Without differentiating among any of the defendants, some of whom—unlike the Director Defendants—were employees who were allegedly (or admittedly) part of the wrongdoing, the Complaint asserts claims of breach of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and violation of federal securities law.

As an initial matter, it bears noting that despite the Complaint's indiscriminate allegations about the "Defendants" collectively, there are absolutely no facts to support the conclusion that the Director Defendants had any involvement in the CityTime scheme.  Instead, Plaintiffs seek to impute knowledge of the CityTime scheme to the Director Defendants based on a handful of newspaper articles documenting budget overruns on the project, two City Council meetings regarding New York City's handling of the project, and membership of some of the Director Defendants on SAIC's Audit and Ethics Committees.  Setting aside that almost all of Plaintiffs' allegations cannot fairly be characterized as "red flags" pointing to fraud, nowhere in the Complaint do Plaintiffs make the critical connection between any of these purported "red flags" and the Director Defendants.  As a result, the Complaint's charge that the Director Defendants caused or permitted SAIC to overbill the CityTime project, failed to oversee and monitor SAIC and, therefore, caused SAIC's financial statements to be materially misstated and in violation of GAAP, rests on nothing more than the Plaintiffs' say-so.  The Second Circuit, applying Delaware law to fiduciary duty claims, has long held such allegations insufficient to show knowing, conscious, and bad faith conduct, as Plaintiffs are required to do to state a claim.  Plaintiffs' other state law claims fare no better: the Complaint does not plead any unjust enrichment, and Delaware law does not recognize claims for abuse of control and gross mismanagement separate from Plaintiffs' (defective) fiduciary duty claims.  Finally, Plaintiffs' claim under Section 14(a) of the Securities Exchange Act and Rule 14a-9 is both substantively

deficient and barred because it is nothing more than an attempt to dress up state-law fiduciary duty claims as a violation of federal law—a theory this Circuit has repeatedly rejected.

Moreover, according to the Complaint, itself, the Director Defendants took appropriate steps to address the CityTime misconduct as soon as they were informed about it.  In December 2010 when the U.S. Attorney's investigation was made public and non-SAIC individuals were indicted, SAIC immediately placed Defendant Gerard Denault on administrative leave.  Ex. A ¶¶ 51, 162.   SAIC then terminated Denault for violating "SAIC's policies and standards, specifically with regard to his time billed to NYC."  *Id.* ¶ 158.  SAIC also fired Defendant Deborah Alderson and two of her subordinates for failures of management, *id.* ¶¶ 175-76, and agreed to pay New York City $500.4 million in restitution and penalties, *id.* ¶ 182.  SAIC made investors aware of the situation and its potential impact on the Company by filing SEC disclosures and informing analysts and investors of the government investigations, *id.* ¶¶ 161-62, and the anticipated related loss.  *Id.* ¶ 22.  Further, SAIC's Statement of Responsibility ("SOR"), approved by the U.S. Attorney's office, states, among other things, that SAIC "responded to the Government's investigation as a responsible and concerned corporate citizen" by "fully cooperating with the Government."[3]   Even setting aside Plaintiffs' fatal failure to make a pre-suit demand or adequately plead demand futility, the Complaint fails to allege any factual basis for their claims against the Director Defendants.

---

[3]   *See* Williams Decl., Ex. B (SAIC Deferred Prosecution Agreement, Ex. C (SOR), at 1 (Mar. 8, 2012)). This Court may, of course, consider documents incorporated by reference or that are relied on and integral to the Complaint, *see, e.g.*, *In re Citigroup ERISA Litig.*, 662 F.3d 128, 135 (2d Cir. 2011), including, SAIC's Deferred Prosecution Agreement and Statement of Responsibility.  *See* Ex. A ¶¶ 23-25, 73, 86-90.

## STATEMENT OF FACTS

**The Parties**

Plaintiffs Edward Stellini and Monte Welch are current shareholders of SAIC, who purport to bring claims derivatively on behalf of nominal defendant, SAIC. *Id.* ¶ 1.

SAIC, Inc., a Delaware corporation headquartered in Virginia, is the nominal defendant. *Id.* ¶ 35. SAIC is a scientific, engineering, and technology applications company that has over 41,000 employees worldwide.[4] It serves customers in the national security and defense, energy and environmental, healthcare, and intelligence, surveillance, and cybersecurity sectors.[5] Over 90% of SAIC's total revenues are attributable to contracts with the U.S. government, and 76% of total revenues are from contracts with the Department of Defense.[6] Only 2% of SAIC's revenues are generated through state or local government contracts, such as CityTime.[7] SAIC currently has over 10,000 active contracts.

Defendants A. Thomas Young, Anita K. Jones, Harry M.J. Kraemer, and Edward J. Sanderson have served as outside directors at all times from 2003 to present, defined by Plaintiffs as the "Relevant Period." Ex. A ¶¶ 1, 37, 43, 45, 47. Defendants France A. Córdova, Jere A. Drummond, Thomas F. Frist, John J. Hamre, Miriam E. John, Lawrence C. Nussdorf, and Louis A. Simpson served on the board of SAIC as outside directors, but did not serve on the board throughout the entire Relevant Period. *Id.* ¶¶ 38-42, 46, 48. Defendant Walter P.

---

[4]   *See* Williams Decl., at Ex. C (excerpts from SAIC, Inc., Annual Report (Form 10-K) at 1, 5 (Mar. 27, 2012)).

[5]   *See* Williams Decl., at Ex. D (excerpts from SAIC, Inc., Quarterly Report (Form 10-Q) at 21 (Sept. 2, 2011)).

[6]   *Id.*

[7]   *See* Williams Decl., at Ex. E (SAIC's Corporate Fact Sheet, *available at* http://www.saic.com/news/pdf/corporatefactsheet.pdf).

Havenstein was a director and also CEO of SAIC from September 2009 to February 29, 2012. *Id.* ¶ 36.  Defendant John P. Jumper has served as a director since 2007 and became President and CEO of SAIC on March 1, 2012.  *Id.* ¶ 44.

Plaintiffs have also named other defendants: Mark W. Sopp, who has served as SAIC's CFO since 2005; Kenneth C. Dahlberg, who was SAIC's CEO from November 2003 until September 2009 and Chairman of the Board from July 2004 until June 2010; Gerald Denault and Carl Bell, former SAIC employees who were charged with criminal wrongdoing related to SAIC's CityTime contract; and Deborah H. Alderson, a former SAIC Group President.  *Id.* ¶¶ 49-53.

**Plaintiffs' Claims**

The Complaint describes the CityTime contracting scandal, in which two former SAIC employees (Defendants Denault and Bell), a consulting company, and a number of New York City Office of Payroll consultants illegally engaged in a scheme to overbill New York City and receive kickbacks.  *Id.* ¶¶ 12, 73-85.  As Plaintiffs note, SAIC has accepted responsibility for the conduct of its employees, and has paid the City hundreds of millions of dollars in restitution.  *Id.* ¶¶ 23, 86.  Plaintiffs allege, however, that the Director Defendants "caused or permitted SAIC to overbill NYC," that they "caused" SAIC's financial reporting to be materially misstated and not in conformance with GAAP, and that the overbilling practices subjected SAIC to "numerous undisclosed" risks.  *Id.* ¶ 29.  For these reasons, Plaintiffs assert the following claims against the directors and the other defendants: breach of fiduciary duty (*id.* ¶¶ 212-25), unjust enrichment (*id.* ¶¶ 226-28), abuse of control (*id.* ¶ 229-33), gross mismanagement (*id.* ¶¶ 234-37), and violation of Section 14(a) of the Securities Exchange Act (*id.* ¶¶ 238-45).  Plaintiffs claim they did not make a demand because it would be a "futile, wasteful and useless act."  *Id.* ¶ 211.

**STANDARD OF REVIEW**

To survive dismissal under Rule 12(b)(6), Plaintiffs must make "factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns Inc. v. The Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Instead, the Complaint must include "enough facts to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 697 (citing *Twombly*, 550 U.S. at 570). For claims sounding in fraud, such as Plaintiffs' breach of fiduciary duty claim based on alleged misstatements or misrepresentations, Plaintiffs must meet Rule 9(b)'s heightened pleading standard. *See e.g., Marino v. Grupo Mundial Tenedora, S.A.*, 810 F. Supp. 2d 601, 606 (S.D.N.Y. 2011). And for claims under Section 14(a) of the Securities Exchange Act, Plaintiffs must satisfy the Private Securities Litigation Reform Act's heightened pleading standard: "PSLRA's threshold for alleging with particularity a '34 Act violation applies to both Sections 14(a) and 10(b)." *In re Bank of Am. Corp. Sec., Derivative, and ERISA Litig.*, 757 F. Supp. 2d 260, 289-91 (S.D.N.Y. 2010).

Because SAIC is a Delaware corporation, Delaware law governs this Court's evaluation of Plaintiffs' state-law claims. *Pereira v. Farace*, 413 F.3d 330, 341 (2d Cir. 2005). Where, as here, jurisdiction over state-law claims is based on supplemental jurisdiction, federal courts apply the choice of law provisions of the forum state. *Carroll v. LeBoeuf, Lamb, Greene & MacRae, LLP*, 623 F. Supp. 2d 504, 509 (S.D.N.Y. 2009) (supplemental jurisdiction). New York follows the internal affairs doctrine, which generally requires that questions relating to the internal affairs of corporations, such as breach of fiduciary duty, "are decided in accordance with the law of the place of incorporation." *In re Stillwater Capital Partners Inc. Litig.*, 853 F. Supp. 2d 441, 450 (S.D.N.Y. 2012). This doctrine in turn "recognizes that only one State should have

6

the authority to regulate a corporation's internal affairs … because otherwise a corporation could be faced with conflicting demands." *Id.* at 450-51. In this case, these rules mandate that Plaintiffs' state-law claims be decided in accordance with Delaware law. *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 108-09 (1991).

## ARGUMENT

### I.   PLAINTIFFS' CLAIMS FOR BREACH OF FIDUCIARY DUTY SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM AS A MATTER OF LAW.

To state a fiduciary duty claim under Delaware law, Plaintiffs must allege that each defendant owed a fiduciary duty and that each defendant breached that duty. *In re BH S & B Holdings LLC*, 420 B.R. 112, 143 (Bankr. S.D.N.Y. 2009), *aff'd as modified*, 09 Civ. 10605 LAK, 2011 WL 3896249 (S.D.N.Y. Sept. 6, 2011) (applying Delaware law). Plaintiffs fail adequately to allege that the Director Defendants breached their duties because they do not plead facts showing knowing or bad faith conduct, as they must to state a claim.

### A.   SAIC's Exculpatory Clause Bars Any Duty of Care Claims.

Delaware General Corporation Law Section 102(b)(7) permits shareholders to "exculpate directors from any personal liability … for breaches of their duty of care" in a company's certificate of incorporation. *Emerald Partners v. Berlin*, 787 A.2d 85, 90 (Del. 2001); *see also Malpiede v. Townson*, 780 A.2d 1075, 1090-96 (Del. 2001).[8] Because SAIC's Certificate exculpates the Director Defendants from personal liability for breaches of the duty of care,[9] this

---

[8]   The Court may properly take judicial notice of an exculpatory provision on a motion to dismiss. *See BH S & B Holdings*, 420 B.R. at 145 (applying Delaware law). "[T]he protection of the exculpation provision may be asserted on a motion to dismiss." *In re Trinsum Grp., Inc.*, 466 B.R. 596, 613 (Bankr. S.D.N.Y. 2012); *see also Malpiede*, 780 A.2d at 1091-92 (finding no reversible error in considering exculpatory provision on a motion to dismiss without converting to summary judgment).

[9]   *See* Williams Decl., Ex. F (excerpts from SAIC, Inc., Current Report (Form 8-K), Ex. 3.1, § 11.B (June 22, 2011) ("Certificate") (providing that "[n]o director shall be personally liable to the Corporation or any of its stockholders for monetary damages for breach of fiduciary duty as a director" except for breaches of the duty of loyalty or good faith)).

provision forecloses Plaintiffs' duty of care claims as a matter of law.[10]  *See Malpiede*, 780 A.2d

at 1091, 1101 (affirming dismissal of duty of care claim pursuant to Section 102(b)(7)).

B.     **Plaintiffs Fail to State a Claim for Breach of Fiduciary Duty in Connection with the Issuance of an Allegedly False or Misleading Statement.**

When a handful of investors purport to stand in the shoes of a company in order to sue

that company's Board of Directors, they face a high bar.  Here, where Plaintiffs allege that

Defendants "allow[ed] the Company to disseminate … materially misleading and inaccurate

information," Ex. A ¶ 214, the bar is especially high.  First, they must plead facts showing that

the Board "deliberately misinform[ed] shareholders about the business of the corporation, either

directly or by a public statement."  *Malone v. Brincat*, 722 A.2d 5, 14 (Del. 1998); *see also*

*Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1287 (Del. 1994).  Under Delaware law,

a breach of fiduciary duty claim based on allegedly false or misleading statements derives from

the duties of loyalty and care.  *See Malone*, 722 A.2d at 9-10; *see also Pfeffer v. Redstone*, 965

A.2d 676, 684 (Del. 2009).  Where, as here, violations of the duty of care are exculpated, to

show a breach of the disclosure duty, the allegations must "support the inference that the

disclosure violation was made in bad faith, knowingly or intentionally."  *In re Citigroup Inc.*

*S'holder Derivative Litig.*, 964 A.2d 106, 132 (Del. Ch. 2009); *Arnold*, 650 A.2d at 1287

("[C]laims alleging disclosure violations that do not otherwise fall within any exception are

protected by Section 102(b)(7) and any certificate of incorporation provision … adopted

pursuant thereto.").  The Delaware Supreme Court "set a very high bar for plaintiffs seeking to

prove [such] a claim [of knowing conduct.] … This level … is similar to, but even more

stringent than, the level of scienter required for common law fraud."  *Metro Commc'n Corp. BVI*

*v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 157-58 (Del. Ch. 2004).  Plaintiffs "must

---

[10]    The Director Defendants do not in any way concede that Plaintiffs have alleged a duty of care violation.

plead facts … regarding what the directors knew and when." *In re Citigroup*, 964 A.2d at 134. Reckless conduct is insufficient. *See id.* at 133 n.88; *see also Steinman v. Levine*, No. Civ. A. 19107, 2002 WL 31761252, at *13 (Del. Ch. Nov. 27, 2002) (dismissing disclosure claim because alleged misstatements were "not false communications from directors *who were deliberately misinforming shareholders*"), *aff'd* 822 A.2d 397 (Del. 2003) (Table).

Second, Plaintiffs' allegation that the Director Defendants "caus[ed] or allow[ed] the Company to disseminate to SAIC shareholders materially misleading and inaccurate information," Ex. A ¶ 214, sounds in fraud, and must meet Rule 9(b)'s heightened pleading standards. *See, e.g.*, *Marino*, 810 F. Supp. 2d at 606; *Rahl v. Bande*, 328 B.R. 387, 413 (S.D.N.Y. 2005) (fiduciary duty claim premised on false financial statements sounds in fraud and requires factual particularity under Rule 9(b)); *Frota v. Prudential-Bache Sec., Inc.*, 639 F. Supp. 1186, 1193 (S.D.N.Y. 1986) ("Rule 9(b) extends to all averments of fraud or mistake, whatever may be the theory … statutory, common law, tort, contractual, or fiduciary."). Plaintiffs must "(1) specify the statements that [they] contend[] were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns*, 493 F.3d at 99.

In addition, "[w]here multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud." *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987); *Sheppard v. Manhattan Club Timeshare Ass'n, Inc.*, No. 11 Civ. 4362(PKC), 2012 WL 1890388, at *5 (S.D.N.Y. May 23, 2012) (requiring fiduciary duty claim based on fraud to be supported by particular facts as to each defendant, "not premised on guilt by association"); *Desimone v. Barrows,* 924 A.2d 908, 943 (Del. Ch. 2007) (finding general allegations of collective wrongs

insufficient and requiring "*facts specific to each director*").  "[T]he complaint may not rely upon blanket references to acts or omissions by all of the defendants, for each defendant … is entitled to be appraised of the circumstances surrounding the fraudulent conduct with which he individually stands charged."  *Red Ball Interior Demolition Corp. v. Palmadessa*, 874 F. Supp. 576, 584 (S.D.N.Y. 1995).  Against these high standards, Plaintiffs' strained attempt to state a claim falls short.

### 1.    The Complaint Does Not Adequately Explain Why The Alleged Misstatements Are Fraudulent.

The Complaint suggests that various statements were "false and misleading" but offers no explanation *why* such statements were false or misleading.  For example, Plaintiffs identify certifications by certain other defendants—not the Director Defendants—regarding the Company's internal controls.  *See, e.g.*, Ex. A ¶¶ 91, 93, 95, 97, 99, 111, 123, 140.  But the only reason given why these certifications are actionable is that "the certifications … associated with the Company's internal and disclosure controls were materially false and misleading."  *Id.* ¶ 146(f).  This circular logic is precisely the sort of allegation that the Second Circuit has rejected time and again.  *See Rombach v. Chang*, 355 F.3d 164, 175 (2d Cir. 2004) ("To meet the pleading requirement of Rule 9(b), plaintiffs cannot rest on their say-so that these statements are fraudulent; they must explain why.  Having neglected to do so, they fail to plead with the requisite particularity.").

In its misdirected efforts to state a claim, the Complaint repeatedly identifies innocuous statements regarding the Company's business practices made in some of SAIC's Annual Reports, such as the statement below of then-CEO Dahlberg:

> SAIC continues to be recognized by customers, industry associations and business and technology media for leadership in many areas. For example, we retained the number four position in the information technology services industry category on FORTUNE's® 2009 list of the World's Most Admired Companies. The list

10

> identifies companies with the strongest reputations, based on feedback from
> approximately 15,000 senior executives and directors from eligible companies,
> along with financial analysts. In FY09, the Ethisphere Institute ranked SAIC
> seventh on its World's Most Ethical Companies list of government contractors.
> The Ethisphere Institute is an organization dedicated to the creation and sharing of
> best practices in ethics, compliance and corporate governance.
>
> ****************
>
> Integrity and high ethical standards comprise a core value at SAIC and have since
> its founding 40 years ago. SAIC maintains a vigorous, universal training program
> on ethical behavior that places it among the leaders in our industry. In FY09,
> chairman and CEO Ken Dahlberg reiterated SAIC's "zero tolerance" policy on
> unethical behavior and directed SAIC's managers to make clear to employees that
> it is a policy that applies from top to bottom.

Ex. A ¶¶125-26.  Plaintiffs also take issue with certain of Defendant Havenstein's statements in

the 2010 Annual Report, such as "I am proud to be a part of a company that continues to be

recognized for its outstanding achievements and dedication to ethics and integrity," *id.* ¶ 141,

and in the 2011 Annual Report:

> At SAIC, we believe diversity of thought and an inclusive environment drive
> innovation and creativity and create a competitive advantage in the marketplace.
> Our commitment to diversity and inclusion is tied to our core values, business
> objectives, and strategic goals. It helps us to attract and retain talented, engaged
> employees who are committed to maintaining our culture of high ethical
> standards, integrity, operational excellence, and customer satisfaction.
>
> ****************
>
> Ethics and integrity have been at the forefront of SAIC's culture since its
> founding in 1969. Our reputation for upholding the highest standards of personal
> integrity and business conduct has served us well and is essential to our continued
> success in the marketplace.
>
> I am pleased that SAIC was named once again to FORTUNE's list of the world's
> five most admired companies in the IT services industry. The list identified
> companies with the strongest reputations, based on feedback from executives,
> directors, and financial analysts.

*Id.* ¶¶ 152-53.  Plaintiffs assert that "Defendants' statements referenced above concerning SAIC

and its supposedly ethical business practices were materially false and misleading when made,

because at that very time the Company was engaged in a massive illicit billing scheme through

which it overbilled NYC hundreds of millions of dollars on the CityTime contract."  *Id.* ¶ 154.

This is no explanation at all.  Plaintiffs do not explain how—even assuming that the Director Defendants were aware of the CityTime scheme before it became public, and there are no well pleaded facts to support such an inference—the fact of the CityTime scheme renders false statements of fact that SAIC "retained the number four position" in a FORTUNE list of admired companies or that the "Ethisphere Institute ranked SAIC seventh on its World's Most Ethical Companies list."  Ex. A ¶ 125.  Nor does the fact that two of SAIC's 41,000 employees engaged in fraudulent conduct on the CityTime contract render false or misleading statements such as "SAIC maintains a vigorous, universal training program on ethical behavior."  Ex. A ¶ 126. These statements, therefore, do not provide any basis to claim that the Director Defendants breached their fiduciary duties by causing or allowing materially false or misleading statements to be made[11] because Plaintiffs have not alleged any reason these statements were false or misleading other than their *ipse dixit*.

Finally, Plaintiffs offer no basis to conclude that any of SAIC's public statements following the December 2010 discovery of the CityTime fraud were false or misleading.  The Complaint recites the Company's June 2, 2011 disclosures of the CityTime investigation, its offer to refund timed billed by Defendant Denault which could not be validated, and its statement that the City had made no demand for reimbursement at that time.  Ex. A ¶ 161.  Plaintiffs claim these statements were false or misleading because they assured stockholders that the City had made no claim and SAIC had recorded no liabilities other than Denault's unvalidated time which SAIC intended to refund.  *Id.* ¶ 165.  Plaintiffs point to no facts demonstrating that these

---

[11]   It also bears noting that Plaintiffs offer no explanation why SAIC's statements regarding its commitment to ethics are *material*.  This is unsurprising given that such statements generally do not constitute *material* misrepresentations.  *See, e.g., ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 205–06 (2d Cir. 2009) (holding bank's statements about its "standard-setting reputation for integrity" were too general to be material).

statements were untrue.  The Complaint makes clear that the City did not make any demand for reimbursement until June 29, 2011, after SAIC made these disclosures.  *Id.* ¶ 169.  Plaintiffs also apparently take issue with the amount of SAIC's $232 million loss provision, reported in December 2011, s*ee id.* ¶ 179, and appear to suggest that SAIC either should have taken a loss provision earlier or in a greater amount.  Such after-the-fact second-guessing does not fraud make.  Under the GAAP standards, SAIC was only required to record a contingency when "(i) it is probable (*i.e.*, likely) … [it] has been incurred; and (ii) the loss can be reasonably estimated." *Id.* ¶ 198.  Plaintiffs plead no facts to suggest that SAIC had determined that a loss was likely incurred any earlier than disclosed, nor that a larger amount was warranted.

### 2.  Plaintiffs Plead No Facts Sufficient to Allege that the Director Defendants Were Involved In or Aware of the CityTime Scheme.

The CityTime kickback scheme involved two SAIC employees who conspired with four consultants to New York City's Office of Payroll Administration and executives at a private consulting company.  Until this suit, no one had ever suggested that anyone on SAIC's Board of Directors knew about or profited from the scheme.  Indeed, although it was a large contract, CityTime was one of 123,000 contracts that SAIC was awarded during the time period covered by the Complaint.  Following an extensive investigation by the Department of Justice and U.S. Attorney's Office, Defendants Bell and Denault were the only SAIC personnel charged with any wrongdoing in connection with CityTime.  Ex. A ¶ 15.  Nonetheless, Plaintiffs lump all the defendants together, including Defendants Bell and Denault, and make conclusory assertions that the "defendants caused or permitted SAIC to overbill NYC by hundreds of millions of dollars …."  *Id.* ¶¶ 29, 186.  Critically, there are absolutely no facts that demonstrate that the Director Defendants had any involvement in the CityTime scheme, and thus, no factual basis for the allegation that they caused SAIC to overbill the CityTime contract.

13

Similarly, there is no basis to infer that the Director Defendants knew of the CityTime scheme but nevertheless permitted SAIC to engage in wrongdoing.[12]   Eleven of the thirteen Director Defendants are outside directors.   *See* Ex. A ¶¶ 37-43, 45-48.   There are "no specific allegations about their involvement in the operation of the Company" to support an inference that they were aware of the CityTime scheme by virtue of their positions as directors as would be required to state a claim against them.   *Staehr v. Mack*, No. 07 Civ. 10368(DAB), 2011 WL 1330856, at *7 (S.D.N.Y. Mar. 31, 2011).   Nor are there any such specific allegations with regard to General Jumper, who was an outside director until March 1, 2012, when he became SAIC's CEO.   Ex. A ¶ 44.   And although Mr. Havenstein was SAIC's CEO from September 2009 to March 2012, *id.* ¶ 36, no alleged facts suggest that he had any involvement in the CityTime contract or was aware of Defendants Denault and Bell's wrongdoing.   "[A]llegations regarding misconduct or [even] awareness of misconduct by employees without a connection to [the Board] is insufficient" to show conscious or knowing misbehavior.   *In re ITT Corp. Derivative Litig.*, 588 F. Supp. 2d 502, 513 (S.D.N.Y. 2008).

Conclusory allegations that the Director Defendants "caused" SAIC to issue financial statements or that certain directors certified those financial statements are insufficient to support an inference that they knew of alleged misstatements in those documents.   The Delaware Supreme Court has explained that a "Board's execution of [the company's] financial reports, without more, is insufficient to create an inference that the directors had actual or constructive notice of any illegality."   *Wood v. Baum*, 953 A.2d 136, 142 (Del. 2008).   Similarly, Plaintiffs'

---

[12]   It is difficult to imagine how such an inference possibly could be drawn from the allegations considering Plaintiffs' allegations that there was no evidence that the three executives who actually oversaw the CityTime project were aware of or involved in the wrongdoing.   *See* Ex. A ¶ 176 (noting that SAIC fired Defendant Alderson, who was the Defense Solutions Group President, and two other employees who reported to her, in connection with CityTime although there was "no evidence that these individuals had any personal involvement in the fraud uncovered in the CityTime program").

claim that the directors who were members of the Audit and Ethics Committees signed off on certain disclosures and must have been aware of the scheme does not demonstrate knowing or bad faith conduct.  *Wood*, 953 A.2d at 142-43 (The assertion that "membership on the Audit Committee is a sufficient basis to infer the requisite scienter…. is contrary to well-settled Delaware law."); *Rahbari v. Oros*, 732 F. Supp. 2d 367, 384 (S.D.N.Y. 2010) (rejecting allegation that by signing a Form 10-K directors must have known of or recklessly disregarded false statements therein in the absence of specific allegations "about the mechanism by which the knowledge required under the bad faith inquiry would be obtained by the board").

### 3.     Purported "Red Flags" Do Not Provide Notice of the CityTime Fraud.

Plaintiffs attempt to remedy their lack of alleged facts by suggesting that the Director Defendants indirectly learned about evidence of illegality—the proverbial "red flag" approach. But this too presents an extraordinarily high burden.  As this Court has said, "[F]lags are not red merely because the plaintiff calls them red."  *Stephenson v. PricewaterhouseCoopers, LLP*, 768 F. Supp. 2d 562, 574 (S.D.N.Y. 2011); *see also In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 487 (S.D.N.Y. 2006) ("Merely labeling allegations as red flags … is insufficient to make those allegations relevant to a defendant's scienter.").  "[S]o-called red flags, which should be deemed to have put a defendant on notice of alleged improprieties, must be closer to smoking guns than mere warning signs."  *Nappier v. PricewaterhouseCoopers LLP*, 227 F. Supp. 2d 263, 278 (D.N.J. 2002) (quotation marks and citations omitted).  "[P]laintiffs must allege that facts which come to a defendant's attention would place a reasonable party in defendant's position on notice of wrongdoing."  *Stephenson*, 768 F. Supp. 2d at 574 (quotation marks and citation omitted).  The facts alleged simply do not support such an inference.

Plaintiffs quote a number of local New York articles reporting that the CityTime project was over budget.  *See, e.g.*, Ex. A ¶¶ 108-09, 112, 134, 138.  Articles reporting that New York

was spending more money on CityTime than originally planned hardly amount to a smoking gun pointing to fraud—especially when the scope of the project was repeatedly and substantially expanded.  Reports about two City Council meetings concerning the project similarly fall short. *See id.* ¶¶ 113, 137.  Nothing in the report about a 2008 Council meeting suggests that the meeting even addressed SAIC's role in the CityTime project, let alone raised any suspicion of fraud.  Indeed, Plaintiffs' allegations make clear that the meeting focused on the City's role in the project: officials "grilled Office of Payroll Administration officials about the program's costs, duration and efficacy." *Id.* ¶ 113.  And while Plaintiffs make much of State Senator Joseph Addabbo's comments regarding CityTime, those comments do not raise questions about SAIC, but about the "cost, quality and impact on privacy" of the project and the City's handling of the project. *Id.* (emphasis omitted). The same is true of the report about a December 2009 Council meeting.  Although an anonymous CityTime worker's tip about her own questionable billing practices was discussed, there is nothing to connect those practices to SAIC. *Id.* ¶ 137. Similarly, a March 2010 article pointing to budget overruns and complaints regarding the City's poor handling of CityTime does not point to any fraud. *Id.* ¶ 138 (reporting that "the city government kept modifying the contract every six months to ensure no one could figure out the final project cost" and that Mayor Bloomberg "quietly added $140 million more in funding"). Indeed, a December 2010 article reveals that the CityTime contract was being closely monitored "because it was running over budget, though no one then alleged any fraud." *Id.* ¶ 149.

Plaintiffs also point to alleged problems with a handful of contracts, among the tens of thousands that SAIC performs, that are wholly unrelated to CityTime and expect the Court to accept these as "red flags." *See* Ex. A ¶ 184.  But Plaintiffs allege no relationship between these other contracts and CityTime; indeed, there is none.  Plaintiffs do not allege that Defendants

Denault and Bell, the two former SAIC employees involved in CityTime, or any managers involved in CityTime were also involved in any of these other contracts.  Simply labeling these other contracts "red flags" does not make them so.  Nor does it make them relevant to show that the Director Defendants deliberately, knowingly, or in bad faith breached their disclosure obligations regarding CityTime.  *In re Marsh & McLennan*, 501 F. Supp. 2d at 487; *see also In re Recoton Corp. Sec. Litig.*, 358 F. Supp. 2d 1130, 1147-48 (M.D. Fla. 2005) (holding prior guilty plea for false statements was not a "red flag" because it was "wholly unrelated to the alleged wrongdoings, [and] it could not have provided reasonable notice").

### 4.   Plaintiffs' Allegations Do Not Demonstrate that the Board Was Actually Aware of Any Purported "Red Flags."

Significantly, even if the purported "red flags" somehow did point to fraud on the CityTime contract, "[t]here is nothing in the … Complaint to suggest or to permit the court to infer that any of [the alleged red flags] ever came to the attention of the board of directors or any committee of the board."  *In re Citigroup Inc. S'holders Litig.*, No. 19827, 2003 WL 21384599, at *2 (Del. Ch. June 5, 2003).  "[W]here pleading … breach of fiduciary duty that has at its core the charge that the defendant knew something, there must, at least, be sufficient well-pleaded facts from which it can reasonably be inferred that this 'something' was knowable and that the defendant was in a position to know it."  *Iotex Commc'ns, Inc. v. Defries*, No. 15817, 1998 WL 914265, at *4 (Del. Ch. Dec. 21, 1998); *see also Ash v. McCall*, No. Civ. A. 17132, 2000 WL 1370341, at *15 (Del. Ch. Sept. 15, 2000) (finding directors did not have constructive knowledge of alleged accounting problems even though the company, "at some organizational level, knew of and responded to public criticism of its accounting practices").  "Red flags must be either waved in one's face or displayed so they are visible to the careful observer."  *Strong v. Taylor*, --- F. Supp. 2d ----, 2012 WL 2564907, at *11 (E.D. La. July 2, 2012) (applying Delaware law).

Plaintiffs' conclusory assertions that the Director Defendants "were, or should have been, on notice of numerous 'red flags'" or that "Defendants were undeniably aware of numerous 'red flags'" are insufficient.  Ex. A ¶ 7, 108.  Simply pointing to news articles and stating that the Director Defendants were "on notice" is not enough.  *See, e.g.*, *Staehr*, 2011 WL 1330856, at *7 (finding allegations that "publication of news reports … meant that [the Board] 'must have been aware' that the Company's subprime assets were troubled" insufficient to show knowing or bad faith conduct).  There are no allegations that any of the Director Defendants were aware of any of the local New York articles about the CityTime project cited in the Complaint.[13]  *See* Ex. A ¶¶ 108, 113, 134.  Likewise, Plaintiffs plead no facts indicating that the Director Defendants were aware that the City Council held two meetings about City Time, participated in those meetings, or even were aware of the articles reporting those meetings.  *Id.* ¶ 113, 134.  "[A]n unseen red flag cannot be heeded."  *Stephenson*, 768 F. Supp. 2d at 573; *In re Citigroup*, 2003 WL 21384599, at *2 ("How, exactly, a member of the … board of directors was supposed to be put on inquiry notice by something he or she never saw or heard of is not explained.").

One of the news articles quoted by Plaintiffs identifies a 2003 letter from New York's Office of Payroll Administration complaining about changes to the CityTime contract and a 2005 anonymous whistleblower complaint.  *See* Ex. A ¶ 155.  Plaintiffs rely on the article to show that "SAIC was warned about irregularities and potential fraud without ever doing anything about it." *Id.* (emphasis omitted). But this, too, is insufficient: "Notably, this allegation is not even made against the Director Defendants, but rather [the Company] generally."  *In re ITT*, 588 F. Supp. 2d at 512.  That omission is telling, because Plaintiffs have not and cannot plead facts suggesting

---

[13]   Some of the Director Defendants were not even on SAIC's Board when some of these purported "red flag" news reports were published.  For instance, any inference of knowledge based on reports in 2008 would be particularly insupportable as to Defendants Havenstein, Frist, and Nussdorf who were not directors then.

the Director Defendants were aware of either of these complaints.  Unsurprisingly, Plaintiffs'
cherry-picked and self-serving quotations from SAIC's Statement of Responsibility omit the
critical fact also contained in the SOR that "[t]he [2005 whistleblower] complaint also was not
brought to the attention of SAIC's Board of Directors."[14]  Moreover, with respect to the 2003
letter, the pleaded facts do not support an inference that any of the Director Defendants knew of
the letter; and, any such inference would be particularly insupportable with respect to Defendants
Havenstein, Córdova, Drummond, Frist, Hamre, John, Jumper, Nussdorf, and Simpson who were
not even members of the Board in February 2003.  Because Plaintiffs do not allege any facts
regarding the other outside directors' involvement in the Company's operations, there is no basis
to infer that any of those who were on SAIC's Board in 2003 and 2005 were aware of either of
these complaints.  The Complaint "fails to identify what the Directors actually knew about the
'red flags' and how they responded to them" and, thus, provides no basis "to draw the significant
inference that the Directors had constructive knowledge that an alleged failure to respond to the
'red flags' would be a breach of their fiduciary duties, which is required under Delaware law."
*In re Intel Corp. Derivative Litig.*, 621 F. Supp. 2d 165, 174 (D. Del. 2009).

## C. Plaintiffs' Own Theory Would Bar Much of Their Fiduciary Duty Claims.

Even assuming, for argument's sake, that the newspaper articles mentioned in the
Complaint were sufficient to put the Director Defendants on notice of the CityTime fraud—and
they were not—those articles would also have been sufficient to put the Plaintiffs on notice of
the fraud, starting the statute of limitations clock running and barring much of the alleged
conduct in the Complaint.  Plaintiffs' purported breach of fiduciary duty claims based on
allegedly false or misleading statements issued by SAIC in connection with the CityTime

---

[14]   Williams Decl., Ex. B, SOR, at 1.

scandal appear to relate to SEC filings and public statements made between April 2004 and the end of 2011.  But fiduciary duty claims are subject to a three-year statute of limitations and, thus, much of the conduct would no longer be actionable.  *See, e.g.*, *Graulich v. Dell, Inc.*, Civ. A. No. 5846-CC, 2011 WL 1843813, at *6 (Del. Ch. May 16, 2011).   Plaintiffs cannot have it both ways:  they may not claim ignorance of the fraud while at the same time contending that the public documents were so-called "red flags" that put the Director Defendants on notice.  *See* Ex. A ¶ 184 (publicly available settlements regarding prior unrelated contracts in 1995, 2004, 2005 and 2006), and *id.* ¶¶ 9, 108-09, 112-13 (publicly available information in 2008 and early 2009 about the CityTime project); *U.S. Cellular Inv. Co. v. Bell. Atl. Mobile Sys., Inc.*, 677 A.2d 497, 503-04 (Del. 1996) (holding that public information can provide notice to a plaintiff of claims).  Thus, any alleged breach based on conduct prior to February 10, 2009 is time-barred.[15]

> ### D. Plaintiffs Fail to State a Claim for Breach of Fiduciary Duty for Failing to Maintain Internal Controls.

In the second and third causes of action, Plaintiffs attempt to assert a *Caremark* claim, alleging that the Director Defendants "willfully ignored the obvious and pervasive problems with SAIC's internal controls and practices and procedures and failed to make a good faith effort to correct these problems" and failed to oversee and manage the company.  Ex. A ¶¶ 218, 220-25. A claim for failure to exercise proper oversight is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."   *In re Caremark Int'l, Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996).  For a *Caremark* claim to survive a motion to dismiss for failure to state a claim, a plaintiff "must allege well-pleaded facts" that the

---

[15]   One of the now consolidated cases, *Stellini v. Havenstein, et al.*, was filed in the Southern District of California on February 10, 2012, and the three-year statute of limitations would make any claim more than three years before that date untimely.  *See* Williams Decl., Ex. G (Dkt. No. 1, *Stellini*, No. 3:12-CV-00373-BEN-BLM (S.D. Cal. Oct. 22, 2012)).

directors breached their duties of loyalty and good faith.  *Malpiede*, 780 A.2d at 1094; *Guttman v. Huang*, 823 A.2d 492, 506 (Del. Ch. 2003) (holding that *Caremark* claim "requires a showing that the directors breached their duty of loyalty by failing to attend to their duties in good faith"). Such a claim exists where either: "(a) the directors utterly failed to implement any reporting or information system or controls; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006); *Guttman*, 823 A.2d at 506 (A plaintiff must show that the "directors were conscious of the fact that they were not doing their jobs.").  "In either case, imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations."  *Stone*, 911 A.2d at 370; *accord In re Trinsum Grp., Inc.*, 466 B.R. 596, 612 n.4 (Bankr. S.D.N.Y. 2012) ("[B]ad faith is a required element for director oversight liability.").  Plaintiffs cannot state a claim on this basis.

## 1. Plaintiffs Have Not and Cannot Allege that SAIC Lacks a Compliance and Reporting System.

Plaintiffs cannot plausibly contend that SAIC had no compliance and reporting system. As the Complaint makes clear, SAIC did have internal controls and reporting channels in place including, among other things, Ethics and Audit Committees.  *See, e.g.*, Ex. A ¶¶ 61-64.  The Complaint includes no allegations that the Ethics and Audit Committees failed to meet, ignored relevant information regarding the CityTime project, or otherwise failed to carry out their respective oversight and compliance roles.  *See Guttman*, 823 A.2d at 507 (finding critical factual pleading lacking where there were no allegations the company's audit committee "met only sporadically and devoted patently inadequate time to its work" or that the committee had "clear notice of serious accounting irregularities and simply chose to ignore them or, even worse,

to encourage their continuation"). Although "established controls [may] ultimately prove[] to be ineffective in preventing illegal conduct," a failure of oversight claim cannot survive absent allegations that "'the directors utterly failed to implement any reporting or information system or controls.'" *In re ITT Corp.*, 588 F. Supp. 2d at 512 (quoting *Stone*, 911 A.2d at 370, 372-73).

> **2.      Plaintiffs Allege No Facts Demonstrating that the Directors Consciously Failed to Oversee or Monitor the Company.**

Plaintiffs also fail to allege "well-pleaded facts" showing that the Director Defendants implemented internal controls but consciously failed to oversee or monitor their operations. *Malpiede*, 780 A.2d at 1094; *Stone*, 911 A.2d at 370. The Complaint lacks "facts suggesting that the board knew that internal controls were inadequate, that the inadequacies could leave room for illegal or materially harmful behavior, and that the board chose to do nothing about the control deficiencies that it knew existed." *Desimone v. Barrows*, 924 A.2d 908, 940 (Del. Ch. 2007) (citing *Stone*, 911 A.2d at 373). "Delaware courts routinely reject the conclusory allegation that because illegal behavior occurred, internal controls must have been deficient, and the board must have known so." *Id.*; *In re ITT Corp.*, 588 F. Supp. 2d at 514 ("The magnitude and duration of illegal activities or the size of the resulting penalties … do not establish either deficient controls or a sustained and systematic conscious failure of oversight."). "It is not enough 'with the benefit of hindsight' that it is revealed that internal controls were inadequate and resulted in a large fine." *King v. Baldino*, 648 F. Supp. 2d 609, 623 (D. Del. 2009).

Plaintiffs point to statements in SAIC's Statement of Responsibility, entered into in connection with settling the CityTime case with the U.S. Attorney in 2012, to try to show inadequate controls. *See* Ex. B ¶¶ 86-89. In the SOR, SAIC accepted responsibility for the actions of its former employees, Denault and Bell, and "acknowledge[d] that the conduct and managerial failures described herein contributed to the ability of Denault and Bell to commit

22

their alleged crimes." *Id.* ¶ 89.   SAIC further acknowledged that there were oversight shortcomings by "management employees responsible for directly overseeing Denault" and that "[s]ome SAIC managers failed to perceive or ignored significant and pervasive irregularities" in SAIC's relationship with its subcontractor, *id.*, but nothing suggests that there were any failures of oversight by the Director Defendants themselves, who oversee SAIC on an enterprise-level. Moreover, there is nothing in the SOR to suggest that the Director Defendants were aware of any shortcomings in the controls, let alone consciously disregarded them.  "[T]he mere fact that an investigatory committee found that there were deficiencies in reporting does not necessarily result in a finding of a failure of oversight." *Rahbari*, 732 F. Supp. 2d at 384 n.19.  There is no indication from any of Plaintiffs' allegations that the Board was "presented with any information that would suggest that the disclosure system was malfunctioning." *Id.* at 384.  To the contrary, the SOR states that CityTime managers "failed to pass on the concerns to the proper Company personnel for investigation."  Ex. A ¶ 89.  The Board is required to act in good faith, but even then "no rationally designed information and reporting system will remove the possibility that the corporation will violate laws or regulations, or that senior officers or directors may nevertheless sometimes be misled or otherwise fail reasonably to detect acts material to the corporation's compliance with the law." *Caremark*, 698 A.2d at 970.

Further, Plaintiffs' allegations of wrongdoing by Defendants Denault and Bell are not sufficient to show that the Director Defendants consciously failed to oversee SAIC's operations. Plaintiffs appear to suggest that because the Board is the "'ultimate decision-making body' of the Company," it "affirmatively adopted, implemented, and/or condoned a business strategy based on criminal violations of law."  Ex. A ¶ 211(a).  This baseless and conclusory allegation does nothing to demonstrate that the Director Defendants were aware of the criminal activities of two

23

of SAIC's more than 41,000 employees; rather, Plaintiffs impermissibly seek to impute the alleged wrongdoing of Defendants Denault and Bell (and other non-SAIC personnel) to the Board.   The SOR allegations, accepted as true, regarding the failures of "[s]ome SAIC managers" and "management employees responsible for directly overseeing Denault and … CityTime" add nothing.   Ex. A ¶ 89. "[A]llegations regarding misconduct or awareness of misconduct by employees without a connection to [the directors] is insufficient to show that [the directors] consciously or recklessly failed to monitor or oversee … operations." *In re ITT*, 588 F. Supp. 2d at 513; *Desimone*, 924 A.2d at 940 ("Delaware courts routinely reject the conclusory allegation that because illegal behavior occurred, internal controls must have been deficient, and the board must have known so.").   Because "most of the decisions that a corporation, acting through its human agents, makes are, of course, not the subject of director attention," *Stone*, 911 A.2d at 372, it is insufficient to premise director liability on allegations that wrongdoing occurred on the directors' watch without connecting that wrongdoing to the Board. *See* id. at 373 ("With the benefit of hindsight, [Plaintiff's] complaint seeks to equate a bad outcome with bad faith.").   Unfortunately, even "directors' good faith exercise of oversight responsibility may not invariably prevent employees from violating criminal laws, or from causing the corporation to incur significant financial liability, or both …." *Id*.

Nor, as discussed above, can Plaintiffs premise liability on certain directors' service on various SAIC committees.   Plaintiffs allege that Defendants Frist, Jones, Jumper, Kraemer and Nussdorf, as members of the Audit Committee "caused or permitted the above-discussed internal control failures."  Ex. A ¶ 211(e).  Similarly, they contend that Defendants Havenstein, Córdova, Drummond, and Jones, as members of the Ethics Committee, "caused or permitted the Company to engage in illicit and illegal activities, including paying kickbacks and overbilling NYC." *Id.*

24

¶ 211(f).  These allegations are wholly conclusory and devoid of any factual support—there is not a single fact demonstrating how these defendants caused internal control failures or caused SAIC to engage in illegal behavior—and fail as a matter of law.  "[N]either an awareness of facts nor a conscious disregard of oversight duties can be inferred solely from a director's service on a committee."  *In re ITT*, 588 F. Supp. 2d at 514; *see also Rahbari*, 732 F. Supp. 2d at 386. Simply put, there are no facts from which to conclude that the Director Defendants acted in bad faith and consciously disregarded their oversight obligations.

In fact, it is clear even from Plaintiffs' own allegations that SAIC began to take corrective action as soon as the CityTime scheme came to light by, among other things:

- placing Defendant Denault on administrative leave in December 2010 when the U.S. Attorney charged six non-SAIC employees with wrongdoing in connection with CityTime, Ex. A ¶ 12, 51;

- terminating "Denault for his violation of SAIC's policies and standards," *id.* ¶ 158;

- terminating three executives for "failures of management with respect to the CityTime program," *id.* ¶ 176 (emphasis omitted);

- "conducting an internal investigation of the CityTime program" and offering to refund billable time that could not be validated, *id.* ¶ 161; and

- cooperating with the U.S. Attorney's investigation, *id.* ¶¶161-62.

Not only are Plaintiffs' allegations insufficient to show a conscious failure to monitor or oversee operations, but they demonstrate that the Director Defendants promptly took action to correct problems when they became aware of them.  *Cf. In re ITT Corp. Derivative Litig.*, 653 F. Supp. 2d 453, 463 (S.D.N.Y. 2009) (finding no conscious disregard of fiduciary duties where Board instructed corporation to cooperate with government investigation, accept responsibility for past criminal conduct, and hire outside counsel to conduct internal investigation even though these measures did not prevent the continuance of criminal conduct of which the Board had been made

aware).  Because Plaintiffs fail to allege well-pleaded facts demonstrating a plausible claim of knowing or bad faith misconduct their fiduciary duty claims should be dismissed.

## II.  PLAINTIFFS FAIL TO STATE A CLAIM FOR THEIR DUPLICATIVE STATE-LAW CLAIMS.

Plaintiffs next attempt to survive dismissal of their complaint through the inclusion of various state law claims duplicative of their breach of fiduciary duty allegations.  These too fail.

### A.  Plaintiffs Fail to State a Claim for Unjust Enrichment.

Plaintiffs have repackaged their breach of fiduciary duty claims into a claim for unjust enrichment, but this Court has repeatedly rejected such attempts.  *See, e.g.*, *Diversified Grp., Inc. v. Daugerdas*, 139 F. Supp. 2d 445, 461 (S.D.N.Y. 2001) ("[T]o the extent [plaintiffs'] claim for unjust enrichment is based upon [defendants'] alleged breach of fiduciary duties, this claim is duplicative.").  To plead a cause of action for unjust enrichment under Delaware law, a complaint must allege: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."  *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010).  Plaintiffs do not state such a claim against any of the Director Defendants.  As an initial matter, the Complaint states in only the most conclusory fashion, that "[b]y their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of SAIC."  Ex. A ¶ 227.  It does not, however, allege any of the elements of unjust enrichment, let alone any facts to support such a claim as to Defendants Young, Córdova, Drummond, Frist, Hamre, John, Jones, Jumper, Kraemer, Nussdorf, Sanderson, and Simpson.  *See id.* ¶¶ 202-208.  *See, e.g.*, *Taylor v. Kissner*, --- F. Supp. 2d ----, 2012 WL 4461528, at *10 (D. Del. Sept. 27, 2012) (Plaintiff "must allege facts demonstrating that each Defendant was enriched ....").

With regard to Defendant Havenstein, the Complaint makes nothing more than a conclusory assertion that he was "overcompensated ... based on financial results which were at least in part the result of illegal overbilling." Ex. A ¶ 204.  Plaintiffs have pled no "enrichment." The Complaint points only to Mr. Havenstein's ordinary salaries, benefits, and bonuses.  *Id.* That is insufficient as a matter of law.  Delaware law does not regard ordinary officer or director compensation with suspicion and there is no "authority … that the mere retention of directors' and officers' ordinary compensation can sustain an unjust enrichment claim predicated on allegations that these defendants breached their fiduciary duties."  *In re Pfizer Inc. S'holder Derivative Litig*., 722 F. Supp. 2d 453, 465-66 (S.D.N.Y. 2010) (applying Delaware law).  As this Court said in *Pfizer*, "[g]iven the lack of non-conclusory allegations that defendant's compensation was profligate or was paid for an improper purpose, the allegations of unjust enrichment fail to 'state a claim to relief that is plausible on its face.'" *Id.* at 466 (quoting *Iqbal*, 556 U.S. at 678; *see also Sills v. Smith & Wesson Corp*., No. Civ. A. 99C-09-283-FSS, 2000 WL 33113806, at *7 (Del. Super. Ct. Dec. 1, 2000) (failure to allege enrichment "fatal" to unjust enrichment claim).

Moreover, the Complaint is devoid of any factual allegations that indicate any "causal relationship" between the alleged wrongful acts and Mr. Havenstein's ordinary compensation.  *In re Pfizer*, 722 F. Supp. 2d at 466; *see also In re Bank of Am. Corp.*, 757 F. Supp. 2d at 342 (dismissing unjust enrichment claim where derivative plaintiffs did not allege that incentive compensation received by officers was tied to the alleged wrongful acts).  The Complaint states that "Company performance determines the amount of any cash incentive awards … as such amounts are principally determined based upon the Company's achievement of financial and operational objectives."  Ex. A ¶ 203 (emphasis omitted).  But Plaintiffs do not allege what

SAIC's "financial and operational objectives" were or whether they were achieved, let alone how the alleged wrongdoing directly benefitted Mr. Havenstein.

Finally, Plaintiffs have not alleged "the absence of a remedy provided by law" as they must to state a claim. *Nemec*, 991 A.2d at 1130. Because Plaintiffs' claim for unjust enrichment is substantively deficient, as well as duplicative, it should be dismissed.

### B. Plaintiffs Cannot and Do Not State a Claim for Abuse of Control or Gross Mismanagement.

The Complaint alleges that the Director Defendants are liable for "abuse of control" and "gross mismanagement." Ex. A ¶¶ 229-237. Delaware law does not recognize either claim. "[C]laims for abuse of control, gross mismanagement, and waste of corporate assets all arise from the alleged breach of fiduciary duties and have been viewed as merely repackaging the same issue under different causes of action rather than as separate torts." *Freuler v. Parker*, Civ. A. No. H-10-3148, 2012 WL 896414, at *1 n.2 (S.D. Tex. Mar. 12, 2012) (applying Delaware law) (citations omitted); *In re ALH Holdings, LLC*, 675 F. Supp. 2d 462, 482-83 (D. Del. 2009) (categorizing abuse of control as a breach of directors' duty of loyalty); *In re Citigroup Inc.*, 964 A.2d at 115 n.6 ("Delaware law does not recognize an independent cause of action against corporate directors and officers for reckless and gross mismanagement; such claims are treated as claims for breach of fiduciary duty.").[16] As Delaware courts have explained, fiduciary duties "have been carefully crafted to define the responsibilities of directors and managers, as fiduciaries, to the corporation," and therefore encompass claims for "reckless and gross mismanagement." *Id*. Because abuse of control and gross mismanagement are not independent

---

[16] It is obvious that Plaintiffs' gross mismanagement claim merely repackages the fiduciary duty counts. *See* Ex. A ¶¶ 235-236 ("Defendants had a duty to SAIC … to prudently supervise, manage and control … SAIC" and "Defendants breached their duties of due care, diligence and candor in the management and administration of SAIC's affairs …."). Even if a gross mismanagement claim existed under Delaware law, because it is premised on an alleged duty of care violation, the Director Defendants could not be held liable pursuant to SAIC's exculpatory clause. *See supra*, Part I.A.

claims under Delaware law, and because Plaintiffs' allegations are wholly conclusory, the Court should dismiss these claims. *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Stumpf*, No. C 11-2369 SI, 2012 WL 424557, at *8 (N.D. Cal. Feb. 9, 2012).

## III.   PLAINTIFFS' SECURITIES EXCHANGE ACT SECTION 14(A) CLAIM FAILS.

Finally, Plaintiffs attempt to use their conclusory allegations to support a claim under the Securities Exchange Act. They assert that defendants "issued materially false and misleading statements in the Audit Committee Report" relating to the Committee's work with the Company's independent registered public accounting firm. Ex. A ¶ 241. To state a claim under Section 14(a) and Rule 14a–9 of the Securities Exchange Act, Plaintiffs would have to show: "'(1) that the proxy materials contain a false or misleading statement of a material fact or omit to state a material fact necessary in order to make the statement made not false or misleading; (2) that the misstatement or omission of a material fact was the result of knowing, reckless or negligent conduct; and (3) that the proxy solicitation was an essential link in effecting the proposed corporate action.'" *Tiberius Capital, LLC v. PetroSearch Energy Corp.*, 09 CV 10270 GBD, 2011 WL 1334839, at *7 (S.D.N.Y. Mar. 31, 2011) (quoting *Berkman v. Rust Craft Greeting Cards, Inc.*, 454 F.Supp. 787, 791 (S.D.N.Y. 1978)); *see also In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 636 (S.D.N.Y. 2005). Even if this claim is construed as direct rather than derivative, dismissal is required because Plaintiffs have not pled these elements.

### A.   Rule 9(b) and the PSLRA's Heightened Pleading Requirements Apply to Plaintiffs' Section 14(a) Claim.

Although Plaintiffs attempt "expressly" to disclaim any allegations of fraud in the Section 14(a) claim, they cannot escape federal pleading requirements so easily. The PSLRA applies, requiring that a plaintiff "shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading …." 15 U.S.C. § 78u–4(b)(1)(B);

*see also In re Marsh & McLennan Cos. Sec. Litig.*, 536 F. Supp. 2d 313, 320 (S.D.N.Y. 2007).

Further, while the Second Circuit does not require a plaintiff to allege fraud to state a claim

under Section 14(a), *see In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d at 636, where a

claim sounds in fraud, it must also meet the heightened pleading standards of Rule 9(b).  As in

*JP Morgan*, Plaintiffs' Section 14(a) claim rests on the same conduct as their other claims:

"When plaintiffs assert Section 14(a) claims grounded in alleged fraudulent conduct, they are

subject to heightened pleading requirements … even if they disclaim reliance on a fraud theory."

*Id.* at 636 (citing *Rombach,* 355 F.3d at 170).

Plaintiffs argue that the following Audit Committee statement in the April 29, 2009,

April 29, 2010, and April 27, 2011 proxy statements was "materially false and misleading":

> [T]he Audit Committee had 'reviewed and discussed with management and
> Deloitte & Touche LLP, the Company's independent registered public accounting
> firm, the audited consolidated financial statements,' and that 'based on the
> reviews and discussions summarized in this Report and subject to the limitations
> on our role and responsibilities referred to above and contained in the Audit
> Committee charter, the Audit Committee recommended to the Board of Directors
> that the Company's audited consolidated financial statements referred to above be
> included in the Company's Annual Report on Form 10-K.

Ex. A ¶ 241.  To begin with, and as addressed below, this statement is so anodyne it can hardly

be characterized as a material misstatement.  More importantly, however, Plaintiffs' entire

argument is based on the Director Defendants' purported knowledge of the CityTime billing

practices.  *See, e.g.*, *id.* ¶¶ 11-12, 26-29, 146, 186.  Earlier in the Complaint, for example,

Plaintiffs allege (albeit in a conclusory and therefore insufficient fashion) that the Director

Defendants knew or "recklessly disregarded" that SAIC had grossly overbilled New York City.

*See id.* ¶ 146.  Thus, according to Plaintiffs, the supposed misstatements were based on the

defendants' knowledge that the Company's financial statements and proxies were materially

false and misleading. This allegation brings the purported misstatements into the realm of fraud, and the requirements of Rule 9(b) apply, in addition to the PSLRA pleading standard.

As discussed above, Rule 9(b) requires Plaintiffs to specify the allegedly fraudulent statements, identify the speaker, state where and when the statements were made, and explain why the statements were fraudulent. *ATSI Commc'ns*, 493 F.3d at 99. Conclusory allegations or those "unsupported by factual assertions" are insufficient. *Id.* The Complaint in no way satisfies the demanding standards of the PSLRA and Rule 9(b); indeed, it does not even satisfy basic notice pleading. Simply put, Plaintiffs have alleged no facts to support their Section 14(a) claim. Indeed, the only place the challenged proxy statements are even referenced is in the Seventh Cause of Action itself, and then only in the most conclusory terms.[17]

## B. Plaintiffs Fail to Allege Any Material Misstatements.

Plaintiffs' failure to allege any material misstatements in the three challenged proxy statements is fatal to their Section 14(a) claim. First, even under the most basic notice pleading standards, let alone the heightened pleading requirements of Rule 9(b) and the PSLRA, applicable here, the Complaint fails to plead facts indicating why any of the information in the proxy statements was false or misleading. Plaintiffs' only explanation why the Audit Committee's statements in the challenged proxies were "false and misleading" is that the Committee "blessed" SAIC's financial statements and internal controls in spite of the fact that significant portions of the revenues were purportedly based on "improper and illicit activities, which were unknown to shareholders." Ex. A ¶ 242. That allegation is at best conclusory and at worst nonsensical. The challenged statement in the proxy was that (1) the Audit Committee met

---

[17] Plaintiffs also briefly reference the April 27, 2011 proxy statement in Paragraph 204 of the Complaint, which states only that the proxy statement indicates that Defendants Havenstein and Sopp were overcompensated. *See* Ex. A ¶ 204. Plaintiffs allege no false or misleading statement in this proxy, nor any facts to support a Section 14(a) claim.

with SAIC's accounting firm regarding the company's financial results, and (2) based on that review, the Committee recommended that the financial statements be included in the annual reporting.  *See id.* ¶ 241.  That is the entirety of the purportedly "misleading" content of the proxy statements.  Nowhere does the Complaint even suggest that (1) the Committee did not meet with the auditors or that (2) it did not recommend SAIC include its financial statements in its SEC filings.  The alleged misstatements, thus, are not misstatements at all.

In reality, Plaintiffs are challenging—if anything—the Board's approval of SAIC's financial statements, which were reached in an exercise of its fiduciary duties.  The Second Circuit has long held that Section 14(a) is not an "avenue for access to the federal courts in order to redress alleged mismanagement or breach of fiduciary duty…."  *Maldonado v. Flynn*, 597 F.2d 789, 796 (2d Cir. 1979); *see also Koppel v. 4987 Corp.*, 167 F.3d 125, 133-34 (2d Cir. 1999).  Plaintiffs' attempt to point to different alleged misstatements in their Section 14(a) claim than they do in their fiduciary duty claim does not save their claim.  The alleged reason that proxies were misleading is that the Audit Committee "blessed" SAIC's financial statements—the same financial statements that are the basis for their First Cause of Action for Breach of Fiduciary Duty in Connection with the Issuance of False and Misleading Statements.  *See* Ex. A ¶¶ 212-15.  Plaintiffs may not backdoor a Section 14(a) claim in this manner.  *See, e.g., Fink v. Weill*, No. 02 Civ. 10250, 2005 WL 2298224, at *5 (S.D.N.Y. Sept. 19, 2005) (dismissing Section 14(a) claim where "wrongs flowing from the allegedly false and misleading disclosure are improper governance"); *Halpert Enters., Inc. v. Harrison*, No. 02CIV9501SHS, 2005 WL 1773686, at *3 (S.D.N.Y. July 26, 2005) (dismissing Section 14(a) claim because it "amount[ed] to nothing more than an attempt to dress up an ordinary state breach of fiduciary duty claim in federal securities law clothing, a maneuver that the caselaw plainly prohibits").

Second, Plaintiffs make nothing more than a conclusory assertion that the allegedly false or misleading proxies were "material to Plaintiffs in voting," Ex. A ¶ 244, but this is patently insufficient to meet the materiality and causation requirements for a Section 14(a) claim.  The Complaint does not even identify at what corporate action the challenged proxies were directed, let alone how the identified statement regarding the Audit Committee's actions was material to any vote solicited through the proxies.  A fact is material if there is a "substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."  *In re Marsh & McLennan*, 536 F. Supp. 2d at 321 (citations omitted).  Because Plaintiffs have failed to identify any false or misleading statement in the proxies, or explain why such statements are false, it is virtually impossible to assess materiality.[18]

### C.    Plaintiffs Fail To Show that the Purported Misrepresentations Were an "Essential Link" to a Transaction Requiring Shareholder Approval.

Plaintiffs also fail to allege transaction causation.  The Complaint states only that the proxies "were an essential link in the accomplishment of the continuation of Defendants' illicit scheme and misstated earnings."  Ex. A ¶ 244.  In other words, Plaintiffs attempt to satisfy the transaction causation requirement by asserting that the "continuation of … the illicit scheme" is the challenged transaction for which proxy consent was required.  But it is obvious that the illegal activities of two of SAIC's tens of thousands of employees is not the subject of shareholder approval.  Moreover, this Circuit's courts have long rejected just such a theory of "but for" causation as Plaintiffs attempt to allege here.  *See, e.g.*, *Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 238 (S.D.N.Y. 2009) (dismissing Section 14(a)

---

[18]    To the extent that Plaintiffs are complaining about a failure to disclose the Director Defendants' alleged breaches of fiduciary duty, failure of oversight, or mismanagement in a proxy solicitation of a vote for the directors, such a claim fails because the Second Circuit has long held that no such disclosure is required. *See, e.g.*, *United States v. Matthews*, 787 F.2d 38, 48 (2d Cir. 1986); *In re Am. Express Co. S'holder Litig.*, 840 F. Supp. 260, 269 (S.D.N.Y. 1993).

claim based on allegations that alleged misrepresentations in challenged proxies were an "'essential link in the accomplishment' of the stock-options backdating scheme, because knowledge of the truth of the omissions would have 'immediately thwarted a continuation of shareholders' endorsement of the directors' positions'"); *Brayton v. Ostrau*, 561 F. Supp. 156, 162-63 (S.D.N.Y. 1983) (dismissing Section 14(a) claim because challenged proxy solicitation was not "essential link" in accomplishment of a repurchase agreement about which plaintiffs complained where no shareholder vote necessary to authorize the agreement); *Rosengarten v. Int'l Tel. & Tel. Corp.*, 466 F. Supp. 817, 827 (S.D.N.Y. 1979) (dismissing Section 14(a) claim where plaintiffs alleged that "had questionable payments been disclosed in proxies concerning the reelection of directors, the directors would not have been reelected and waste of … assets from further [questionable] payments could have been avoided").  It is not enough to allege that wrongdoing should have been disclosed in a proxy statement because, "but for" failure to do so, the directors would not have been reelected to continue a course of alleged misdeeds.  *See United Canso Oil & Gas Ltd. v. Catawba Corp.*, 566 F. Supp. 232, 238 (D. Conn. 1983).  "Labeling a quantity of [alleged] misdeeds a 'scheme' does not magically transform what the plaintiffs are seeking damages for into a transaction requiring shareholder approval."  *Id.*

> ### D.     Plaintiffs Fail to Allege Loss Causation.

Finally, in order to state a claim under Section 14(a), the plaintiff bears the burden of pleading and proving loss causation, *Grace v. Rosenstock*, 228 F.3d 40, 46 (2d Cir. 2000), which requires a plaintiff to show "both that the loss [was] foreseeable *and* that the loss [was] caused by the materialization of the concealed risk," *Lentell v. Merrill, Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005).  Plaintiffs fail to make any allegations at all about loss causation: nowhere do they state any particular loss, much less that such loss was foreseeable or caused by the Audit Committee's statements that it met with SAIC's accountant.  Instead, Plaintiffs state only in the

most conclusory terms that SAIC was "damaged."  Ex. A ¶ 245.  Having identified no false or misleading statement, nor having pled materiality, transaction causation or loss causation, Plaintiffs' claim under Section 14(a) must be dismissed.

      **E.**      **Plaintiffs' Section 14(a) Claims Are Time Barred.**

      Finally, the Section 14(a) claim based on proxy statements filed on April 29, 2009 and April 29, 2010 must also be dismissed for the independent reason that it is time barred.  "The statute of limitations applicable to the § 14(a) claims is one year from discovery or three years from the occurrence that gives rise to the Complaint, whichever is less."  *Bond Opportunity Fund v. UniIab Corp.*, No. 99 Civ. 11074(JSM), 2003 WL 21058251, at *12 (S.D.N.Y. May 9, 2003).  The statutory period "begin[s] to run when the claim accrued or upon discovery of the facts constituting the alleged fraud," and discovery includes "constructive and inquiry notice as well as actual notice."  *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 350 (2d Cir. 1993).  As Plaintiffs themselves emphasize, in December 2010, the U.S. Attorney's Office filed a criminal complaint against persons involved in the CityTime fraud.  Ex. A ¶ 12.  At the latest, once the criminal complaint was filed (and met with significant publicity), *see, e.g.*, *id.* ¶ 149, Plaintiffs had inquiry notice of "the facts giving rise to the action."  *See also supra* Part I.C.  The first-filed complaint was filed February 10, 2012, more than one year since the 2009 and 2010 proxy statements in question, and more than one year since Plaintiffs were on inquiry notice.  Thus, to the extent the Section 14(a) claim is premised on the 2009 and 2010 proxy statements, it is time barred.  To the extent it is based on the 2011 proxy statement, it is deficient for the reasons already stated.

**CONCLUSION**

      For the foregoing reasons, the Director Defendants respectfully request that the Court dismiss Plaintiffs' claims.

35

Dated:  October 25, 2012                    Respectfully submitted,

                                            s/
                                            _____

                                              Mark Filip, admitted *pro hac vice*
                                              Kirkland & Ellis LLP
                                                300 North LaSalle
                                                Chicago, Illinois  60654
                                                Telephone: (312) 862-2000
                                              Facsimile:  (312) 862-2200
                                              Mark.Filip@kirkland.com

                                              W. Neil Eggleston, Bar No. WE7674
                                              Beth A. Williams, Bar No. BA1221
                                              Emily Hughes
                                              Vikas Didwania
                                              Kirkland & Ellis LLP
                                              655 15th St. NW, Suite 1200
                                              Washington, DC  20005
                                              Telephone:
                                              Facsimile:
                                              Neil.Eggleston@kirkland.com
                                              Beth.Williams@kirkland.com

                                              *Attorneys for Defendants Walter P.*
                                              *Havenstein, A. Thomas Young, France A.*
                                              *Córdova, Jere A. Drummond, Thomas F.*
                                              *Frist, John J. Hamre, Miriam E. John,*
                                              *Anita K. Jones, John P. Jumper, Harry*
                                              *M.J. Kraemer, Jr., Lawrence C. Nussdorf,*
                                              *Edward J. Sanderson, Jr., and Louis A.*
                                              *Simpson*

36

<u>**CERTIFICATE OF SERVICE**</u>

I, Neil Eggleston, hereby certify that on this 25th day of October, 2012, I caused a copy of the foregoing document to be served upon all counsel of record via the Electronic Case Filing system, and upon the parties listed below by United States Postal Service, first class postage prepaid:

Andrew S. Tulmello
Jason J. Mendro
Gibson Dunn & Crutcher LLP
1050 Connecticut Avenue, NW
Washington, DC  20036
*Counsel for SAIC, Inc.*

Robert Weiser
James M. Ficaro
The Weiser Law Firm, P.C.
22 Cassatt Avenue
Berwyn, PA  19087
*Counsel for Plaintiff*

David M. Promisloff
Kessler Topaz Meltzer & Check, LLP
280 King of Prussia Road
Radnor, PA  19087
*Counsel for Plaintiff*

                                s/ _____
                                Neil Eggleston