# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE SAIC INC. DERIVATIVE LITIGATION | :   Master File No. 1:12-CV-02437-JPO |
| | : |
| | : |
| | : |
| | : |
| | : |
| This Document Relates to: | : |
| | : |
| ALL ACTIONS | : |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE <u>COMPLAINT</u>

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................1

II.    FACTUAL BACKGROUND .............................................................................5

     A.    Overview of SAIC and Defendants' Multi-Year Illicit Scheme to Overbill
          New York City by Hundreds of Millions of Dollars ......................................5

     B.    Despite Their Knowledge, Defendants Fail to Disclose or to Take Action
          In Response to the Company's Massive, Improper Billing Scheme ...............6

     C.    The Truth Begins to Emerge ..........................................................................9

     D.    Defendants Downplay the Severity of the Company's Illicit Scheme to
          Defraud New York City ...............................................................................10

     E.    As a Result of Defendants' Illicit Scheme, the Company Is Forced to Pay
          Over Half a Billion Dollars in a Record Settlement .....................................12

     F.    Defendants Were On Notice of Numerous "Red Flags" Regarding the
          Company's Overbilling Practices for Years ..................................................13

III.   ARGUMENT ..................................................................................................15

     A.    The Complaint Raises a Reasonable Doubt that a Majority of the Director
          Defendants Are Interested in a Demand ......................................................15

          1.    Legal Standards Governing Demand Futility .....................................15

          2.    There Is Reason to Doubt That the Director Defendants Are
                Entitled to the Protections of the Business Judgment Rule Because
                They Knowingly or Recklessly Disregarded Illegal Actions in
               Connection With CityTime ...............................................................18

          3.    Demand Is Also Excused Because the Director Defendants Face a
                Substantial Likelihood of Liability in Connection with the
               Company's Illegal Business Strategy ................................................29

     B.    Plaintiffs Adequately Allege All Causes of Action ......................................31

          1.    Plaintiffs Adequately State a Claim for Breach of Fiduciary Duties...................31

               a.    Defendants Breached Their Fiduciary Duties by Issuing
                   False and Misleading Statements......................................32

               b.    Defendants Breached Their Fiduciary Duties By Failing to
                   Maintain Adequate Internal Controls.................................38

               c.    Defendants' Reliance on Saic's Exculpatory Provision is
                   Inappropriate At This Juncture and Inapplicable in Any
                     Regard ...............................................................................39

i

2.     Plaintiffs Adequately State a Claim for Unjust Enrichment ................................ 42

3.     Plaintiffs Adequately State Claims For Abuse of Control and Gross Mismanagement ................................................................................................ 44

4.     Plaintiffs Adequately State a Claim Under Section 14(a) of the Securities Exchange Act ................................................................................ 45

        a.     SAIC's Proxy Statements Were Materially False and Misleading ................................................................................ 46

        b.     Plaintiffs Adequately Allege an Essential Link Between the Proxy Statements and Defendants' Misconduct ...................................... 48

5.     Plaintiffs' Claims Are Timely ................................................................ 49

6.     Defendants' Arguments Regarding Service Fails ................................ 51

IV.    CONCLUSION ................................................................................................ 52

## TABLE OF AUTHORITIES

Cases

*Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford,*
    554 F. Supp.2d 538 (D. Del. 2008) ........................................................................... 39

*Alidina v. Internet.com Corp.,*
    CIV. A. 17235-NC, 2002 WL 31584292 (Del. Ch. Nov. 6, 2002) ....................... 39

*Arnold v. Soc'y for Say. Bancorp, Inc.,*
    650 A.2d 1270 (Del. 1994), ...................................................................................... 33

*Aronson v. Lewis,*
    473 A.2d 805 (Del. 1984) ................................................................................. passim

*Ash v. McCall,*
    2000 Del. Ch. LEXIS 144 (Del. Ch. Mar. 15, 2000) ........................................... 30

*Ashcroft v. Iqbal,*
    129 S. Ct. 1937 (2009) ............................................................................................. 31

*Beard Research, Inc. v. Kates,*
    8 A.3d 573 (Del. Ch. 2010) ..................................................................................... 31

*Beck v. Dobrowski,*
    559 F.3d 680 (7th Cir. 2009) ................................................................................... 46

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) .................................................................................................. 31

*Beneville v. York,*
    769 A.2d 80 (Del. Ch. 2000) ................................................................................... 18

*Cal. Pub. Emps.' Ret. Sys. v. Coulter,*
    No. Civ.A. 19191, 2002 WL 31888343 (Del. Ch. Dec. 18, 2002) ........................ 19

*Cinerama, Inc. v. Technicolor, Inc.,*
    663 A.2d 1156 (Del. 1995) ...................................................................................... 31

*City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.,*
    No. 11 Civ. 5026 (JSR), 2012 WL 2866425 (S.D.N.Y. July 13, 2012) ................. 36

*Conrad v. Blank,*
    940 A.2d 28 (Del. Ch. 2007) ................................................................................... 11

*DCML LLC v. Danka Bus. Sys. PLC,*
    No. 08 Civ. 5829 (SAS), 2008 WL 5069528 (S.D.N.Y. Nov. 26, 2008) .............. 46

*Dodona I, LLC v. Goldman, Sachs & Co.,*
    No. 10 Civ. 7497(VM), 2012 WL 935815 n.13 (Mar. 21, 2012) ........................... 36

*Dura Pharms., Inc. v. Broudo,*
   544 U.S. 336 (2005)......................................................................................... 49

*Durant v. Traditional Investments, Ltd.,*
   No. 88 CIV. 9048 (PKL), 1990 WL 33611 (S.D.N.Y. Mar. 22, 1990) ........................... 51, 52

*E. Refractories Co. v. Forty Eight Insulations, Inc.,*
   187 F.R.D. 503 (S.D.N.Y. 1999) ..................................................................... 51

*Emerald Partners v. Berlin,*
   726 A.2d 1215 (Del. 1999) ............................................................................. 39

*Emerald Partners v. Berlin,*
   787 A.2d 85 (Del. 2001) ................................................................................. 40

*Foman v. Davis,*
   371 U.S. 178 , (1962).................................................................................... 52

*Frank v. Elgamal,*
   2012 WL 1096090 (Del. Ch. Mar. 30, 2012)..................................................... 43

*Ganino v. Citizens Utilities Co.,*
   228 F.3d 154 (2d Cir. 2000)............................................................................ 31

*Gerstle v. Gamble-Skogmo, Inc.,*
   478 F.2d 1281 (2d Cir. 1973).......................................................................... 46

*Grimes v. Donald,*
   673 A.2d 1207(Del. 1996), ............................................................................ 16

*Grobow v. Perot,*
   539 A.2d 180 (Del. 1988), ......................................................................... 16, 32

*Guth v. Loft, Inc.,*
   5 A.2d 503 (Del. Ch. 1939)........................................................................... 3, 4

*Harper v. NYC Admin. for Children's Servs.,*
   No. 09 Civ. 2468 (JGK), 2010 WL 23328 (S.D.N.Y. Jan. 5, 2010)....................... 51

*Ho v. Duoyuan Global Water, Inc.,*
   No. 10-CV-7233 (GBD), 2012 WL 3647043 (S.D.N.Y. Aug. 24, 2012)................. 50

*Hughes v. BCI Int'l Holdings, Inc.,*
   452 F. Supp. 2d 290 (S.D.N.Y. 2006)............................................................... 44

*In re Abbott Labs. Deriv. S'holders Litig.,*
   325 F.3d 795, 808 (7th Cir. 2003) ............................................................ passim

*In re Adelphia Comm. Corp. Sec. & Deriv. Litig.,,*
   398 F. Supp. 2d 244 (S.D.N.Y. 2005)............................................................... 36

*In re Alcatel Sec. Litig.,*
   382 F. Supp. 2d 513 (S.D.N.Y. 2005)............................................................... 49

*In re AOL Time Warner, Inc. Sec. &"ERISA" Litig.*,
   381 F. Supp. 2d 192 (S.D.N.Y. 2004) ................................................................. 50

*In re Atlas Worldwide Holdings, Inc. Sec. Litig.*,
   324 F. Supp. 2d 474 (S.D.N.Y. 2004) ................................................................. 24

*In re Autobacs Strauss, Inc.*,
   473 B.R. 525 (D. Del. 2012) ............................................................................... 40

*In re Baxter Int'l, Inc. S'holder Litig.*,
   654 A.2d 1268 (Del. Ch. 1995) ..................................................................... 17, 29

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
   763 F. Supp. 2d 423 (S.D.N.Y. 2011) ................................................................. 36

*In re BISYS Sec. Litig.*,
   397 F. Supp. 2d 430 (S.D.N.Y. 2005) ................................................................. 36

*In re Caremark  Int'l, Inc. Deriv. Litig.*,
   698 A.2d 959 (Del. Ch. 1996) .............................................................................. 20

*In re CitiGroup Inc. Bond Litig.*,
   723 F. Supp. 2d 568 (S.D.N.Y. 2010) ................................................................. 37

*In re Citigroup Inc. Sec. Litig.*,
   753 F. Supp. 2d 206 (S.D.N.Y. 2010) ................................................................. 36

*In re Countrywide Fin. Corp. Derivative Litig.*,
   554 F. Supp. 2d 1044 (C.D. Cal. 2008) ................................................... 25, 45, 48

*In re Direct Response Media, Inc.*,
   466 B.R. 626 (D. Del. 2012) ............................................................................... 41

*In re Elan Corp. Sec. Litig.*,
   543 F.Supp.2d 187 (S.D.N.Y. 2008) ................................................................... 28

*In re Heckmann Corp. Sec. Litig., C.A. *,
   No. 10-378-LPS-MPT, 2012 WL 2428433 (D. Del. May 25, 2012) .................... 49

*In re InfoUSA, Inc. S'holders Litig.*,
   953 A.2d 963 (Del. Ch. 2007) ....................................................................... 17, 33

*In re Lehman Bros. Sec. & Erisa Litig.*,
   799 F. Supp. 2d 258 (S.D.N.Y. 2011) ................................................................. 36

*In re McKesson HBOC, Inc. Sec. Litig.*,
   126 F. Supp. 2d 1248 (N.D. Cal. 2000) .............................................................. 46

*In re MRU Holdings Sec. Litig.*,
   769 F. Supp. 2d 500 (S.D.N.Y. 2011) ................................................................. 36

*In re Netsmart Techs., Inc. S'holders Litig.*,
   924 A.2d 171 (Del. Ch. 2007) ............................................................................. 33

*In re Oxford Health Plans, Inc.*,
   192 F.R.D. 111 (S.D.N.Y. 2000). ...................................................................... 11, 20, 28, 45

*In re Philip Servs Corp. Sec. Litig.*,
   383 F. Supp. 2d 463 (S.D.N.Y. 2004) .................................................................... 36

*In re Pfizer Inc. S'holder Deriv. Litig.*,
   722 F. Supp. 2d 453 (S.D.N.Y. 2010) ............................................................. passim

*In re Pure Res., Inc., S'holders Litig.*,
   808 A.2d 421 (Del. Ch. 2002).................................................................... 33, 34, 35

*In re Refco, Inc. Sec. Litig.*,
   503 F. Supp. 2d 611 (S.D.N.Y. 2007) .................................................................... 36

*In re Reserve Fund Sec. & Deriv. Litig.*,,
   732 F. Supp. 2d 310 (S.D.N.Y. 2010) .................................................................... 24

*In re Scottish Re Grp. Sec. Litig.*,
   524 F. Supp. 2d 370 (S.D.N.Y. 2007) .................................................................... 37

*In re SFBC Int'l, Inc. Sec. & Deriv. Litig.*,
   495 F. Supp. 2d 477 (D.N.J. 2007) ................................................................. 21, 24

*In re Smith Barney Transfer Agent Litig.*,
   765 F. Supp. 2d 391 (S.D.N.Y. 2011) .................................................................... 36

*In re Sonus Networks, Inc. Sec. Litig.*,
   No. Civ.A.04-10294-DPW, 2006 WL 1308165 (D. Mass. May 10, 2006) ............................ 39

*In re TASER Int'l S'holder Deriv. Litig.*,
   No. CV-05-123-PHX-SRB, 2006 WL 687033 (D. Ariz. Mar. 17, 2006).............................. 40

*In re The Brown Schools*,
   368 B.R. 394 (Bankr. D. Del. 2007) ...................................................................... 40

*In re Tower Air, Inc.*,
   416 F.3d 229 (3d Cir. 2005)................................................................................ 40

*In re Tyson Foods, Inc.*,
   2007 WL 2351071  (Del. Ch. Aug. 15, 2007) ......................................................... 32

*In re Van der Moolen Holding N.V. Sec. Litig.*,
   405 F. Supp. 2d 388 (S.D.N.Y. 2005).................................................................... 36

*In re Veeco Instruments, Inc. Sec. Litig.*,
   434 F. Supp. 2d 267 (S.D.N.Y. 2006) ................................................. 16, 17, 28, 29

*In re Walt Disney Co. Deriv. Litig.*,,
   825 A.2d 275 (Del. Ch. 2003)............................................................................. 29

*In re Walt Disney Co. Deriv. Litig.*,,
   907 A.2d 693 (Del. Ch. 2005)............................................................................. 40

*Int'l Equity Capital Growth Fund, L.P. v. Clegg*, ,
No. Civ.A. 14995, 1997 WL 208955 (Del. Ch. Apr. 22, 1997) ................................ 17, 22-23

*Int'l Ins. Co. v. Johns*,
874 F.2d 1447 (11th Cir. 1989) ................................................................................. 19

*Jackson Nat'l Life Ins. Co. v. Kennedy*,
741 A.2d 377 (Del. Ch. 1999) ................................................................................... 42

*Janus Capital Grp., Inc. v. First Deriv. Traders*,
131 S. Ct. 2296 (2011) .............................................................................................. 49

*Jimenez v. Brazil Ethanol, Inc.*,
No. 11 Civ. 3635(LBS), 2011 WL 5932600 (S.D.N.Y. Nov. 29, 2011) ................. 36

*Jones v. Corus Bankshares, Inc.*,
701 F. Supp. 2d 1014 (N.D. Ill. 2010) ..................................................................... 39

*Kahn ex rel. DeKalb Genetics Corp. v. Roberts*,
679 A.2d 460 (Del. 1996) .......................................................................................... 19

*Kamen v. Kemper Fin. Servs. Inc.*,
500 U.S. 90 (1991) ..................................................................................................... 15

*Kelley v. Rambus, Inc., No. C-07-01238 JF (HRL)*,
2008 WL 5170598 (N.D. Cal. Dec. 9, 2008) ........................................................... 48

*La. Mun. Police Emps. Ret. Sys. v. Pyott*,
46 A.3d 313 (Del. Ch. 2012) ..................................................................................... 26

*Lapin v. Goldman Sachs Grp., Inc.*,
506 F. Supp. 2d 221 (S.D.N.Y. 2006) ...................................................................... 50

*LC Capital Partners LP v. Frontier Ins. Grp., Inc.*,
318 F.3d 148 (2d Cir. 2003) ...................................................................................... 50

*Malone v. Brincat*,
722 A.2d 5 (Del. 1998) ...................................................................................... 31, 32

*Malpiede v. Townson*,
780 A.2d 1075 (Del. 2001) ........................................................................................ 42

*Marhart, Inc. v. CalMat Co.*,
No. 11820, 1992 WL 82365 (Del. Ch. Apr. 22, 1992) ............................................ 32

*Maruzen Intern., Co. Ltd. v. Bridgeport Merchandise, Inc.*,
770 F. Supp. 155 (S.D.N.Y. 1991) ..................................................................... 51, 52

*McCall v. Scott*,
239 F.3d 808 (6th Cir. 2001) ............................................................................. 20, 27

*McCall v. Scott*,
   250 F.3d 997 (6th Cir. 2001) ......................................................................... 40

*Merck & Co. v. Reynolds*,
   130 S. Ct. 1784 (2010) ............................................................................. 49, 50

*Mervyn's Holdings, LLC v. Lubert-Adler Group IV, LLC*,
   426 B.R. 488 (D. Del. 2010) .......................................................................... 39

*Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs., Inc.,*,
   854 A.2d 121 (Del. Ch. 2004) .................................................................... 19, 32

*MGH Capital Corp. v. Maginn*,
   2010 WL 1782271 (Del. Ch. May 5, 2010) ..................................................... 43

*Miller v. AT&T*,
    507 F.2d 759 (3d Cir. 1974) .......................................................................... 19

*Mills Acquisition Co. v. MacMillan, Inc.*,
   559 A.2d 1261 (Del. 1989) ............................................................................ 38

*Mills v. Elec. Auto-lite Co.*,
   396 U.S. 375 , 90 S. Ct. 616, 24 L. Ed. 2d 593 (1970) ...................................... 45

*Newman v. Prior*,
   518 F.2d 97 (4th Cir. 1975) ........................................................................... 51

*Newman v. Warnaco Grp., Inc.*,
   335 F.3d 187 (2d Cir. 2003) ........................................................................... 49

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) ........................................................................... 46

*O'Reilly v. Transworld Healthcare, Inc.*,
   745 A.2d 902 (Del. Ch. 1999) ........................................................................ 33

*Orman v. Cullman*,
   794 A.2d 5 (Del. Ch. 2002) ........................................................................... 41

*Pension Comm. of Univ. of Montreal Pension Plan v. Bank of Am. Sec., LLC*,
   446 F. Supp. 2d 163 (S.D.N.Y. 2006) .............................................................. 36

*Pereira v. Cogan*,
   294 B.R. 449 (S.D.N.Y. 2003) ........................................................................ 18

*Portannese v. Donna Karan Int'l., Inc.*,
   No. 97-CV-2011 CBA, 1998 WL 637547 (E.D.N.Y. Aug. 14, 1998) .................. 48

*Rabkin v. Philip A. Hunt Chem. Corp.*,
   547 A.2d 963 (Del. Ch. July 15, 1929) ............................................................ 44

*Rales v. Blasband*,
   634 A.2d 927 (Del. 1993) ................................................................. 16, 29, 31

*Richardson v. Downing*,
  209 F.R.D. 283 (D. Mass. 2002) ........................................................................ 51

*Richman v. Goldman Sachs Grp., Inc.*,
  868 F. Supp. 2d 261 (S.D.N.Y. 2012) ........................................................... 37, 49

*Ryan v. Gifford*,
  918 A.2d 341 (Del. Ch. 2007) ................................................................. 17, 33, 43

*Ryan v. Lyondell Chemical Co.*,
  C.A. No. 3176 VCN, 2008 WL 4174038 (Del. Ch. Aug. 29, 2008) .............. 30, 40

*S.E.C. v. Landberg*,
  836 F. Supp. 2d 148 (S.D.N.Y. 2011) .................................................................. 36

*Staehr v. The Hartford Fin. Servs. Grp., Inc.*,
  547 F.3d 406 (2d Cir. 2008) ................................................................................. 50

*Stone v. Travis*,
  No. 05 Civ. 6249 (RPP), 2006 WL 334648 (S.D.N.Y. Feb. 10, 2006) ............... 45

*Stratte–McClure v. Stanley*,
  784 F. Supp. 2d 373 (S.D.N.Y. 2011) .................................................................. 36

*Teachers' Ret. Sys. of Louisiana v. Aidinoff*,
  900 A.2d 654 (Del. Ch. 2006) .............................................................................. 42

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ............................................................................................. 31

*Total Care Physicians, P.A. v. O'Hara*,
  798 A.2d 1043 (Del. Super. 2001) ....................................................................... 42

*TSC Indus. v. Northway, Inc.*,
  426 U.S. 438 , 96 S. Ct. 2126, 48 L. Ed. 2d 757 (1976) ..................................... 45

*U.S. v. 630 Ardmore Dr.*,
  178 F. Supp. 2d 572 (M.D.N.C. 2001) ................................................................ 51

*United Food & Comm. Workers Union v. Alpha Beta Co.*,
  736 F.3d 1371, 1382 (9th Cir. 1984) ................................................................... 51

*Wall St. Sys., Inc. v. Lemence*,
  No. 04 Civ. 5299 (JSR), 2005 WL 292744 (S.D.N.Y. Feb. 8, 2005) .................. 46

*Weisberg v. Coastal States Gas Corp.*,
  609 F.2d 650 (2d Cir. 1979) ................................................................................. 48

*Weiss v. Swanson*,
  948 A.2d 433 (Del. Ch. 2008) .............................................. 24, 29, 32, 43, 47

*Westinghouse Elec. Corp. v. Franklin*,
  789 F. Supp. 1313 (D.N.J. 1992) ......................................................................... 48

*Wilson v. Great Am. Indus.*,
  855 F.2d 987 (2d Cir. 1988) ................................................................................. 46

*Zapata v. City of New York*,
  502 F.3d 192 (2d Cir. 2007) ................................................................................. 51

Statutes

15 U.S.C. §78n(a) ...................................................................................................... 45

Other Authorities

S. Samuel Arsht, The Business Judgment Rule, 8 Hofstra L. Rev. 93, 129 (1979) .................... 19

Co-Lead Plaintiffs Monte Welch ("Welch") and Edward Stellini ("Stellini") respectfully submit this memorandum of law in opposition to Defendants'[1] six separate motions to dismiss Plaintiffs' Verified Consolidated Shareholder Derivative Complaint (the "Complaint").[2]  As discussed herein, the Complaint[3] brought on behalf of SAIC raises a reasonable doubt regarding the disinterestedness of a majority of the Director Defendants, rendering pre-suit demand in this shareholder derivative action (the "Action") futile.  Additionally, as discussed herein, the Complaint states claims upon which relief may be granted.  Accordingly, the Motions should be denied in their entirety.

I.    INTRODUCTION

This Action is about good faith – or, to be more precise, the perils presented by unfaithful fiduciaries.  Where a director consciously ignores his or her duties, thereby causing injury to the

---

[1] "Defendants" include: Walter P. Havenstein ("Havenstein"), A. Thomas Young ("Young"), France A. Córdova ("Córdova"), Jere A. Drummond ("Drummond"), Thomas F. Frist ("Frist"), John J. Hamre ("Hamre"), Miriam E. John ("John"), Anita K. Jones ("Jones"), John P. Jumper ("Jumper"), Harry M.J. Kraemer, Jr. ("Kraemer"), Lawrence C. Nussdorf ("Nussdorf"), Edward J. Sanderson, Jr. ("Sanderson"), Louis A. Simpson ("Simpson"), Mark W. Sopp ("Sopp"), Kenneth C. Dahlberg ("Dahlberg"), Gerard. A. Denault ("Denault"), Carl Bell ("Bell"), and Deborah H. Alderson ("Alderson").  The "Director Defendants" refers to the members of SAIC Inc.'s ("SAIC" or the "Company") Board of Directors (the "Board") when the above-captioned shareholder derivative action (the "Action") was initiated: Havenstein, Young, Córdova, Drummond, Frist, Hamre, John, Jones, Jumper, Kraemer, Nussdorf, Sanderson, and Simpson.

[2] Six separate motions to dismiss the Complaint (collectively, the "Motions") are currently pending: (1) Nominal Defendant SAIC, Inc.'s Motion to Dismiss the Verified Consolidated Shareholder Derivative Complaint (the "SAIC Motion"); (2) Director Defendants' Motion to Dismiss the Verified Consolidated Shareholder Derivative Complaint (the "Directors' Motion"); (3) Deborah H. Alderson's Motion to Dismiss Verified Consolidated Shareholder Derivative Complaint ("Alderson's Motion"); (4) Defendant Mark W. Sopp's Motion to Dismiss ("Sopp's Motion"; (5) Defendant Gerard Denault's Motion to Dismiss the Verified Consolidated Shareholder Derivative Complaint ("Denault's Motion"); and (6) Kenneth C. Dahlberg's Motion to Dismiss the Verified Consolidated Shareholder Derivative Complaint ("Dahlberg's Motion"). In the interests of brevity, this opposition responds to all of the Motions.

[3] References herein to the Complaint shall appear in the following format: "¶ or ¶¶ ."

corporation, he or she has not acted in good faith.  Simply put, directors of a Delaware corporation cannot stick their heads in the sand like ostriches, adopt a "we don't care about the risks" attitude, and – at the same time – invoke the provisions of the law designed to protect directors who faithfully execute their duties.  The protections afforded to directors of Delaware corporations are designed to be a shield for the faithful – not a sword for the indifferent.  Where, as here, directors are alleged to have turned a deliberate blind-eye to wrongdoing and violated their duty of good faith, they cannot invoke the protections of the business judgment rule (or an exculpatory clause) at the pleading stage, and they also face a substantial likelihood of liability, excusing pre-suit demand.

In this Action, Plaintiffs allege with particularity that the Director Defendants consciously permitted a multi-year illegal scheme to overbill New York City ("NYC") to the tune of hundreds of millions of dollars on the now-infamous "CityTime" project,[4] ultimately subjecting SAIC to a ***record settlement amounting to more than half a billion dollars***, and thus breached their duty of good faith.  Accordingly, there is reason to doubt that the Director Defendants could have properly, dispassionately, and disinterestedly considered a pre-suit demand.  This Action is a textbook example of why Delaware and other jurisdictions developed the demand futility doctrine in the first place – equitable principles arise from conscience – and stockholder plaintiffs should not be forced to proceed with empty, futile ceremonies.  Here, based on Plaintiffs' particularized allegations of repeated "red flags" including: (a) widespread media reports documenting, criticizing, and calling into question the massive, unprecedented cost

---

[4]  As discussed further herein, under a contract SAIC entered into with NYC in 2001, the Company was obligated to develop and implement an automated time, attendance and workforce management system for certain NYC agencies known as "CityTime."  ¶1.  When CityTime commenced, NYC's contract with SAIC was budgeted to cost NYC a total of $63 million.  ¶2.  By April 2010, however, NYC had paid SAIC more than ***$600 million*** for work on CityTime – or nearly ***ten times over the original budget***.

overruns on the CityTime project, certain of which contained anonymous accounts of rampant overbilling; (b) public NYC hearings held regarding the cost overruns during which NYC officials, *inter alia,* called for a moratorium on the CityTime project pending a full-scale investigation (and media coverage of same); and (c) prior accusations of Company overbilling on government contracts, it strains credulity to believe that the Director Defendants could have properly, dispassionately, and disinterestedly considered a pre-suit demand.

The simple, unfortunate truth (for stockholders of most corporations) is that, unlike the Director Defendants here, the average director of a public company never even has the opportunity to discover potential employee wrongdoing as it is occurring.  This reality likely has little to do with the nature of "fraudulent" conduct; rather, in most situations, there is only so much information that is available to a board of directors.  One of the ironies of our information age is that it is simply unreasonable to expect non-employee directors to know all of the actions of far-flung corporate personnel.  Directors of Delaware corporations are ***not*** charged with ensuring that they possess enterprise-wide knowledge of every employee activity and, indeed, this reality is reflected in the vast majority of authority on this subject.  Ancient Delaware corporate law principles, however, ***require*** directors to take action to address wrongdoing ***once they are on notice*** of information that suggests they should.  Delaware directors have an affirmative duty to act if they are on notice, thereby preventing problems from mushrooming into far-more-significant troubles.[5]

---

[5] *See, e.g., Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. Ch. 1939) ("A public policy, existing through the years, and derived from a profound knowledge of human characteristics and motives, has established a rule that demands of a corporate officer or director, ***peremptorily*** and inexorably, the most scrupulous observance of his duty, [which includes acting] ***affirmatively*** to protect the interests of the corporation committed to his charge…")  Thus, once a director is on notice of a Company's problems, he is required to act on them.  *Id.*  Plaintiffs also note that *Guth* (and its voluminous progeny) are not "aspirational ideals"; rather, effective Delaware directors actually do accomplish what is undoubtedly one of the primary duties of boards; managing problems and preventing them from compounding.  Unless otherwise noted, all emphasis is

Such was the case here.  In the face of the repeated red flags set forth in the Complaint, any claim by the Director Defendants that they were "blamelessly unaware" of the wrongdoing giving rise to unprecedented penalties (and this Action) must be rejected at the pleading stage. Indeed, as *The Washington Post* stated earlier this year, "***there were plenty of warning signs for anyone with even a passing familiarity with the government contracting business***," let alone the Director Defendants, who specifically warned stockholders that SAIC's compliance with laws and regulations relating to the administration and performance of government contracts were, and are, critical to SAIC.  Further, SAIC relies almost exclusively on revenues generated from government contracts.

Thirteen Director Defendants served on the Board when the Action was initiated.  Thus, the Motions must be denied if the Court has "reason to doubt" that at least seven of the Director Defendants could have properly considered a demand.  Plaintiffs easily satisfy the "reasonable doubt" standard because, *inter alia*, all of the Director Defendants face a substantial likelihood of liability based on their violations of the duty to act in good faith.  Plaintiffs have alleged with particularity that the Director Defendants knew, or should have known, of repeated "red flags" concerning substantial, illicit overbilling on the CityTime contract, yet sat on this information for years and did nothing to rectify the situation.  They cannot now complain that Plaintiffs should have issued a demand.  Plaintiffs' allegations, particularly when considered *in toto*, easily create the "reasonable doubt" necessary to defeat the Motions.

---

added and all internal citations and quotations are omitted.

## II.     FACTUAL BACKGROUND

### A.     Overview of SAIC and Defendants' Multi-Year Illicit Scheme to Overbill New York City by Hundreds of Millions of Dollars

According to its public filings, SAIC provides defense, intelligence, homeland security, logistics, energy, environment and heath solutions and services to federal, state and local government agencies, foreign governments and customers in select commercial markets.  ¶1. This Action arises from serious, unprecedented misconduct in connection with SAIC's billing (or, to be more precise, rampant overbilling) on a contract with NYC to develop and implement an automated time, attendance and workforce management system for certain NYC agencies, which was known as CityTime.  *Id.*  Ultimately, in 2012, as a result of Defendants' multi-year illicit scheme that is the subject of this Action, SAIC was forced to pay ***over half a billion dollars*** as part of a ***record settlement*** with governmental and regulatory authorities.  *Id.*

Specifically, in 2001, when CityTime commenced, NYC's contract with SAIC was budgeted to cost NYC a total of $63 million.  ¶2.  By April 2010, however, NYC had paid SAIC more than ***$600 million*** for work on CityTime – or nearly ***ten times*** over the original budget.  *Id.* Notably, observers commented publicly that is was unheard of to have a budget increase of this magnitude on a government contract of this type without a cancellation of the project altogether. ¶138.  As discussed in the Complaint, NYC's ballooning contract costs were the result of a multi-year, secret illicit overbilling scheme perpetuated on NYC under Defendants' direction, or with their conscious disregard.  *Id.*

**B.      Despite Their Knowledge, Defendants Fail to Disclose or to Take Action In Response to the Company's Massive, Improper Billing Scheme**

During the Relevant Period,[6] Defendants did not disclose that the Company was engaged in a massive, improper billing scheme through which it was scamming NYC out of hundreds of millions of dollars.  ¶3.  To the contrary, Defendants repeatedly and falsely claimed that under their direction, SAIC was purportedly "committed to customer satisfaction, mission success, and the highest standards of performance, ethics and integrity."  *Id.*  Moreover, Defendants issued a multitude of financial and other public statements throughout the Relevant Period that failed to disclose that the Company, on their watch, was improperly recognizing hundreds of millions of dollars in revenues which had been obtained through illegal conduct.  ¶4.  The Company's revenue growth during the Relevant Period was not entirely "organic" as Defendants would have had shareholders believe – rather, it was fueled, at least in part, by the serious wrongdoing alleged in the Complaint.  *Id.*[7]

Critically, due to the nature of its business, SAIC has relied almost exclusively throughout the Relevant Period (and it continues to heavily rely) on revenues generated from government contracts. ¶5.  Indeed, according to the Company's public filings, for fiscal year 2011, revenues generated from government contracts accounted for ***97%*** of the Company's overall revenues.  *Id.*  Similarly, according to the Company's public filings, revenues generated from government contracts accounted for 87%, 88%, and 88% of SAIC's total revenues for fiscal years 2008, 2007, and 2006, respectively.  *Id.*  Thus, Defendants (including the Director

---

[6] The "Relevant Period" is defined as 2003 to the present.  ¶1.

[7] Defendants reported $7.8 billion in annual revenues for 2006, $8.3 billion in annual revenues for 2007, $9 billion in annual revenues for 2008, $10 billion in annual revenues for 2009, $10.8 billion in annual revenues for 2010, and $11.1 billion in annual revenues for 2011.  ¶5, n.1.

Defendants) were well-aware throughout the Relevant Period, and consistently warned SAIC stockholders, that: (a) the Company's reputation and its relationships with governmental entities and (b) its compliance with laws and regulations relating to the administration and performance of government contracts were, and are, critical to the Company's business.  *Id.*[8]

Defendants likewise were, or should have been, on notice of numerous "red flags" during the Relevant Period related to the Company's overbilling on government contracts in general, and the CityTime disaster in particular, years prior to its eventual public blowup beginning in December 2010.  ¶6.  For instance, as discussed in the Complaint (and herein), dating back as far as April 2008,[9] there was widespread media coverage, most notably by the *New York Daily News* (the "*Daily News*") – one of the most widely circulated newspapers in the country – that was critical of both SAIC and NYC for the tremendous, unprecedented cost overruns in connection

---

[8] For example, in SAIC's Annual Report on Form 10-K filed on March 28, 2008 with the U.S. Securities and Exchange Commission (the "SEC"), Defendants warned that SAIC depends on its contracts with government entities "for a significant portion of our revenues and, if our reputation or relationships with these agencies were harmed, our future revenues and growth prospects would be adversely affected… ***[i]f our reputation with these agencies is negatively affected, or if we are suspended or debarred from contracting with government agencies for any reason…our future revenues and growth prospects would be adversely affected***."  ¶6, n.2.  Defendants further warned that ***any failure by SAIC to comply with laws and regulations applicable to government contracts could potentially lead to penalties and termination of those contracts***.  *Id.*  More recently, in SAIC's Annual Report on Form 10-K filed with the SEC on March 25, 2011, Defendants warned that "[i]f a review or investigation identifies improper or illegal activities, we may be subject to civil or criminal penalties or administrative sanctions, including the termination of contracts, forfeiture of profits, the triggering of price reduction clauses, suspension of payments, fines and suspension or debarment from doing business with governmental agencies."  *Id.*

[9] Notably, 10 of the 13 Director Defendants – Young, Córdova, Drummond, Hamre, John, Jones, Jumper, Kraemer, Sanderson, and Simpson – joined the Board by February 2008 or earlier. ¶¶36-53.

with the CityTime project.  ¶7.[10]  Specifically, as pointed out in its December 19, 2010 article entitled "As Scandal Erupts and Arrests Are Made, Warning Signs For CityTime Fraud Were There All Along," the *Daily News* published a series of critical articles which "***first raised questions about CityTime in April 2008,*** when it was a $410 million project."  *Id.*

Further, as a result of the negative media coverage of the skyrocketing costs of CityTime, in May 2008, at the urging of New York State Senator Joseph Addabbo, Jr. ("Senator Addabbo"), who then served on the New York City Council as Chairman of the Civil Service and Labor Committee, there was a ***public*** New York City Council hearing held regarding the massive CityTime cost overruns.  ¶8.  During that hearing, among other things, Senator Addabbo ***specifically recommended that there be a moratorium placed on the CityTime project while a full-scale investigation could take place***.  *Id.*[11]

No moratorium ever occurred, however.  ¶9.  Incredibly, in March 2009, less than a year after Senator Addabbo publicly called for putting a stop to the CityTime Project pending an investigation, in the Company's 2009 Annual Report, Defendants (including the Director Defendants) specifically touted the Company's CityTime contract with NYC, singling it out as a purportedly shining example of SAIC's top-quality work.  ¶127.  Meanwhile, the CityTime project continued unabated even in the face of harsh public criticism, and its unprecedented cost overruns continued to spiral out of control.  ¶9.  In response to this information, and the continued media backlash about CityTime, in December 2009, yet another ***public*** New York

---

[10] The *Daily News* is the fourth-most widely circulated daily newspaper in the U.S.  *See* http://www.capitalnewyork.com/article/media/2011/11/3970412/journal-times-and-news-among-top-five-biggest-selling-papers-us-post-n.

[11] As Senator Addabbo later explained in December 2010, "[i]n 2008, while facing a looming city budget deficit of $4 billion, I wondered if we were at a point after a decade of using CityTime, whether we were throwing good money at a bad program. Because of the inflated cost and undetermined duration, I called for at minimum, a halt on payments and work under the contract."  ¶9, n.3.

City Council hearing was held, this time by the Committee on Contracts.  *Id.*  During the December 2009 hearing, Chairperson Letitia James specifically referenced a *Daily News* report, and an email she had received, about the account of an anonymous individual.  *Id.*  This individual claimed to have been paid $120,000 for work on CityTime over an eight month period even though he or she "probably did real work for approximately two weeks.  Most of the time we sat and browsed the internet and hung out.  The unwritten rule was to keep billing for the hours you showed up, not the work you did."  *Id.*

Accordingly, it is clear that Defendants, including the Director Defendants, were undoubtedly on notice for years of the serious wrongdoing that ultimately gave rise to a record settlement with the government costing SAIC (*i.e.*, its stockholders) more than half a billion dollars – yet they took no action.  ¶10.

### C.     The Truth Begins to Emerge

On December 15, 2010, the U.S. Attorney's Office for the Southern District of New York (the "US Attorney") filed a criminal complaint against four consultants to the NYC Office of Payroll Administration ("OPA") in connection with CityTime.  ¶11.  The worst was yet to come, however.  ¶12.  On February 10, 2011, the US Attorney issued a press release announcing the filing of an indictment in connection with fraud, kickback, and money laundering schemes involving CityTime.  ¶13.  In addition, the US Attorney announced that one of the consultants to the OPA, Victor Natanzon, had pled guilty to charges on February 8, 2010 arising out of his role in the CityTime scandal.  *Id.*

On June 20, 2011, the US Attorney issued another press release, announcing that it was unsealing a superseding indictment, which added two more individual defendants as well as a corporate defendant.  ¶14.  Importantly, the US Attorney charged defendant Denault, SAIC's

9

longtime former Vice President and Operations Manager.  *Id.*  The press release also announced the unsealing of a guilty plea by defendant Bell, a Chief Systems Engineer in SAIC's New York office.  *Id.*  Defendant Bell pled guilty to multiple criminal charges based on his participation in the CityTime billing scheme.  *Id.*

The US Attorney's press release also quoted Preet Bharara, the U.S. Attorney for the Southern District of New York, who stated that "since the first announcement of arrests and seizures, we have developed evidence that ***the corruption on the CityTime project was epic in duration, magnitude, and scope***.  As alleged, CityTime served as a vehicle for ***an unprecedented fraud***, which appears to have metastasized over time."  ¶15.

### D.     Defendants Downplay the Severity of the Company's Illicit Scheme to Defraud New York City

Despite the criminal charges filed, Defendants continued to misleadingly downplay SAIC's involvement in, and its potential exposure in connection with, the CityTime scandal. ¶16.  For instance, on June 2, 2011, Defendants issued a press release announcing SAIC's financial results for the first fiscal quarter of 2011, the period ended April 30, 2011, and held a conference call with analysts and investors to discuss the Company's earnings and operations. *Id.*  During that call, Defendants tried to create the impression that the Company's exposure arising from any wrongdoing on CityTime was limited because they claimed it was based on the activities of just one project manager who had improperly billed NYC for merely $2.5 million. *Id.*  Defendants further emphasized that NYC had not filed any claims against SAIC or requested reimbursement of any payments previously made to SAIC for CityTime.  *Id.*

Less than four weeks later, however, on June 29, 2011, NYC Mayor Michael R. Bloomberg ("Mayor Bloomberg") wrote a letter to defendant Havenstein, SAIC's Chief Executive Officer ("CEO") and a member of the Board, ***demanding the return of $600 million***

to NYC that had been paid to SAIC for CityTime.  ¶17.  Defendants, notably, did not publicly correct their earlier representations to shareholders made on the June 2, 2011 conference call, and did not disclose the existence of the June 29 letter from Mayor Bloomberg until much later. *Id.*[12]

Indeed, over a month after Mayor Bloomberg sent his letter demanding the return of $600 million to NYC, on August 31, 2011, Defendants finally started to acknowledge the Company's exposure as it related to CityTime.  ¶18.  Defendants, however, still minimized the potential significant impact of that exposure on SAIC.  *Id.*  Specifically, on that date, Defendants issued a press release announcing SAIC's financial results for the second quarter of 2011, the period ended July 31, 2011.  ¶19.  For the quarter, Defendants reported an approximate 6% decline in revenues and a 23% decline in operating margins.  *Id.*  Defendants also held a conference call with analysts and investors, wherein they disclosed that the Company's revenues were, in part, adversely impacted by the "wind[ing] down" of the CityTime contract. *Id.*  Defendants said that, while they could not quantify the amount, they believed that it was "probable" that SAIC would have to make restitution to NYC in connection with the CityTime scandal.  *Id.*  Following these revelations, SAIC's stock price fell by nearly 14%, from $15 per share on August 31, 2011, to

---

[12] This was in and of itself a separate and distinct breach of fiduciary duty, and in addition to the other independent reasons (discussed at length herein) why demand is excused, demand is also excused because no reasonable SAIC shareholder could reasonably expect the Board to respond to a demand in good faith based on its failure to promptly correct its June 2, 2011 statements to shareholders stressing that NYC had not requested reimbursement of any payments previously made to SAIC.  *See, e.g., Conrad v. Blank*, 940 A.2d 28, 37-38 (Del. Ch. 2007) (excusing demand based purely on board's vague, incomplete disclosures regarding alleged wrongdoing that was the subject of the action).  If, under the particular circumstances of a given case, a Court finds that based on a board's disclosures or conduct, "it would be odd if Delaware law required a stockholder to make demand on the board of directors," demand may be excused on that basis alone.  *Id.*; *see also In re Oxford Health Plans, Inc.*, 192 F.R.D. 111, 116 (S.D.N.Y. 2000) (applying Delaware law, denying motion to dismiss, and noting that "the totality of [the directors'] actions to date suggest most strongly that they will not take action" in response to a demand).

$12.97 per share on September 1, 2011.  ¶20.

On December 8, 2011, Defendants caused SAIC to file a Quarterly Report on Form 10-Q with the SEC.  ¶21.  The Form 10-Q revealed that as a result of Defendants' breaches of fiduciary duty and other misconduct, they expected that the Company's losses relating to CityTime would amount to at least $232 million (despite the fact that Mayor Bloomberg had previously demanded $600 million).  *Id.*  As such, Defendants caused the Company to record a loss provision in that amount, consisting of a $52 million reduction in revenue and a $180 million charge to selling, general and administrative expenses.  *Id.*  As it later turned out, the Company's exposure was well more than double what Defendants represented on December 8, 2011.  *Id.*

### E.     As a Result of Defendants' Illicit Scheme, the Company Is Forced to Pay Over Half a Billion Dollars in a Record Settlement

On March 14, 2012, Defendants caused the Company to announce that it had entered into a Deferred Prosecution Agreement (the "DPA") with the US Attorney.  ¶22.  Per the terms of the DPA, Defendants agreed that SAIC would be obligated to pay ***$500.4 million*** to the government, comprised of: (a) $370.4 million in restitution to NYC and (b) a $130 million penalty.  *Id.*  In addition, Defendants agreed that SAIC would forfeit another $40 million in unpaid bills that had been previously invoiced to NYC, bringing the total monetary value of the settlement to ***$540.4 million***.  *Id.*  According to the US Attorney, this settlement was historic, setting ***the record*** for a case arising from misconduct in connection with a state or local government contract.  *Id.*

Moreover, in connection with the DPA, Defendants caused SAIC to agree to a Statement of Responsibility (the "SOR") admitting that SAIC defrauded NYC by inducing it to significantly overpay for the CityTime project.  ¶23.  Specifically, in the SOR, Defendants admitted that "***the conduct and managerial failures described [t]herein contributed to the***

*ability of Denault and Bell to commit their alleged crimes against the City, and that the City was defrauded by SAIC as a result*." ¶24.  Further, in the SOR, Defendants admitted that under their direction and on their watch, "*SAIC failed to take actions that might have detected, disrupted or curtailed the charged conspiracies, allowing the City to be victimized repeatedly and systematically for more than seven years*." *Id.*

### F. Defendants Were On Notice of Numerous "Red Flags" Regarding the Company's Overbilling Practices for Years

Notably, despite the fact that (as discussed above) Defendants were on notice of the Company's actual CityTime misconduct *for years* based on media reports and New York City Council hearings, Defendants were likewise on notice of numerous other "red flags" concerning the Company's overbilling practices and other misconduct in the administration and performance of government contracts.  ¶25.  For instance, both before and during the Relevant Period, the Company was repeatedly accused of, cited. and punished for similar misconduct.  *Id.*   In particular, according to the Project on Government Oversight's *Federal Contractor Misconduct Database*, SAIC has come under scrutiny for no less than **thirteen** "instances of misconduct," at least two of which involved claims for overbilling on government contracts brought pursuant to the False Claims Act (the "FCA").[13]  *Id.*  These incidents include the following:

- In 1995, SAIC was charged with defrauding the government over its efforts to design a flat panel display screen for fighter jets. The government alleged that SAIC received millions of dollars, but never produced a fully operational model and misled the government about the status of its progress. According to media reports, in December 1995, SAIC settled with the government and paid a fine of $2.5 million;

---

[13] Under the FCA, knowingly presenting or causing to be presented to the government any false or fraudulent claim for payment is illegal.  ¶26, n.4.  The government may recover for a violation of the FCA three times the amount of the damages the government sustained, in addition to a civil monetary penalty.  *Id.*

- In 2004 (*i.e.,* during the Relevant Period), SAIC agreed to settle allegations based on FCA violations involving a contract to design a computer program for the Department of Defense, called the Defense Occupational and Environmental Health Readiness System (DOEHRS). The government claimed that SAIC repeatedly misrepresented its progress on the DOEHRS project and caused the government to overpay for its services;

- Also in 2004 (again, during the Relevant Period), the Nuclear Regulatory Commission (the "NRC") filed a lawsuit against SAIC, alleging that SAIC submitted false and/or fraudulent bills and made other statements to the government in violation of the FCA. ***In July 2008 – mere months after the media and political firestorm over the massive cost overruns on CityTime had begun and Senator Addabbo had publicly called for a moratorium on the project, a jury found that SAIC knowingly submitted 60 false claims for payment and knowingly made 17 false statements to get claims paid on two NRC contracts*** and awarded the U.S. government $1.97 million in damages (tripled to $5.9 million under the FCA). The court also ordered SAIC to pay civil penalties of $7,500 for each of the 77 false claims and statements (for a total of $577,500);

- Also in 2004 (again, during the Relevant Period), the Pentagon's Inspector General released a report on Iraq humanitarian assistance contracts awarded for the Coalition Provisional Authority. A large portion of the contracts under review were awarded on a sole-source basis to SAIC. The Inspector General found irregularities in both the award and administration of the contracts, ***including instances of improper or unsupported billing*** and weak oversight;

- In 2005 (again, during the Relevant Period), SAIC paid the government $2.5 million to settle allegations that it made false claims and engaged in defective pricing on delivery orders with the Air Force for environmental clean-up at Kelly Air Force Base in San Antonio, Texas. It had been alleged that SAIC knowingly failed to disclose information about its costs during price negotiations with the Air Force and that SAIC inflated its estimates of the amount of labor hours it would require to complete the work;

- In 2006 (again, during the Relevant Period), a review of SAIC's subcontractor labor charges found that Federal Bureau of Investigation (the "FBI") was billed twice for the same subcontractor invoice; and

- In 2009 (again, during the Relevant Period, and in the year after the media and political firestorm over the massive cost overruns on CityTime had begun), the U.S. Department of Justice ("DOJ") joined a FCA whistleblower lawsuit against SAIC (and others) alleging that the defendants submitted or caused to be submitted false claims and conspired

14

to submit false claims under a government contract.  In September 2011 (after the CityTime overbilling scheme came to light), SAIC agreed to pay a total of $24.9 million to settle the lawsuit.

¶26.  Accordingly, it is clear that not only were Defendants affirmatively on notice of serious problems in connection with the CityTime project for years before they were finally forced to "come clean," they likewise were on notice of numerous "red flags" concerning the Company's improper and related practices on many other government contracts, which, as discussed above, accounted for over *90%* of the Company's revenues.  *Id.*

As a result of Defendants' breaches, the Company has still not recovered from these events.  ¶28.  For instance, the price of the Company's stock currently trades for under $12 per share, which represents a decline of approximately *35%* from its Relevant Period highs.  *Id.* Moreover, on March 20, 2012, Defendants announced that SAIC had recorded a *$308 million loss* for the fourth quarter of fiscal year 2011 due to the record CityTime settlement.  *Id.*

## III.   ARGUMENT

### A.   The Complaint Raises a Reasonable Doubt that a Majority of the Director Defendants Are Interested in a Demand

#### 1.   Legal Standards Governing Demand Futility

Because SAIC is a Delaware corporation, the parties agree that Delaware law controls the instant demand futility analysis.  *See, e.g.,* SAIC Mem. at 9; *see also Kamen v. Kemper Fin. Servs. Inc.*, 500 U.S. 90, 108-09 (1991) ("a court that is entertaining a derivative action . . . must apply the demand futility exception as it is defined by the law of the State of incorporation"). Under Delaware law, a demand on a board of directors is not required if the facts pled show that such a demand would have been futile.  *Aronson v. Lewis*, 473 A.2d 805, 807 (Del. 1984), *overruled on other grounds by Brehn v. Eisner*, 746 A.2d 244 (Del. 2000).

A plaintiff is excused from making a pre-suit demand if there is reason to doubt that: (i) a

majority of a board's directors are independent or disinterested; or (ii) the challenged acts are a valid exercise of business judgment. *Id.* at 812; *see also In re Pfizer Inc. S'holder Deriv. Litig.*, 722 F. Supp. 2d 453, 458 (S.D.N.Y. 2010) (applying Delaware law).  To implicate the *Aronson* test, a plaintiff must challenge a board decision where its members exercised business judgment. *Aronson*, 473 A.2d at 812; *see also In re Veeco Instruments, Inc. Sec. Litig.*, 434 F. Supp. 2d 267, 274 (S.D.N.Y. 2006) (applying Delaware law).

Where a complaint does not challenge a specific action or decision of the board, demand is excused where the complaint raises a reasonable doubt that a majority of the directors are disinterested or independent. *Rales v. Blasband*, 634 A.2d 927, 930 (Del. 1993).  Under this test:

> [A] court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a ***reasonable doubt*** that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand.  If the derivative plaintiff satisfies this burden, then demand will be excused as futile.

*Id.* at 934.  This reasonable doubt standard "is sufficiently flexible and workable to provide the stockholder with 'the keys to the courthouse' in an appropriate case where [as here], the claim is not based on mere suspicions or stated solely in conclusory terms."  *Grimes v. Donald*, 673 A.2d 1207, 1217 (Del. 1996), *overruled on other grounds by Brehn*, 746 A.2d 244.

"Reasonable doubt," as applied by Delaware courts, means "reason to doubt" that a board is capable of making an independent or disinterested decision.  *Id.*; *see also Grobow v. Perot*, 539 A.2d 180, 186-87 (Del. 1988), *overruled on other grounds by Brehn*, 746 A.2d 244.  Thus, plaintiffs only need allege with particularity facts that would give a reasonable shareholder reason to doubt the directors' ability to consider a demand disinterestedly.[14]  *Id.*   This is

---

[14] In their simplest terms, both the *Aronson* and *Rales* tests ask whether the "directors are incapable of making an impartial decision regarding such litigation."  *Rales*, 634 A.2d at 932.

particularly appropriate in derivative suits, because plaintiffs typically have not had the benefit of discovery.  *Rales,* 634 A.2d at 934 (requiring a reasonable probability of success on the merits would be "an extremely onerous burden to meet at the pleading stage without the benefit of discovery").

Further, a plaintiff properly alleges reasonable doubt that a director is disinterested in a demand where that director "is personally interested in the outcome of the litigation, in that the director will personally benefit or suffer as a result of the lawsuit."  *In re InfoUSA, Inc. S'holders Litig.*, 953 A.2d 963, 985 (Del. Ch. 2007).  A plaintiff may also raise reasonable doubt regarding the disinterestedness of directors by demonstrating that they are subject to a "substantial likelihood of liability."[15]  *Ryan v. Gifford*, 918 A.2d 341, 355 (Del. Ch. 2007).  As the Delaware Chancery Court has explained, directors who are sued "have a disabling interest for pre-suit demand purposes when the potential for liability is not a mere threat but instead may rise to a substantial likelihood."  *Id.* (quoting *In re Baxter Int'l, Inc. S'holder Litig.*, 654 A.2d 1268, 1269 (Del. Ch. 1995)); *see also In re Abbott Labs. Deriv. S'holders Litig.*, 325 F.3d 795, 808 (7th Cir. 2003) ("*Abbott Labs*").

It is well-established, and this district court has repeatedly recognized, that an affirmative violation of the law or the conscious disregard of the same cannot constitute a legally protected business decision, and as such is not, and cannot be, a valid exercise of business judgment.  *See Aronson*, 473 A.2d at 814 (corporate directors have no discretion to act beyond their lawful powers and such actions excuse demand); *Veeco*, 434 F. Supp. 2d at 278 (excusing demand under Delaware law based on allegations that directors "conscientiously permitted a known

---

[15] Further, even if no single allegation taken in isolation would be sufficient to raise a reasonable doubt regarding a director's independence, the totality of the plaintiff's allegations in combination may be sufficient to do so.  *Int'l Equity Capital Growth Fund, L.P. v. Clegg*, No. Civ.A. 14995, 1997 WL 208955, at *5 (Del. Ch. Apr. 22, 1997).

violation of law by the corporation to occur"); *Pfizer*, 722 F. Supp. 2d at 460 (excusing demand under Delaware law based on allegations that directors were on notice of illegal activities, but failed to act).

Finally, when this Action was initiated, the Board consisted of the 13 Director Defendants. ¶211. Thus, to plead demand futility, Plaintiffs need only raise a reason to doubt the disinterestedness or independence of seven of the Director Defendants. *See Beneville v. York*, 769 A.2d 80, 85-86 (Del. Ch. 2000). As discussed herein, Plaintiffs easily satisfy this standard because based on the particularized allegations in the Complaint and all reasonable inferences to be drawn therefrom, there is reason to doubt that ***all*** of the Directors Defendants are entitled to the protections of the business judgment rule and that they could have disinterestedly considered a demand in good faith.

> ### 2. There Is Reason to Doubt That the Director Defendants Are Entitled to the Protections of the Business Judgment Rule Because They Knowingly or Recklessly Disregarded Illegal Actions in Connection With CityTime

The Director Defendants tacitly approved and/or turned a deliberate blind eye to the illicit (and illegal) CityTime overbilling scheme at the center of this Action, which bilked NYC out of hundreds of millions of dollars, and is not a protected business judgment, excusing demand. *See, e.g., Pfizer*, 722 F. Supp. 2d at 459-60 (knowing or reckless disregard of illegal activity is sufficient to excuse demand). This is particularly true because, as discussed below, Defendants were repeatedly, clearly placed on notice of the illegal CityTime overbilling scheme through, *inter alia*, harsh criticism in the press and by NYC officials, and consciously disregarded it,

which is not protected by the business judgment rule.  *Id.*[16]

Both law and logic support this rule.  *See Pereira v. Cogan*, 294 B.R. 449, 531 n.76 (S.D.N.Y. 2003) ("In any case, the business judgment rule would not protect the illegal acts complained of . . . ."), *vacated on other grounds*, 413 F.3d 330 (2d Cir. 2005); *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs., Inc.*, 854 A.2d 121, 131 (Del. Ch. 2004) ("Under Delaware law, a fiduciary may not choose to manage an entity in an illegal fashion, even if the fiduciary believes that the illegal activity will result in profits for the entity.").[17]  Corporate directors do not have the discretion to act beyond their lawful powers, and turning a blind eye to illegality is not a "valid exercise of business judgment" because it is not a business judgment at all.  *Aronson*, 473 A.2d at 814; *see also Pfizer*, 722 F. Supp. 2d at 459-60.  As one treatise explains:

> The business judgment rule does not protect decisions by directors that constitute . . . illegality, or *ultra vires* conduct.  Therefore . . . a decision by directors that a violation of law or fraudulent or *ultra vires* conduct would serve the best interests of the corporation is not protected by the business judgment rule.

---

[16]  Remarkably, Defendants now accuse Plaintiffs of naming the Director Defendants as defendants to this Action purely to further a demand futility argument.  SAIC Mem. at 15.  This assertion is ridiculous and utterly false.  As shown in detail below, Plaintiffs more than adequately allege that the Director Defendants knew or should have known of the illegal actions that ultimately forced SAIC to enter into a record-breaking settlement and give rise to this Action.

[17] *See also Cal. Pub. Emps.' Ret. Sys. v. Coulter*, No. Civ.A. 19191, 2002 WL 31888343, at *10 (Del. Ch. Dec. 18, 2002) (accepting *ultra vires* argument excusing demand futility because "the business judgment rule may not be invoked to shelter unauthorized actions of a board of directors"); *Kahn ex rel. DeKalb Genetics Corp. v. Roberts*, 679 A.2d 460, 465 (Del. 1996) ("business judgment rule normally protects all **lawful** actions of a board"); *Int'l Ins. Co. v. Johns*, 874 F.2d 1447, 1461 (11th Cir. 1989) (explaining that the court will "substitute its judgment for that of the board" upon a "showing of abuse of discretion, fraud, bad faith, or illegality"); *Miller v. AT&T*, 507 F.2d 759, 762 (3d Cir. 1974) (business judgment does not insulate directors from liability for violation of federal statute); *see also* S. Samuel Arsht, *The Business Judgment Rule*, 8 Hofstra L. Rev. 93, 129 (1979) ("Bad faith may preclude application of the business judgment defense where directors knowingly violate a statute or comparable expression of public policy, even if such a violation is undertaken in the corporation's best interests.").

Dennis J. Block, Nancy E. Barton & Stephen A. Radin, *The Business Judgment Rule: Fiduciary Duties of Corporate Directors* 41-42 (4th ed. 1995).

Because directors cannot exercise "business judgment" to consciously allow illegal conduct,[18] it is no surprise that Defendants cite cases for unremarkable legal propositions without discussing or analyzing the actual facts underlying those decisions.  *See, e.g.*, SAIC Motion at 10-19.  None of Defendants' "authority" is factually on point.[19]  By contrast, cases with

---

[18] Notably, this Court has held that "where liability is based upon a failure to supervise and monitor, and to keep adequate supervisory controls in place, ***demand futility is ordinarily found, especially where the failure involves a scheme of significant magnitude and duration which went undiscovered by the directors***." *Oxford Health*, 192 F.R.D. at 117 (applying Delaware law and excusing demand based on allegations that directors permitted the company to engage in improper billing practices and violate insurance regulations, subjecting the company to fines, penalties, and investigations); *see also McCall v. Scott*, 239 F.3d 808, 819 (6th Cir. 2001) (demand excused under Delaware law based on allegations that directors turned a blind eye to "red flags" suggesting that the company was committing health care fraud, including, *inter alia*, *New York Times* reports.)

[19] Defendants' demand futility arguments are almost entirely based on *In re Caremark  Int'l, Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996), which Defendants cite heavily in support of their characterization of the claims asserted in this Action as mere "failure to monitor" claims.  SAIC Mem. at 11.  *Caremark* is inapplicable (as is its progeny) because there, the directors had no reason to know of the liability-inducing conduct at issue, whereas in this Action, the Director Defendants were repeatedly put on notice of the misconduct at issue.  The *Caremark* Court's "review of directors liability was 'predicated upon ignorance of liability creating activities,' where there were no facts to indicate the directors 'conscientiously permitted a known violation of law by the corporation to occur.'"  *Caremark*, 698 A.2d at 967.  The unremarkable distinguishing principle of *Caremark* is knowledge, or the inference of knowledge; that directors should not be held liable for conduct they did not know of or had no reason to know of.  Plaintiffs here allege that the Director Defendants were repeatedly placed on notice of the CityTime overbilling scheme because of, *inter alia*: (a) widespread media reports documenting, criticizing, and calling into question the massive, unprecedented cost overruns on the CityTime project, certain of which contained anonymous accounts of rampant overbilling; (b) public NYC hearings held regarding the cost overruns during which NYC officials called for a moratorium on the CityTime project pending a full-scale investigation (and media coverage of same); and (c) prior accusations of Company overbilling on government contracts.  This means Plaintiffs have not alleged *Caremark* "due care" claims; rather, Plaintiffs properly allege "good faith" claims.  *See, e.g., Pfizer*, 722 F. Supp.2d at 459-60 (distinguishing *Caremark* based on the "inference of knowledge" of directors on whom demand would be made); *Abbott Labs*, 325 F.3d at 795 (same).  Unlike in *Caremark*, Plaintiffs have not sought to base the Director Defendants' liability for being ignorant "of liability creating activities;" but for time and again being placed on notice of them, and either perpetuating or turning a deliberate blind eye to them.

comparable facts illustrate the clear rule of law that a board's conscious abandonment of duty evidences bad faith and is not protected by the business judgment rule, excusing demand.

The Seventh Circuit's seminal decision in *Abbott Labs.*, 325 F.3d at 795, is instructive. In that case, the plaintiffs alleged that the directors ignored red flags raised about violations of health-care regulations over a six-year period and consciously took no action to remedy those problems or exercise reasonable oversight. *See id.* at 802-03. Specifically, the plaintiffs in *Abbott Labs* alleged (and the court eventually held) that the Board's knowledge of the company's problems could be reasonably inferred based on, *inter alia*, warnings from Food and Drug Administration ("FDA") officials and **notice in the press** (including reporting by the *Wall Street Journal* and *Bloomberg*). *Id.* at 809. Plaintiffs further alleged that these failures caused the directors to violate their fiduciary duty of good faith and were not valid exercises of business judgment. Plaintiffs argued that the board:

> "[K]new of the continuing pattern of noncompliance with FDA regulations and knew that the continued failure to comply with FDA regulations would result in severe penalties and yet ignored repeated red flags raised by the FDA and in media reports **and chose not to bring a prompt halt to the improper conduct causing the noncompliance, nor to reprimand those persons involved, nor to seek redress for Abbott for the serious damages it has sustained** . . . ."

*Id.* at 802-03. The Seventh Circuit reversed the district court's dismissal, holding:

> [T]he facts support a reasonable assumption that there was a "sustained and systematic failure of the board to exercise oversight," in this case intentional in that **the directors knew of the violations of law, took no steps in an effort to prevent or remedy the situation, and that failure to take any action for such an inordinate amount of time resulted in substantial corporate losses, establishing a lack of good faith**.
>
> *       *       *
>
> **With respect to demand futility based on the directors' conscious inaction, we find that the plaintiffs have sufficiently pleaded allegations, if true, of a breach of the duty of good faith to reasonably conclude that the directors' actions fell outside the protections of the business judgment rule**.

*Id.* at 809.[20]

Notably, this district court expressly followed *Abbott Labs* in reaching its recent decision in *Pfizer*, 722 F. Supp. 2d at 453.  There, similar to the instant Action, the plaintiffs alleged that Pfizer's directors ignored repeated red flags over the course of nearly a decade and consciously implemented or turned a deliberate blind-eye to a business strategy to, *inter alia*, engage in pervasive, illegal off-label marketing and promotion of various drugs in violation of federal laws. *Id.* at 456-57.  These illicit activities (and other related misconduct) ultimately resulted in Pfizer having to pay a record $2.3 billion in civil and criminal fines and penalties as part of an historic settlement with the DOJ in 2009.  *Id.* at 454-57.

In response to the defendants' motions to dismiss, the *Pfizer* plaintiffs argued that this Court could reasonably infer that Pfizer's directors were on notice of Pfizer's continuing illegal activities and consciously disregarded them because of, *inter alia*, repeated red flags, including warnings from government officials and (analogous to the anonymous account described above that was the subject of a *Daily News* article and the NYC City Council Committee on Contracts hearing in December 2009) allegations raised in *qui tam* lawsuits.  *Id.* at 460.  This district court, based on these allegations, held that it could reasonably infer at the pleading stage that Pfizer's board of directors, "at a minimum, knew of a high probability that Pfizer was continuing to purposely promote off-label marketing and deliberately decided to let it continue by blinding themselves to that knowledge," thus satisfying the second prong of the *Aronson* test.  *Id.*

---

[20] *See also In re SFBC Int'l, Inc. Sec. & Deriv. Litig.*, 495 F. Supp. 2d 477, 485-86 (D.N.J. 2007) (where plaintiffs' complaint alleged "plenty of red flags concerning the improper and even possibly illegal practices in which the company was engaged," demand was excused under Delaware law because "the alleged misconduct related to the core of PDG's business," and the Court reasonably inferred at the pleading stage that the directors consciously disregarded such misconduct).

In this Action, the totality of Plaintiffs' allegations regarding the Director Defendants' knowledge of the illegal scheme to defraud NYC are as strong, if not stronger, than those in *Abbott Labs* and *Pfizer*, which are necessarily more than sufficient to excuse demand. *Clegg*, 1997 WL 208955, at *5 (allegations to be considered in totality).   As a preliminary matter, this Action is radically and far removed from the realm of a "garden variety" derivative action, in that Defendants have not only admitted responsibility for the very scheme that is the core of the Action, but have caused SAIC to pay over a half a billion dollars in restitution and fines as a result.   Specifically, in connection with the SOR, Defendants have admitted:

- the Company's "conduct and managerial failures…contributed to the ability of [SAIC employees] to commit their alleged crimes against the City, and that the City was defrauded by SAIC as a result."

- "Some SAIC managers failed to perceive or ignored significant and pervasive irregularities with the SAIC-Technodyne relationship" that ultimately allowed the fraud to be accomplished;

- SAIC "failed to take actions that might have detected, disrupted or curtailed the charged conspiracies, allowing the City to be victimized repeatedly and systematically for more than seven years"; and

- "SAIC's failures resulted, in part, from an overemphasis on the financial and operational success of the CityTime project by those assigned to manage the Project, at the expense of the Company's own ethics, human resources and procurement policies."   ¶25, SOR at 1-2.

In the face of these stunning admissions, any suggestion that Plaintiffs have not adequately alleged that the Director Defendants knew or should have known of the CityTime overbilling

scheme is simply not credible.[21]

Second, it is well-established that it is reasonable to infer that a director is aware of information relating to the core operations of the company for which he or she serves. *See, e.g.*, *In re Reserve Fund Sec. & Deriv. Litig.*, 732 F. Supp. 2d 310, 322-23 (S.D.N.Y. 2010) ("Once a plaintiff has adequately alleged that a defendant made false and misleading statements about the core operations of a company . . . an inference arises that the defendant knew or should have known the statements were false when made."); *In re Atlas Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004) ("if a plaintiff can plead that a defendant made false or misleading statements when contradictory facts of critical importance to the company either were apparent, or should have been apparent, an inference arises that high-level officers and directors had knowledge of those facts by virtue of their positions with the company"); *SFBC*, 495 F. Supp. 2d at 485-86 (holding that where allegations involve the core operations of a company, "the Court finds that the Complaint avers sufficient obvious signs of wrongdoing to

---

[21] In response, Defendants submit self-serving claims of "innocence," arguing that SAIC and the Director Defendants themselves were defrauded or misled by the primary wrongdoers. Specifically, Defendants argue that: (i) a U.S. Attorney press release accuses Denault and Bell of defrauding SAIC; and (ii) the SOR includes a clause stating that a whistleblower complaint regarding the CityTime overbilling scheme was not brought to the Board's attention. SAIC Mem. at 13, 17. Defendants' arguments border on the incredible. First, these arguments inherently invoke disputed questions of fact that cannot be resolved on a motion to dismiss. *See, e.g.*, *Weiss v. Swanson,* 948 A.2d 433, 445 (Del. Ch. 2008) ("Perhaps evidence will come to light establishing the directors had no idea or opinion as to the effect of the earnings releases on Linear's stock price…[b]ut those factual determinations are for another day"). Second, any inference drawn from such facts must be taken in the plaintiffs' favor. *Id.* ("[A]t this stage of the litigation, the Court must draw all reasonable inferences in favor of Weiss."). Finally, and most damning, these statements are not determinative of anything. The former is an unproven assertion in a press release that does not absolve the Board of any wrongdoing – it merely provides that certain former employees "falsely certified" certain facts and deprived SAIC of its right to honest services. And the latter is even worse. It is nothing more than a self-serving statement by the Board; it would be a bizarre result, indeed, for the Board not to have insisted on its making this representation in a settlement-related document. Indeed, a variant of that language appears in virtually every settlement agreement where fault is not fully admitted.

support the allegation that the Demand Directors knew or should have known that they were not fulfilling their obligations by failing to take action in response to the company's widespread problems").[22]   Here, CityTime, as one of SAIC's government contracts, represented a significant part of the Company's core operations for years: SAIC's own public filings stated that revenue generated from government contracts accounted for over 90% of SAIC's revenues during the last three fiscal years, and 87%, 88%, and 88%, respectively, for fiscal years 2008, 2007, and 2006. ¶69.   It reasonably follows, then, that the Director Defendants were aware of, or should have been aware of, the overbilling scheme at CityTime, and the reasonable inference that CityTime was a material contract to SAIC, and not a "run-of-the-mill" contract, is supported by Defendants' own August 31, 2011 disclosure of an approximate 6% decline in revenues which they (in part) attributed to the "wind[ing] down" of the CityTime project.   ¶20.

Indeed, Defendants' own March 2009 Annual Report specifically touting the CityTime project as a purportedly shining example of SAIC's top-quality work underscores not only the Director Defendants' own focus on CityTime, but that CityTime was an unusually high-profile project.   ¶127.   It was not simply a generic contract with a generic city to create a generic timekeeping system.   Rather, it was a high-profile, bellwether contract with the country's largest city and media capital that would (allegedly) showcase SAIC's abilities to create a custom system that would synthesize and oversee the attendance and workforce management of tens of thousands of individual employees.   In short, from the time of its inception, CityTime was a material and key project for SAIC – with both major financial and "public image" implications – and it is reasonable to infer that the Board closely followed the progress of the CityTime project,

---

[22] *See also In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044, 1081 (C.D. Cal. 2008) (applying Delaware law, excusing demand, and reasonably inferring that directors were on notice of, and failed to take action to address, wrongdoing that "implicate[d] a fundamental part of the Company's business.").

as well as all media coverage and other public discourse regarding CityTime.

Third, public reports and/or investigations of wrongdoing also served as "red flags" that weigh heavily in favor of a reasonable inference that directors knew or should have known of the CityTime misconduct. *See, e.g., Pfizer*, 722 F. Supp. 2d at 457-60. Indeed, where a board consciously ignores or fails to investigate "red flags," a motion to dismiss should be denied. *La. Mun. Police Emps. Ret. Sys. v. Pyott*, 46 A.3d 313, 341 (Del. Ch. 2012). Here, going as far back as the Spring of 2008 (again, by no later than February 2008, Director Defendants Young, Córdova, Drummond, Hamre, John, Jones, Jumper, Kraemer, Sanderson, and Simpson had joined the Board), media coverage and investigations of CityTime-related issues were massive and on a virtually unprecedented scale. For example:

- On March 2, 2008, *CityLimits* (a non-profit investigative publication) warned that problems with the implementation of CityTime had run radically over-budget and had cost (at the time) $348 million rather than $63 million (¶¶108-109);

- On April 12, 2008, the *Daily News*, the fourth-most widely circulated newspaper in the U.S., published a story warning that CityTime had expanded (and continued to expand) to a cost of $410 million, and that Senator Addabbo had scheduled a hearing for May 2008 regarding the skyrocketing costs of CityTime (¶112);

- On May 18, 2008, *CityLimits* published another article in which it highlighted that Senator Addabbo was so concerned with CityTime that he had called for the project to be halted due to "enough evidence or inefficiency or questionable facts to justify further investigation" (¶113);

- On December 3, 2009, the *Daily News* published yet another story on CityTime in which it again warned that costs had risen materially – this time to over $700 million – and highlighted and addressed specific reported instances of questionable billing for the project (¶134);

- On December 18, 2009, the New York City Council held a second public hearing on the CityTime cost overruns *and* discussed specific instances where workers assigned to the CityTime project engaged in fraudulent overbilling (¶137); and

- On March 29, 2010 *IEEE Spectrum Risk Factor* released an article in which it extensively chronicled the history of cost overruns with CityTime, the difficulties

and failures in its implementation, and a recently announced full audit of the project by the New York City Controller (¶138).

In light of the foregoing, it cannot credibly be argued that the Board was not on notice of substantial red flags indicating that there was something very foul afoot with the CityTime project.  *See, e.g., Abbott Labs*, 325 F.3d at 809 (reasonably inferring directors' knowledge of wrongdoing based on red flags, including media coverage); *McCall*, 239 F.3d at 819 (same).  Indeed, the *Washington Post* stated the obvious in April 2012, observing that "***there were plenty of warning signs for anyone with even a passing familiarity with the government contracting business, which includes almost everyone at SAIC***" ¶156.[23]  Yet, the Board did not act; to the contrary, Defendants publicly and repeatedly denied "that there were any problems at all with" CityTime.  ¶157.  As was the case in *Abbott Labs* and *Pfizer*, the Board's reasonably-inferred knowledge and its failure to act raises doubt that the Board members are entitled to business judgment protection at the pleading stage and accordingly, demand is excused.  *Pfizer*, 722 F.

---

[23] Further, even setting aside the numerous public red flags that support the reasonable inference that the Director Defendants knew or should have known of the CityTime overbilling scheme, Defendants repeatedly and publicly cited a host of internal controls throughout the Relevant Period, including the policies and procedures of the Board's Audit Committee and its Ethics Committee (*see, e.g.,* ¶¶62-64), that would have alerted the Board to the scheme.  Courts regularly hold that the existence of a corporate governance structure like the foregoing gives rise to a strong inference that directors were apprised of red flags and thus knew or should have known of the problem or issue implicated by the red flags.  *Pfizer*, 722 F. Supp. 2d at 461, citing *Abbott Labs.*, 325 F.3d at 808.

Supp. 2d at 460; *Abbott Labs.*, 325 F.3d at 795.[24]

Finally, as this district court has repeatedly recognized, the "magnitude and duration" of a scheme is probative to the inquiry of whether it is reasonable to infer that a director knew or should have known of it. *Pfizer*, 722 F. Supp. at 460; *Oxford Health*, 192 F.R.D. at 117. Here, the CityTime project was budgeted at inception in 2001 to generate approximately $63 million in revenue for SAIC. ¶3. Over the next nine years, however, the budget for CityTime expanded to over ***$700 million*** – an increase of over ***1000%***. An increase of such extraordinary magnitude and historic significance,[25] uninvestigated by the Director Defendants, supports the more than reasonable inference that the Board "conscientiously permitted" the occurrence of the scheme. *See Veeco*, 434 F. Supp. 2d at 278.[26] Accordingly, demand is excused.

---

[24] That SAIC had repeatedly been cited for similar overbilling schemes in the past is further probative of the reasonable inference that the Director Defendants knew, or should have known, of the overbilling on CityTime. *In re Elan Corp. Sec. Litig.*, 543 F.Supp.2d 187, 221 (S.D.N.Y. 2008) ("past misconduct of the same type as the misconduct alleged in the complaint" probative of defendants' knowledge of fraud alleged in complaint). Here, between 2004 and 2009 (within the Relevant Period), SAIC was found to have overbilled in connection with government contracts no less than six times. ¶26. In connection with the foregoing misconduct, the Company paid tens of millions of dollars in fines and restitution. Accordingly, because the Director Defendants knew that the Company had overbilled in the past, they knew, or should have known, of the CityTime overbilling scheme.

[25] As a March 29, 2010 *RiskFactor* article calling into question the massive cost overruns on CityTime stated, "[I]f anyone knows of an IT project over $50 million that has exceeded its budget by more than 10 times and still hasn't been canceled, let me know. I haven't found any in my archives." ¶138.

[26] While this Court need look no further than the decisions in *Abbott Labs* and *Pfizer* to hold that demand is futile, this District court's *Veeco* holding, 434 F. Supp. 2d at 267, is also highly instructive. In *Veeco*, the derivative plaintiffs alleged that board members were placed on notice of a pattern of material violations of the federal export laws due to, *inter alia*, employee accounts of these violations. *Id.* at 272. Notably, the alleged violations implicated Veeco's core operations, because approximately 70% of its revenues were derived from export sales. *Id.* at 278. This district court excused demand because *Veeco* was "not a case where the directors had 'no grounds for suspicion' or 'were blamelessly unaware of the conduct leading to the corporate liability'" but, rather, a situation where the complaint adequately alleged that "the director-

### 3.    Demand Is Also Excused Because the Director Defendants Face a Substantial Likelihood of Liability in Connection with the Company's Illegal Business Strategy

Further, demand was not required because a majority of the Director Defendants is not disinterested based upon a substantial likelihood of liability.  *See, e.g., Pfizer*, 722 F. Supp. 2d at 460 (holding not only that demand was excused under the second prong of the *Aronson* test based on allegations that the directors consciously turned a blind eye to wrongdoing, but that demand was also excused under such circumstances because Pfizer's directors were interested in a demand due to "a substantial threat of personal liability").  Under Delaware law, "[d]irectors who are sued for failure to oversee subordinates have a disabling interest for pre-suit demand purposes when 'the potential for liability is not a 'mere threat' but instead may rise to a 'substantial likelihood.'"  *Baxter*, 654 A.2d at 1268-69 (*quoting Rales*, 634 A.2d at 936).  To meet the "substantial likelihood" burden on a pleading motion, "the alleged facts need only give rise to a ***reason to doubt*** business judgment protection, not 'a judicial finding that the directors' actions are not protected by the business judgment rule.'"  *In re the Walt Disney Co. Deriv. Litig.*, 825 A.2d 275, 289 (Del. Ch. 2003), *aff'd,* 906 A.2d 27, 62 (Del. 2006).[27]  Among other situations, the "substantial likelihood" test is satisfied where a plaintiff alleges facts to support the reasonable inference that a majority of the directors on a board knew that a corporation was engaged (or possibly engaged) in imprudent or unlawful conduct and breached their fiduciary

---

Committee members 'conscientiously permitted a known violation of law by the corporation to occur.'"  *Id.*  Given the vast amount of red flags alleged in the Complaint, the same is true here.

[27]  This is a critical distinction – at the pleading stage, the Court need only find that Plaintiffs have alleged sufficient facts to open the courthouse doors; it need not determine that any of the Director Defendants actually breached their fiduciary duties.  The Director Defendants will have the opportunity to present evidence that they complied with their fiduciary duties at summary judgment and trial.  *See, e.g.*, *Weiss,* 948 A.2d at 445 (denying motion to dismiss and noting that only in future proceedings could the director defendants produce evidence intended to show valid business reasons for their alleged misconduct).

duty of good faith by declining to take corrective action.  *See Ash v. McCall*, 2000 Del. Ch. LEXIS 144, *55-*57 (Del. Ch. Mar. 15, 2000).

Specifically, as discussed at length above, the Company has come under fire in a multitude of instances both before and during the Relevant Period for very similar misconduct. ¶211(c).   Additionally, the Board was on notice of the potential for similar problems in connection with the CityTime project for years, prior to the overbilling scheme becoming public starting in December 2010.  *Id.*  Indeed, in addition to the harsh, widespread media coverage of the massive CityTime cost overruns dating back to the Spring of 2008, the New York City Council actually held a public hearing in May 2008 to determine whether the CityTime project should face a moratorium pending an investigation regarding its massive, unprecedented cost overruns – a fact about which the Board was undeniably aware of or should have been aware. Another similar hearing took place in December 2009.  Despite clearly being placed on notice, the members of the Board consciously disregarded their fiduciary duties to SAIC when, under their direction and on their watch, the Company continued to engage in the massive, illicit overbilling of NYC in connection with the CityTime project.  *Id.*

The Director Defendants' turn of a deliberate blind-eye to illegal conduct constituted an "'intentional dereliction of duty'" and "'a conscious disregard for one's responsibilities,'" each of which is "'properly treated as a non-exculpable, non-indemnifiable violation of the fiduciary duty to act in good faith.'"  *Ryan v. Lyondell Chemical Co.*, C.A. No. 3176-VCN, 2008 WL 4174038, at *2-*3 (Del. Ch. Aug. 29, 2008) ("*Lyondell*"); *Pfizer*, 722 F. Supp. 2d at 460 (finding that directors were interested in a demand because it could be reasonably inferred that they were on notice of illegality, consciously disregarded it and thus faced a substantial likelihood of liability "arising from their alleged breach of their non-exculpated fiduciary

duties"). Because the Complaint adequately alleges that every Director Defendant breached his or her fiduciary duties to act in good faith, every director is interested in a demand based on a substantial likelihood of liability, and demand is excused. *See, e.g.*, *Rales*, 634 A.2d at 936.

**B.      Plaintiffs Adequately Allege All Causes of Action**

To survive a motion to dismiss, a plaintiff's allegations need only be "plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). Courts must "accept all factual allegations in the complaint as true" and "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Additionally, courts must also draw "all reasonable inferences in the plaintiffs' favor." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 161 (2d Cir. 2000).

**1.      Plaintiffs Adequately State a Claim for Breach of Fiduciary Duties**

To adequately plead a claim for breach of fiduciary duty under Delaware law, plaintiffs need only allege that: (1) a fiduciary duty existed; and (2) defendants breached that duty. *Beard Research, Inc. v. Kates*, 8 A.3d 573 (Del. Ch. 2010). Delaware officers and directors owe duties of care, good faith, and loyalty to corporations and stockholders they serve, and must independently satisfy all of those duties to properly exercise their responsibilities. *See Malone v. Brincat*, 722 A.2d 5, 9-12 (Del. 1998); *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156 (Del.

1995).[28]

### a.   Defendants Breached Their Fiduciary Duties by Issuing False and Misleading Statements

Plaintiffs state a claim for a breach of fiduciary duty based upon on Defendants' repeated false and misleading statements.  "Whenever directors communicate publicly or directly with shareholders about the corporation's affairs, with or without a request for shareholder action, directors have a fiduciary duty to shareholders to exercise due care, good faith and loyalty." *Malone*, 722 A.2d at 10.[29]  It follows that "the *sine qua non* of directors' fiduciary duty to shareholders is honesty."  *Id*.  When directors are "deliberately misinforming shareholders about the business of the corporation, either directly or by a public statement, there is a violation of fiduciary duty."  *Id*. at 14.  Importantly, "even where there is no obligation to disclose certain information, if it is volunteered, the information must be stated truthfully and candidly." *Marhart, Inc. v. CalMat Co.*, No. 11820, 1992 WL 82365, at *3 (Del. Ch. Apr. 22, 1992).  In fact, and critically here in light of Defendants' failure to promptly correct their June 2, 2011 discosures, a fiduciary may be held liable for making a "material misdisclosure" or if he "authorizes without fault or knowledge a misleading disclosure, later comes into knowledge of the misleading nature of the previous communication, and knowingly and in bad faith (in other words, 'dishonestly') fails to correct the misleading impression created by the earlier communication." *Metro*, 854 A.2d at 159.  "Communications that depart from this expectation . . . violate the fiduciary duties that protect shareholders. Such violations are sufficient to subject

---

[28]  It is well-settled under Delaware law that a breach of fiduciary duty claim may be averred generally, and that there is no requirement whatsoever that a plaintiff allege "*scienter*." *Grobow*, 539 A.2d at 921.  Significantly, even claims for breach of fiduciary duty which at their core charge that the defendants "knew something" may be averred generally.  *Weiss*, 948 A.2d at 449.

[29]  *See also In re Tyson Foods, Inc.*, 2007 WL 2351071 at *3 (Del. Ch. Aug. 15, 2007) (when "directors communicate with shareholders, they also must do so with **complete candor**") (emphasis in original).

directors to liability in a derivative claim." *InfoUSA*, 953 A.2d at 990.

Additionally, and significantly in light of the fact that Plaintiffs' breach of fiduciary duty claims are based in part on misrepresentations in certain of the Company's Proxy Statements issued during the Relevant Period, officers and directors are duty-bound to make accurate and fair representations whenever they solicit shareholder action, such as a stockholder vote. *Arnold v. Soc'y for Say. Bancorp, Inc.*, 650 A.2d 1270, 1277 (Del. 1994); *Ryan,* 918 A.2d at 358. This obligation clearly attaches to representations issued by directors and officers in annual proxy statements, which are made in contemplation of stockholder action. *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 916 (Del. Ch. 1999); *Arnold*, 650 A.2d at 1277. Significantly, directors' and officers' misrepresentations made in connection with solicitation of shareholder action subject shareholders to irreparable harm. *See In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 207 (Del. Ch. 2007); *In re Pure Res., Inc., S'holders Litig.*, 808 A.2d 421, 452 (Del. Ch. 2002).

Here, Plaintiffs adequately allege that Defendants breached their fiduciary duties by issuing a series of false and misleading statements. For example, SAIC relied almost exclusively throughout the Relevant Period on revenues generated from government contracts. ¶¶6, 68-69. Indeed, according to the Company's public filings, for fiscal year 2011, revenues generated from government contracts accounted for *97%* of the Company's overall revenues. ¶¶6, 68-69. Similarly, according to the Company's public filings, revenues generated from government contracts accounted for 87%, 88%, and 88% of SAIC's total revenues for fiscal years 2008, 2007, and 2006, respectively. ¶¶6, 68-69. As alleged, moreover, Defendants have *admitted* that under their direction, the Company overbilled NYC by hundreds of millions of dollars on the CityTime Project for years. ¶73. As a result of these overbilling practices, the Company's

33

financial results during the Relevant Period were materially misstated.  ¶¶29, 91-145, 148, 150, 151, 160, 163.  SAIC and defendants Dahlberg and Sopp, moreover, falsely represented that the Company's financial statements fairly presented in all material respects the financial condition of the Company and that SAIC's financial statements were prepared in conformity with Generally Accepted Accounting Principles ("GAAP").  ¶¶91-145, 148, 150, 151, 163.  These financial results were false and misleading because nearly all of the $600 million that NYC paid to SAIC was derived through an illegal, multi-year, massive overbilling scheme.  ¶¶167-88.

Defendants' misrepresentations continued.  On December 8, 2011, Defendants caused SAIC to file a Form 10-Q with the SEC.  ¶22.  The Form 10-Q revealed that as a result of Defendants' breaches of fiduciary duty and other misconduct, they expected that the Company's losses relating to CityTime would amount to at least *$232 million* (despite the fact that Mayor Bloomberg had previously demanded $600 million).  *Id*.  As such, Defendants caused the Company to record a loss provision in that amount, consisting of a $52 million reduction in revenue and a $180 million charge to selling, general, and administrative expenses.  *Id*.  In contrast to these representations, however, the Company's exposure was more than twice what Defendants represented on December 8, 2011.  *Id*.  Indeed, on March 14, 2012, Defendants caused the Company to announce that it had entered into a Deferred Prosecution Agreement (the "DPA") wherein SAIC would be obligated to pay *$500.4 million* to the government, comprised of: (a) *$370.4 million in restitution* to NYC and (b) a $*130 million penalty*.  ¶23.  In addition, Defendants agreed that SAIC would forfeit another *$40 million* in unpaid bills that had been previously invoiced to NYC, bringing the total monetary value of the settlement to *$540.4 million*.  *Id*.  This settlement represented *the record* for a case based on misconduct in connection with a state or local government contract.  *Id*.

Additionally, Defendants, misleadingly downplayed SAIC's involvement in – and the Company's exposure in connection with – the CityTime scandal.  ¶17.  For instance, on June 2, 2011, Defendants held a conference call with analysts and investors to discuss the Company's earnings and operations.  *Id*.  During that call, Defendants tried to create the impression that the Company's exposure was limited because they claimed such exposure was based on the activities of one project manager who had improperly billed NYC for merely $2.5 million.  *Id*.  Defendants further stated that NYC had not filed any claims against SAIC or requested reimbursement of any payments previously made to SAIC.  *Id*.  Less than four weeks later, however, on June 29, 2011, Mayor Bloomberg wrote a letter to CEO and board member Havenstein demanding the return of ***$600 million*** to NYC that had been paid to SAIC for CityTime.  ¶18.  Notably, Defendants did not publicly correct their earlier representations made on the June 2, 2011 conference call and did not disclose the letter from Mayor Bloomberg until much later.  *Id*.[30]  As demonstrated below, moreover, Defendants also made false and misleading statements while soliciting shareholder votes in the Company's proxy statements.

Defendants claim that they cannot be held liable for the Company's false and misleading statements because Plaintiffs purportedly do not allege that each director participated in the dissemination of the false statements.  Defendants, however, ignore the fact that under the group-pleading doctrine, Plaintiffs are allowed to rely upon a presumption that statements made on behalf of a company "are the collective work of those individuals with direct involvement in the

---

[30]  Additionally, the Nuclear Regulatory Commission (the "NRC") filed a lawsuit against SAIC, alleging that SAIC submitted false and/or fraudulent bills and made other statements to the government in violation of the FCA.  ¶26.  ***In July 2008 – mere months after the media and political firestorm over the massive cost overruns on CityTime had begun and Senator Addabbo had called for a moratorium on the project, a jury found that SAIC knowingly submitted 60 false claims for payment and knowingly made 17 false statements to get claims paid on two NRC contracts*** and awarded the U.S. government $1.97 million in damages (tripled to $5.9 million under the FCA).  *Id*.  The court also ordered SAIC to pay civil penalties of $7,500 for each of the 77 false claims and statements (for a total of $577,500).  *Id*.

everyday business of the company." *Pension Comm. of Univ. of Montreal Pension Plan v. Bank of Am. Sec., LLC*, 446 F. Supp. 2d 163, 180 (S.D.N.Y. 2006).

"The doctrine may apply to outside directors, who . . . can fall within the group pleading presumption when, by virtue of their status or a special relationship with the corporation . . . have access to information more akin to a corporate insider." *Id.*; *see also In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 239 (S.D.N.Y. 2010) (holding an outside director liable for the company's false statements under the group pleading doctrine); *In re Adelphia Comm. Corp. Sec. & Deriv. Litig.*, 398 F. Supp. 2d 244, 250 (S.D.N.Y. 2005) (rejecting defendants' argument that plaintiffs are required to specifically identify the role of each defendant because plaintiffs can establish liability against members of the board of directors based upon the group pleading doctrine); *In re Philip Servs Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 483 (S.D.N.Y. 2004) (holding outside directors liable for the company's statements under the group pleading doctrine). Additionally, the argument that the Private Securities Litigation Reform Act of 1995 ("PSLRA") has abolished the group-pleading doctrine "has been rejected by most of the judges in this District who have addresses the effect of the PSLRA on the group pleading doctrine." *City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*, No. 11 Civ. 5026 (JSR), 2012 WL 2866425, at *13 (S.D.N.Y. July 13, 2012).[31]

---

[31] *See, e.g.*, *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 439 & n.42 (S.D.N.Y. 2005); *Dodona I, LLC v. Goldman, Sachs & Co.*, No. 10 Civ. 7497(VM), 2012 WL 935815, at *17 n.13 (Mar. 21, 2012); *Jimenez v. Brazil Ethanol, Inc.*, No. 11 Civ. 3635(LBS), 2011 WL 5932600, at *4 (S.D.N.Y. Nov. 29, 2011); *S.E.C. v. Landberg*, 836 F. Supp. 2d 148, 156 (S.D.N.Y. 2011); *In re Lehman Bros. Sec. & Erisa Litig.*, 799 F. Supp. 2d 258, 276 n.106 (S.D.N.Y. 2011); *Stratte–McClure v. Stanley*, 784 F. Supp. 2d 373, 384 (S.D.N.Y. 2011); *In re MRU Holdings Sec. Litig.,* 769 F. Supp. 2d 500, 504 n.4 (S.D.N.Y. 2011); *In re Smith Barney Transfer Agent Litig.*, 765 F. Supp. 2d 391, 401 (S.D.N.Y. 2011); *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 485 (S.D.N.Y. 2011); *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 239 (S.D.N.Y. 2010) (Stein, J.); *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 641–42 (S.D.N.Y. 2007); *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 399 (S.D.N.Y. 2005).

Here, Plaintiffs have alleged that Defendants had access to insider information that renders the group pleading doctrine applicable.  Specifically, for instance, plaintiffs allege that defendants had access to information demonstrating that SAIC was repeatedly engaged in misconduct involving overbilling on government contracts – the very same type of conduct involved in the CityTime contract.   ¶¶26, 184.   Additionally, members of SAIC's Ethics Committee and Audit Committee were charged with the responsibility of "overseeing the investigation of any alleged misconduct" and "reviewing *with management* any significant deficiencies and material weakness in the design or operation of the Company's internal controls."   ¶¶62, 64.   Defendants Havenstein, Córdova, Drummond, and Jones served as members of the Company's Ethics Committee during the Relevant Period (¶¶35, 38, 39, 43, 56) and Defendants Frist, Jones, Jumper, Kraemer, and Nussdorf served as members of the Company's Audit Committee during the Relevant Period.  ¶¶40, 43, 44, 45, 46, 55.  Accordingly, because the group pleading doctrine is applicable because of Defendants' access to insider information through their committee membership, the false and misleading statements alleged constitute the collective work of Defendants.  Thus, Plaintiffs state a breach of fiduciary duty claim based upon Defendants' false and misleading statements.[32]

---

[32] The Director Defendants claim that certain of SAIC's statements regarding the Company's ethics and integrity are not actionable.  Def. Mem at 10-12.  Courts in this district have rejected this argument.  *See Richman v. Goldman Sachs Grp., Inc*., 868 F. Supp. 2d 261, 277 n.8 (S.D.N.Y. 2012) ("Goldman's arguments in this respect are Orwellian.  Words such as honesty, integrity, and fair dealing apparently do not mean what they say; they do not set standards; they are mere shibboleths.  If Goldman's claim of honesty and integrity are simply puffery, the world of finance may be in more trouble than we recognize.").  Dahlberg, moreover, claims that plaintiffs' allegations regarding his false and misleading statements are "mere conclusions." Dahlberg Mem. at 9.  Courts, however, recognize that "[p]laintiffs' allegation – that defendants represented that their financial statements had been compiled in compliance with GAAP when, in fact, defendants failed to comply with GAAP in several, significant respects – identifies an untrue statement of material fact. . . ."  *In re CitiGroup Inc. Bond Litig*., 723 F. Supp. 2d 568, 594 (S.D.N.Y. 2010).  Additionally, contrary to Dahlberg's claims, plaintiffs do allege red flags that were present at the time of defendants' misrepresentations.  ¶¶82-83, 109-137.  Dahlberg's SOX Certifications also constitute false statements.  *See, e.g*., *In re Scottish Re Grp. Sec. Litig*.,

### b. Defendants Breached Their Fiduciary Duties By Failing to Maintain Adequate Internal Controls

Defendants also breached their fiduciary duties by failing to maintain adequate internal controls. *See Mills Acquisition Co. v. MacMillan, Inc.*, 559 A.2d 1261, 1282 n.32 (Del. 1989) (finding that the board's virtual abandonment of oversight functions was a breach of the fundamental duties of loyalty and care). Here, Plaintiffs allege with particularity that during the Relevant Period, Defendants knew – or should have known – that it was critical that they implement well-designed internal controls sufficient to control for the single greatest risk that the Company faced: potential exclusion from contracting with the government. ¶72. Defendants, moreover, repeatedly falsely represented that SAIC's internal controls were adequate. ¶¶91, 93, 95, 97, 99, 111, 123, 140, 151, 208, 216-219. Indeed, the Director Defendants *admit* that SAIC acknowledged that "conduct and managerial failures" involving CityTime "contributed to the ability of Denault and Bell to commit their alleged crimes," that there were "oversight shortcomings by management employees," and that some "SAIC managers failed to perceive or ignored significant and pervasive irregularities." Additionally, as stated within Mayor Bloomberg's letter to SAIC and Havenstein, moreover, "the recent indictment of Gerard Denault, SAIC's lead Project Manager supervising the CityTime project, and the recent criminal charges filed against and guilty plea of Carl Bell, SAIC's Chief Systems Engineer who developed the software and oversaw all technical aspects of the project, *are extremely troubling and raise questions about SAIC's corporate responsibility and internal controls to prevent and*

---

524 F. Supp. 2d 370, 391 (S.D.N.Y. 2007) ("Because plaintiffs' allegation that the certifications at issue represent false statements is plausible, the motion to dismiss the Sarbanes-Oxley claim is denied."). Defendant Denault – who was arrested after the U.S. Department of Justice alleged that he received millions of dollars in illegal kickbacks – claims that he cannot be held liable for failing to supervise his own illegal conduct. Denault Mem at 1-9. Denault, however, misses the point – by engaging in the illegal conduct alleged, Denault knew that SAIC was making false statements regarding its financial statements as they related to the CityTime contract and allowed SAIC to make such false statements. ¶¶15, 25, 51, 74, 77(b), 78-90, 155-59.

*combat fraud*."   ¶169.  Thus, Plaintiffs have also adequately alleged that Defendants breached their fiduciary duties by failing to maintain adequate internal controls at SAIC.[33]

> **c.   Defendants' Reliance on Saic's Exculpatory Provision is Inappropriate At This Juncture and Inapplicable in Any Regard**

Defendants' attempt to rely on the "exculpatory provision" in SAIC's Restated Certificate of Incorporation, both for demand futility purposes and in connection with Plaintiffs' breach of fiduciary duty claims, is unavailing.  *See, e.g.,* SAIC Mem. at 12.  First, Plaintiffs cannot be dismissed at the pleading stage based on the "exculpatory provision" of SAIC's charter, because such a clause cannot even be considered by a Court at the pleading stage (or even the summary judgment stage) under Delaware law, unless the **sole conceivable basis of liability** is a violation of the duty of care.  *Emerald Partners v. Berlin*, 726 A.2d 1215, 1223 (Del. 1999); *Alidina v. Internet.com Corp.*, CIV. A. 17235-NC, 2002 WL 31584292, at **8-9 (Del. Ch. Nov. 6, 2002).  Accordingly, dismissal of a derivative action on Section 102(b)(7) grounds at the pleading stage is an extreme application of the rule and a strongly disfavored approach to resolving a pleading motion.  *See Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford*, 554 F. Supp.2d 538, 561 (D. Del. 2008); *Mervyn's Holdings, LLC v. Lubert-Adler*

---

[33]  The Director Defendants suggest that because SAIC purportedly began to take corrective action, they are immune from liability.  Def. Mem at 25.  This argument fails.  *See, e.g., Jones v. Corus Bankshares, Inc*., 701 F. Supp. 2d 1014, 1025 (N.D. Ill. 2010) ("Thus, the fact that [the company] disclosed certain of its difficulties . . . does not necessarily negate an inference of scienter, for [the company's] statements may still have been intended to conceal the fact that its condition was substantially worse than its statements suggested.").  "Acknowledging one's wrongdoing does not excuse it."  *In re Sonus Networks, Inc. Sec. Litig*., No. Civ.A.04-10294-DPW, 2006 WL 1308165, at *17 (D. Mass. May 10, 2006).

*Group IV, LLC*, 426 B.R. 488, 502 (D. Del. 2010).[34]

Second, even assuming, *arguendo*, that Defendants could properly raise this defense at the pleading stage – which they cannot – the protection afforded by Section 102(b)(7) does not extend to "acts or omissions not in good faith" or which "involve intentional misconduct or a knowing violation of law." *See Abbott Labs*, 325 F.3d at 810 ("breaches other than duty of care may not exempt the directors from liability and would disable the directors from considering a demand fairly").  Indeed, Section 102(b)(7) does not shield directors from "duty of loyalty violations, good faith violations and certain other conduct." *Emerald Partners v. Berlin*, 787 A.2d 85, 90 (Del. 2001).  As the Sixth Circuit aptly noted in *McCall*, which like this Action, was based on allegations that the defendant directors consciously turned a blind eye to wrongdoing:

> Here, Plaintiffs accuse the directors not merely of "sustained inattention" to their management obligations, but rather of "intentional ignorance of" and "willful blindness" to "red flags" signaling fraudulent practices throughout [the company]. Accordingly, regardless of how plaintiffs style their duty of care claims, we find that they have alleged a conscious disregard of known risks, which conduct, if proven, cannot have been undertaken in good faith. Thus, we hold that plaintiffs' claims are not precluded by [the company's] § 102(b)(7) waiver provision.

*McCall v. Scott*, 250 F.3d 997, 1001 (6th Cir. 2001); *see also Lyondell*, 2008 WL 4174038, at *3 (holding that a "intentional dereliction of duty or a conscious disregard of one's responsibilities"

---

[34] Because "the protection of an exculpatory charter provision appears to be in the nature of an affirmative defense," such "defenses generally will not form the basis for dismissal under Rule 12(b)(6)."  *In re Tower Air, Inc*., 416 F.3d 229, 242 (3d Cir. 2005); *see also In re Autobacs Strauss, Inc.*, 473 B.R. 525, 561 n.112 (D. Del. 2012) (denying dismissal of claims based upon an exculpatory provision because Section 102(b)(7) constitutes an affirmative defense that is inappropriate for consideration on a motion to dismiss); *In re The Brown Schools*, 368 B.R. 394, 401 (Bankr. D. Del. 2007) ("The exculpation clause is an affirmative defense and the determination of the viability of that defense is not proper at this stage"); *In re TASER Int'l S'holder Deriv. Litig*., No. CV-05-123-PHX-SRB, 2006 WL 687033, at *19 (D. Ariz. Mar. 17, 2006) (declining to consider an exculpatory charter provision in the context of defendants' motion to dismiss because it constituted an affirmative defense that was inappropriate for consideration).  Additionally, "it is the burden of the director defendants to demonstrate that they are entitled to the protections of the relevant charter provision.*" In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 752 (Del. Ch. 2005).  Defendants have provided the Court with ***no evidence*** to satisfy their burden of demonstrating that they are entitled to the protections of Section 102(b)(7) as a matter of law.

constitutes misconduct that amounts to a "non-exculpable, non-indemnifiable violation of the fiduciary duty to act in good faith).

Plaintiffs have made nearly identical allegations here.  For example, Plaintiffs allege that: "defendants were likewise on notice of numerous other *'red flags'* concerning the Company's overbilling practices and other misconduct in the administration and performance of government contracts" that included numerous instances of defrauding the government (¶¶26, 184); "Defendants *willfully ignored* the obvious and pervasive problems with SAIC's internal controls and practices and procedures and failed to make a good faith effort to correct these problems or prevent their recurrence" (¶218); "Despite clearly being placed on notice, the members of the Board *consciously disregarded* their fiduciary duties to SAIC when, under their direction, the Company continued to engage in the massive, illicit overbilling of NYC in connection with the CityTime project." (¶211(c)).   Indeed, plaintiffs have specifically alleged that defendants violated, among other duties, their fiduciary duties of "*loyalty*, *and good faith* by causing or allowing the Company to disseminate to SAIC materially misleading and inaccurate information. . . ." ¶214; *see also* ¶¶57, 59, 211(b)-(f), 217, 218, 221, 222.

**Defendants completely ignore these allegations**. "Where the complaint sufficiently alleges a breach of fiduciary duties based on a failure of the directors to act in good faith, bad faith actions present a question of fact that cannot be determined at the pleading stage." *Abbott Labs*, 325 F.3d at 811; *see also In re Direct Response Media, Inc*., 466 B.R. 626, 651 (D. Del. 2012) (holding that a defense based upon an exculpation clause "cannot be raised at the 12(b)(6) motion to dismiss stage, because the Amended Complaint has stated sufficient facts supporting a claim that directors acted in bad faith or conscious disregard of their responsibilities")  "Put simply, if a complaint *properly* pleads a non-exculpated claim, that claim at least survives a

motion to dismiss." *Orman v. Cullman*, 794 A.2d 5, 41 (Del. Ch. 2002) (emphasis in original). Because Plaintiffs have adequately alleged a conscious disregard of known risks that cannot have been undertaken in good faith, Defendants' argument fails.[35]

### 2.      Plaintiffs Adequately State a Claim for Unjust Enrichment

Plaintiffs have also adequately pled a claim for unjust enrichment.  Under Delaware law, unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Teachers' Ret. Sys. of Louisiana v. Aidinoff,* 900 A.2d 654, 671, n. 24 (Del. Ch. 2006).  To state a claim for unjust enrichment, plaintiff need only allege: "(1) an enrichment; (2) an impoverishment; (3) a relation between the enrichment and the impoverishment; (4) the absence of justification; and (5) the absence of a remedy provided by law." *Total Care Physicians, P.A. v. O'Hara,* 798 A.2d 1043, 1056 (Del. Super. 2001).

Here, Plaintiffs allege that SAIC suffered losses as a result of Defendants' breaches of fiduciary duty in connection with the Company's multi-year illicit scheme involving CityTime. ¶¶21, 28.  Plaintiffs allege with particularity that under Defendants' direction and on their watch, SAIC bilked NYC out of hundreds of millions of dollars without justification.   Indeed, SAIC was ultimately forced to pay ***more than half a billion dollars*** as part of a record settlement with governmental and regulatory authorities.  ¶2.  These facts are sufficient to support an unjust enrichment claim. *See, e.g.*, *Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 394 (Del. Ch.

---

[35] The reliance of the Director Defendants upon *Malpiede v. Townson*, 780 A.2d 1075 (Del. 2001), is misplaced.  Def. Mem. at 7.  The court in *Emerald Partners* clarified the decision in *Malpiede*, holding that "in *Malpiede*, this Court held that if a shareholder unambiguously asserts ***only*** a due care claim, the complaint is dismissible once the corporation's Section 102(b)(7) provision is properly invoked."  *Emerald Partners*, 787 A.2d at 91 (emphasis in original). Plaintiffs here do not assert only a due care claim; rather they allege that Defendants violated, among other duties, their fiduciary duties of loyalty and good faith.  ¶¶57, 59, 211(b)-(f), 214, 217, 218, 221, 222.

1999) (where plaintiffs alleged facts sufficient to plead a claim for breach of fiduciary duty, "it was axiomatic" that plaintiffs also sufficiently pled a claim for unjust enrichment); *Weiss*, 948 A.2d at 443-44.

Further, Plaintiffs allege that, as a result of their wrongdoing alleged in the Action, certain of the Defendants unjustly received artificially-inflated compensation as a result of their false portrayal of SAIC's revenue growth and its artificially inflated revenues.   ¶¶202-208. Indeed, Defendants maintained publicly that the Company's financial performance "determines the amount of any cash incentive awards to be paid at the end of the fiscal year." *Id.*  During the Relevant Period, defendants Havenstein, Dahlberg, and Sopp collectively were paid about *$46 million*. *Id.*  Because Defendants caused SAIC's revenue figures to be artificially inflated during the Relevant Period, thus ensuring outsized compensation for themselves, a cause of action for unjust enrichment is adequately pled.   Moreover, such restitution is an appropriate remedy regardless of the Defendants' respective roles in the scheme that is the subject of this Action. *See Ryan*, 918 A.2d at 355.

Plaintiffs' unjust enrichment claim, moreover, is not "duplicative" as Defendants suggest. Def. Mem. at 26.Unjust enrichment is an equitable and typically alternative theory of liability in instances where a legal remedy is unavailable:

> Frank's claim for unjust enrichment in Cause of Action II appears, at least to some extent, to be duplicative of his claim for breach of fiduciary duty in Cause of Action I. Delaware law, however, appears to permit a plaintiff to simultaneously assert two equitable claims even if they overlap. . .A plaintiff will only receive, at most, one recovery, but, at least at this procedural juncture, Frank may simultaneously assert a claim for breach of fiduciary duty and a claim for unjust enrichment against the members of the Control Group. Thus, the Defendants' motion to dismiss Cause of Action II is denied.

*Frank v. Elgamal,* 2012 WL 1096090, at *11 (Del. Ch. Mar. 30, 2012) (citing *MGH  Capital Corp. v. Maginn,* 2010 WL 1782271, at *25 n.147 (Del. Ch. May 5, 2010) ("One can imagine, however, factual circumstances in which the proofs for a breach of fiduciary duty claim and an

unjust enrichment claim are not identical, so there is no bar to bringing both claims against a director.")); *see also Hughes v. BCI Int'l Holdings*, *Inc.*, 452 F. Supp. 2d 290, 304-08 (S.D.N.Y. 2006) (denying motion to dismiss claims of breach of fiduciary duty and unjust enrichment). Thus, Plaintiffs have adequately pled a claim for unjust enrichment.

### 3. Plaintiffs Adequately State Claims For Abuse of Control and Gross Mismanagement

Under Delaware law, gross mismanagement in the corporate arena has been deemed to mean "reckless indifference to or a deliberate disregard of the stockholders." *Rabkin v. Philip A. Hunt Chem. Corp.*, 547 A.2d 963, 970 (Del. Ch. July 15, 1929). A plain reading of the allegations in the Complaint demonstrates how the defendants, both individually and collectively, grossly mismanaged the business of SAIC by ignoring their responsibilities and fiduciary duties to the Company that required them to prudently manage the assets business and financial reporting system of SAIC. *See, e.g.*, ¶¶91-145, 148, 150, 151, 163, 167-88.  Indeed, despite the fact that Defendants were on notice of the Company's actual CityTime misconduct *for years* based on media reports and New York City Council hearings, Defendants were likewise on notice of numerous other "red flags" concerning the Company's overbilling practices and other misconduct in the administration and performance of government contracts.  ¶25.  For instance, both before and during the Relevant Period, the Company was repeatedly accused of and cited (and punished) for similar misconduct.  *Id.*  In particular, according to the Project on Government Oversight's *Federal Contractor Misconduct Database*, SAIC has come under scrutiny for no less than ***thirteen*** "instances of misconduct," at least two of which involved claims for overbilling on government contracts brought pursuant to the FCA.  ¶26.  Thus,

plaintiffs adequately state claims for abuse of control and gross mismanagement.[36]

### 4. Plaintiffs Adequately State a Claim Under Section 14(a) of the Securities Exchange Act

Plaintiffs also adequately state a claim under Section 14(a) of the Securities Exchange Act.  Section 14(a) and Rule 14a-9 prohibit a false or misleading declaration of material fact in a statement soliciting a proxy, or an omission of material fact that makes any portion of the proxy statement misleading.  15 U.S.C. §78n(a); *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044 (C.D. Cal. 2008).  To plead a claim under §14(a), Plaintiffs need only allege that: (1) Defendants made a material misrepresentation or omission in a proxy statement; (2) the statement omits a material fact which was necessary to make the statement not false or misleading or which was required to be disclosed by SEC regulations; (3) the misstatement or omission of a material fact was the result of knowing, reckless or negligent conduct; and (4) the proxy solicitation was an essential link in effecting corporate action.  *See Mills v. Elec. Auto-lite Co.*, 396 U.S. 375, 385, 90 S. Ct. 616, 24 L. Ed. 2d 593 (1970).

The key of a §14(a) violation is a material misstatement – something "*that a reasonable shareholder would consider . . . important in deciding how to vote.*"  *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S. Ct. 2126, 48 L. Ed. 2d 757 (1976).  Material information is information that, if disclosed in a proxy statement, would likely be viewed by a reasonable investor as having "significantly altered the 'total mix' of information made available." *Id*. Claims under §14(a) are not subject to any requirement that a plaintiff demonstrate scienter. Instead, such claims are subject to the pleading standards of Rule 8(a) of the Federal Rules of

---

[36] Defendants also assert that Plaintiffs' claims for abuse of control and gross mismanagement are duplicative.  Def. Mem. at 28.  Not so.  *See, e.g.*, S*tone v. Travis*, No. 05 Civ. 6249 (RPP), 2006 WL 334648, at *4-*5 (S.D.N.Y. Feb. 10, 2006) (denying motion to dismiss claims of breach of fiduciary duty, unjust enrichment, and gross mismanagement); *Oxford*, 192 F.R.D. at 114 (denying motion to dismiss claims of breach of fiduciary duty, gross mismanagement, and waste of corporate assets).

Civil Procedure, and mere negligence is sufficient to establish liability.  *See, e.g., Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1301 (2d Cir. 1973) (holding that plaintiffs "are not required to establish any evil motive or even reckless disregard of the facts");  *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1265-66 (N.D. Cal. 2000) (finding officers and directors liable under §14(a) negligence standard).  Indeed, the mere "preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact is sufficient to satisfy the *Gerstle* negligence standard."  *Wilson v. Great Am. Indus.*, 855 F.2d 987, 995 (2d Cir. 1988).[37]

### a.   SAIC's Proxy Statements Were Materially False and Misleading

Plaintiffs have adequately alleged that SAIC's proxy statements were materially false and misleading.  In *Countrywide*, for instance, the plaintiffs alleged that, like here, the challenged proxy statements failed to disclose that the subject company had departed from its own policies and used deceptive measures to meet its financial goals, thereby subjecting it to heightened risk:

> ***[Plaintiffs] allege that the proxy statements failed to disclose that Countrywide abandoned its underwriting standards, thus exposing itself to an undisclosed level of heightened risk***.  Furthermore, the "true operational and financial state of Countrywide" would have been material to shareholders during a proxy vote because of its impact on the Company's balance sheet.  *See also   Atlas v.*

---

[37]  Defendants attempt to impose heightened pleading requirements on Plaintiffs' §14(a) claims by arguing that this claim "sounds in fraud."  *See, e.g.*, Def. Mem. at 10.  Defendants, however, seek to require a showing that far exceeds the relevant and applicable legal standards.  Where, as here, the complaint does not attribute the material omissions from the proxy statements to fraudulent intent or a similar state of mind, mere negligence is required to state a claim for violation of § 14(a).  *See, e.g., DCML LLC v. Danka Bus. Sys. PLC*, No. 08 Civ. 5829 (SAS), 2008 WL 5069528, at *1 (S.D.N.Y. Nov. 26, 2008); *Beck v. Dobrowski*, 559 F.3d 680, 681-82 (7th Cir. 2009); (Posner, J.) (explaining that "negligence is not a state of mind").  Additionally, even if plaintiffs' §14(a) claim were subject to heightened particularity requirements, the Complaint amply satisfies those standards as well.  Pursuant to Rule 9(b) of the Federal Rules of Civil Procedure a complaint must "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'"  *Wall St. Sys., Inc. v. Lemence*, No. 04 Civ. 5299 (JSR), 2005 WL 292744, at *1 (S.D.N.Y. Feb. 8, 2005) (quoting *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)).  As illustrated below with respect to each aspect of defendants' material misstatements in, and omissions from, the proxy statements, the Complaint satisfies every element of the particularity requirement.

*Accredited Home Lenders Holding Co.*, 2008 WL 80949, at *10 (underwriting practices of mortgage originator "would be among the most important information looked to by investors"). ***Shareholders would reasonably consider the Company's financial performance in deciding whether to reelect the directors.*** Likewise, though Plaintiffs' reasoning is a bit more circuitous on this point, shareholders would be interested in knowing whether the directors would use deceptive methods to achieve the performance measures that were the benchmarks of the 2005 and 2006 compensation plans. Though it is more difficult to evaluate the Board's statements regarding the effectiveness of the director and executive compensation policies, ***the statements concerning the Company's extraordinary performance in a challenging environment were also material and misleading if in fact, they failed to disclose the Company's true financial condition. Accordingly, Plaintiffs have adequately stated a §14(a) and Rule 14a-9 claim*** for all Defendants except Dougherty and Snyder.

*Countrywide*, 554 F. Supp. 2d at 1077.

Here, a reasonable SAIC shareholder would have considered Defendants' misconduct important in deciding how to vote. As alleged, in the Company's Proxy Statements filed on Form DEF 14A with the SEC and disseminated to SAIC stockholders on April 29, 2009, April 29, 2010, and April 27, 2011 (collectively, the "Proxies"), the Board issued materially false and misleading statements in the Audit Committee Report, representing that the Audit Committee had "reviewed and discussed with management and Deloitte & Touche LLP, the Company's independent registered public accounting firm, the audited consolidated financial statements," and that "[b]ased on the reviews and discussions summarized in this Report and subject to the limitations on our role and responsibilities referred to above and contained in the Audit Committee charter, the Audit Committee recommended to the Board of Directors that the Company's audited consolidated financial statements referred to above be included in the Company's Annual Report on Form 10-K . . ." ¶241. Defendants' statements in the Proxies were false and misleading because the Audit Committee "blessed" the Company's financial statements and its internal controls even though a substantial portion of the Company's revenues were derived through improper and illicit activities, which was unknown to SAIC shareholders. ¶242. Defendants' misrepresentations, therefore, subjected the Company and its stockholders to

47

irreparable harm.  *See, e.g., Weiss*, 948 A.2d at 449 (plaintiffs claim for breach of fiduciary duty sustained based on allegations that defendants omitted from proxies soliciting stockholder votes that stock options were awarded in violation of publicly-stated plan terms).   These facts adequately state a claim under §14(a).  *Countrywide*, 554 F. Supp. 2d at 1077.[38]

> **b.    Plaintiffs Adequately Allege an Essential Link Between the Proxy Statements and Defendants' Misconduct**

Plaintiffs also satisfy the "essential link" element of a §14(a) claim because shareholder approval was necessary to accomplish the challenged transactions.  *See, e.g.*, *Weisberg v. Coastal States Gas Corp.*, 609 F.2d 650, 654 (2d Cir. 1979) (holding that "the challenged 'transaction' is the election of the directors, and we have no doubt that the 'proxy solicitation itself . . . was an essential link in the accomplishment of that transaction' ").  As alleged, Defendants' material omissions from the Proxies ***directly*** harmed the Company by keeping the Board's longstanding non-compliance with the law in place.  Indeed, damages flowing from the acts of directors who were elected pursuant to a misleading proxy statement satisfy the essential link element of §14(a).  *See Kelley v. Rambus, Inc.*, No. C-07-01238 JF (HRL), 2008 WL 5170598, at *8 (N.D. Cal. Dec. 9, 2008) ("the involvement of directors authorized by the proxy vote in some future wrongdoing, has been critical in every case that has found an essential link"), *aff'd*, 384 F. App'x 570 (9th Cir. 2010).  Thus, these allegations sufficiently state a §14(a) claim

---

[38]  Defendants' assertion that they were not required to disclose their improper conduct because no misconduct had yet been charged or proven is wholly without merit.  "[T]he mere fact that the conduct in question arguably constitutes mismanagement will not preclude a claim under the federal securities laws if the defendant made a statement of material fact wholly inconsistent with known existing mismanagement or failed to disclose a specific material fact resulting from that mismanagement." *Portannese v. Donna Karan Int'l., Inc.*, No. 97-CV-2011 CBA, 1998 WL 637547, at *10 (E.D.N.Y. Aug. 14, 1998); *see also Westinghouse Elec. Corp. v. Franklin*, 789 F. Supp. 1313, 1320 (D.N.J. 1992) (holding that "[a]llegations of failure to disclose illegal and deceptive practices will survive a motion to dismiss" a §14(a) claim), *rev'd on other statute-of-limitations grounds*, 993 F.2d 349 (3d Cir. 1993).

under the Exchange Act.[39]

### 5.      Plaintiffs' Claims Are Timely

Certain Defendants claim that the articles alleged would have placed Plaintiffs on inquiry notice, thereby triggering the statute of limitations.  *See, e.g.,* Def. Mem. at 35; Alderson Mem. at 22-25.  Defendants are incorrect.  The Supreme Court's decision in *Merck & Co. v. Reynolds*, 130 S. Ct. 1784, 1797 (2010), makes it clear that until sufficient facts to support each element of plaintiffs' claim could have been discovered to defeat a motion to dismiss, the statute of limitations does not yet run.

Even before *Merck* "set a high bar" for defendants invoking the statute of limitations, this circuit imposed rigorous rules on defendants seeking the refuge of the statute of limitations. "[T]he duty to inquire is not triggered unless plaintiffs were able to perceive the general fraudulent scheme on the basis of available information … and the wrongdoing indicated by that information was 'probable, not merely possible.'"  *In re Alcatel Sec. Litig*., 382 F. Supp. 2d 513, 523-524 (S.D.N.Y. 2005) (citing, *inter alia*, *Newman v. Warnaco Grp., Inc*., 335 F.3d 187, 193 (2d Cir. 2003)).  Nor could the information be equivocal.  Rather, the Second Circuit required

---

[39] The Director Defendants also claim that Plaintiffs fail to adequately allege loss causation. Def. Mem. at 34-35.  The Director Defendants are wrong.  To adequately plead loss causation, a plaintiff need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).  The pleading standard for loss causation, moreover, is governed by Rule 8 of the Federal Rules of Civil Procedure, which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  *Id.* at 346; *see also Richman v. Goldman Sachs Grp., Inc*., 868 F. Supp. 2d 261, 282  (S.D.N.Y. 2012) ("Allegations of loss causation are not subject to the heightened pleading requirements of Rule 9(b) and the PSLRA.").  Here, Plaintiffs allege that SAIC's stock price fell as a result of the misconduct alleged and that the Company was forced to pay more than half a billion dollars as a direct result of such misconduct.  ¶¶2, 20-23, 28.  Courts have held that similar allegations satisfy the lenient standard to adequately allege loss causation for Section 14(a) claims.  *In re Heckmann Corp. Sec. Litig*., C.A. No. 10-378-LPS-MPT, 2012 WL 2428433, at *14-*15 (D. Del. May 25, 2012).  Defendant Alderson's reliance upon *Janus Capital Grp., Inc. v. First Deriv. Traders*, 131 S. Ct. 2296 (2011), is misplaced.  As Defendant Alderson herself recognizes, *Janus* was concerned with violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, not liability in derivative actions. Breaches of fiduciary duties are not the same as liability under Rule 10b-5 to render *Janus* applicable.

"*uncontroverted* evidence [that] *irrefutably* demonstrates when plaintiff discovered or should have discovered the fraudulent conduct." *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 209 (S.D.N.Y. 2004) (emphasis added) (citation omitted). Without such uncontroverted, irrefutable evidence, defendants could not satisfy "the heavy burden of establishing inquiry notice as a matter of law." *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 234 (S.D.N.Y. 2006) (citing cases). For this reason, the prior law of the circuit held that whether a plaintiff had sufficient facts to place it on inquiry notice is "often inappropriate for resolution on a motion to dismiss." *Staehr v. The Hartford Fin. Servs. Grp., Inc*., 547 F.3d 406, 412 (2d Cir. 2008) (citing *LC Capital Partners LP v. Frontier Ins. Grp., Inc*., 318 F.3d 148, 156 (2d Cir. 2003)).

*Merck* raised this bar even higher. Certain defendants argue that because plaintiffs allege certain "red flags" for *defendants*, this means that ordinary investors were placed on inquiry notice of their claims. In *City of Pontiac*, however, the Second Circuit expressly ruled that this is not the relevant standard after *Merck*:

> **Prior to *Merck***, the law of our Circuit had provided that a plaintiff was on "inquiry notice" when public information would lead a reasonable investor to investigate the possibility of fraud …
>
> ***Merck* overruled this analysis**: "[T]he discovery of facts that put a plaintiff on inquiry notice *does not* automatically begin the running of the limitations period." 130 S.Ct. at 1798.

637 F.3d at 173-74. A fact is not "discovered" until a reasonably diligent plaintiff can plead it with sufficient specificity to survive a motion to dismiss. *Id.* at 175. Courts in this district have recognized this distinction and have rejected similar arguments from defendants. *Ho v. Duoyuan Global Water, Inc*., No. 10-CV-7233 (GBD), 2012 WL 3647043, at *9-*11 (S.D.N.Y. Aug. 24, 2012). Because defendants have not demonstrated that plaintiffs were on inquiry notice of their claims *as a matter of law*, defendants' argument fails.

### 6.      Defendants' Arguments Regarding Service Fails

Although they have filed lengthy briefs challenging the sufficiency of plaintiffs' claims, defendants Alderson, Dahlberg, and Sopp claim that dismissal is warranted because they purportedly were not properly served.  Alderson Mem. at 4-5; Dahlberg Mem. at 2; Sopp Mem. at 2.  The Court should deny defendants' attempt for dismissal on this basis.[40]

"Rule 4 is to be construed liberally with regard to service of process."  *Maruzen Intern., Co. Ltd. v. Bridgeport Merchandise, Inc*., 770 F. Supp. 155, 159 (S.D.N.Y. 1991).  Accordingly, dismissal is generally not justified absent a showing of prejudice.  *Durant v. Traditional Investments, Ltd*., No. 88 CIV. 9048 (PKL), 1990 WL 33611, at *4 (S.D.N.Y. Mar. 22, 1990); *see also United Food & Comm. Workers Union v. Alpha Beta Co.*, 736 F.3d 1371, 1382 (9th Cir. 1984); *Newman v. Prior*, 518 F.2d 97, 99 (4th Cir. 1975); Fed R. Civ. P. 61.  Courts have held that even in instances where plaintiffs have failed to effect proper service on a defendant, denial of the motion to dismiss is warranted where defendant had, in fact, received a copy of the summons and complaint and had actual knowledge of the action.  *Richardson v. Downing*, 209

---

[40] In the process of amending the operative complaint, plaintiffs included several defendants who were not previously named as defendants in all of the consolidated actions.  Any deficiency with respect to service upon defendant Alderson was inadvertent.  Plaintiffs are willing and able to effect service upon defendant Alderson if necessary.  Plaintiffs respectfully suggest, however, that in light of defendant Alderson's pending motion to dismiss on substantive issues, the lack of any demonstration of prejudice, and the authority cited herein, that it is more expeditious for the Court to liberally construe the issue regarding service upon defendant Alderson since she has clearly received actual notice.  Dahlberg claims that plaintiffs served him 16 days after the 120 days prescribed by Rule 4(m) of the Federal Rules of Civil Procedure, and Sopp claims that plaintiffs served him 26 days afterward.  District courts, however, have discretion to grant extensions under Rule 4(m) even in the absence of good cause.  *Zapata v. City of New York*, 502 F.3d 192, 196 (2d Cir. 2007); *see also Harper v. NYC Admin. for Children's Servs*., No. 09 Civ. 2468 (JGK), 2010 WL 23328, at *2 (S.D.N.Y. Jan. 5, 2010) (extending time for service where the delay "was a for a minimal period of time and there is no showing that the defendant was prejudiced by the eighteen day delay").  Because the applicable statute of limitations has not run and since Dahlberg and Sopp have actual notice of the claims and have not been prejudiced, their service argument also fails.  *E. Refractories Co. v. Forty Eight Insulations, Inc*., 187 F.R.D. 503, 506 (S.D.N.Y. 1999).

F.R.D. 283, 284 (D. Mass. 2002); *U.S. v. 630 Ardmore Dr.*, 178 F. Supp. 2d 572, 579 (M.D.N.C. 2001). Such is the case here. Defendants make no argument that they have been prejudiced; on the contrary, they have appeared in the action to challenge the sufficiency of plaintiffs' claims. "Thus, when a defendant receives actual notice of a lawsuit brought against him, technical imperfections with service will rarely invalidate the service." *Maruzen*, 770 F. Supp. at 159; *Durant*, 1990 WL 33611, at *3-*4. Thus, the Court should deny Defendants' service arguments.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Motions be denied in their entirety. If the Court grants any portion of defendants' motions, plaintiffs respectfully request leave to amend. *Foman v. Davis*, 371 U.S. 178, 182, (1962); *ATSI Comm'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).

Dated:  December 10, 2012

**GLANCY BINKOW & GOLDBERG LLP**

By:  *s/ Elizabeth M. Gonsiorowski*
ELIZABETH M. GONSIOROWSKI
30 Broad St., Suite 1401
New York, NY 10004
Telephone:  (212) 382-2221
Facsimile:  (212) 382-3944

-and-

LIONEL Z. GLANCY
MICHAEL M. GOLDBERG
EX KANO S. SAMS II
ROBERT V. PRONGAY
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone:  (310) 201-9150
Facsimile:  (310) 201-9160

**THE WEISER LAW FIRM, P.C.**
ROBERT B. WEISER
BRETT D. STECKER
JEFFREY J. CIARLANTO

CHRISTOPHER NELSON
22 Cassatt Avenue
First Floor
Berwyn, PA 19312
Telephone:  (610) 225-2677
Facsimile:  (610) 408-8062

*Co-Chairs of the Executive
Committee for Plaintiffs*

**BLOCK & LEVITON LLP**
JEFFREY C. BLOCK
JASON M. LEVITON
WHITNEY E. STREET
155 Federal Street, Suite 1303
Boston, MA 02110
Telephone:  (617) 398-5600
Facsimile:  (617) 507-6020

**MURRAY FRANK LLP**
BRIAN P. MURRAY
BRIDGET V. HAMILL
275 Madison Avenue, Suite 801
New York, NY 10016
Telephone:  (212) 681-1818
Facsimile:  (212) 682-1862

*Members of the Executive Committee for
Plaintiffs*

**PROOF OF SERVICE BY ELECTRONIC POSTING
PURSUANT TO SOUTHERN DISTRICT OF NEW YORK
ECF AND LOCAL RULES AND BY MAIL
ON ALL KNOWN NON-REGISTERED PARTIES**

I, the undersigned, say:

I am a citizen of the United States and am employed in the office of a member of the Bar of this Court.  I am over the age of 18 and not a party to the within action.  My business address is 30 Broad St., Suite 1401, New York, New York 10004.

On December 10, 2012, I caused to be served the following document:

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**

By posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the attached Court's Service List.

And by **U.S. Mail** to all known non-ECF registered parties: By placing true and correct copies thereof in individual sealed envelopes, with postage thereon fully prepaid, which I deposited with my employer for collection and mailing by the United States Postal Service.  I am readily familiar with my employer's practice for the collection and processing of correspondence for mailing with the United States Postal Service.  In the ordinary course of business, this correspondence would be deposited by my employer with the United States Postal Service that same day.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on December 10, 2012, at New York, New York.

*s/ Elizabeth M. Gonsiorowski*
Elizabeth M. Gonsiorowski

## Mailing Information for a Case 1:12-cv-02437-JPO

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Barry A. Bohrer**
  bbohrer@maglaw.com,bfisher@maglaw.com

- **Jeffrey J. Ciarlanto**
  jjc@weiserlawfirm.com

- **Lauren Elizabeth Curry**
  lcurry@brownrudnick.com

- **Eric Robert Delinsky**
  edelinsky@zuckerman.com

- **Kristopher Price Diulio**
  kdiulio@gibsondunn.com

- **Warren Neil Eggleston**
  neil.eggleston@kirkland.com,kenymanagingclerk@kirkland.com

- **Mark Robert Filip**
  mark.filip@kirkland.com

- **Lionel Z. Glancy**
  lglancy@glancylaw.com,mmgoldberg@glancylaw.com,csadler@glancylaw.com,pbinkow@glancylaw.com,info@glancylaw.com,rprongay@glancylaw.com,cturner@glancylaw.com

- **Elizabeth Mary Gonsiorowski**
  egonsiorowski@glancylaw.com,info@glancylaw.com

- **Bridget Veronica Hamill**
  bhamill@murrayfrank.com

- **Roy Laurence Jacobs**
  rljacobs@pipeline.com

- **Sidhardha Kamaraju**
  skamaraju@maglaw.com

- **Gregory Bradley Linkh**
  glinkh@glancylaw.com

- **Jason Robert Meltzer**
  jmeltzer@gibsondunn.com

- **Brian Philip Murray**
  bmurray@murrayfrank.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com

- **Ex Kanos S Sams , II**
  esams@glancylaw.com

- **Brett D Stecker**
  bds@weiserlawfirm.com

- **Ariana Judith Torchin**
  atorchin@maglaw.com

- **Andrew Santo Tulumello**
  atulumello@gibsondunn.com

- **Mark Henry Tuohey , III**
  mtuohey@brownrudnick.com

- **Beth Ann Williams**
  beth.williams@kirkland.com,emily.hughes@kirkland.com,rebecca.weinstein@kirkland.com,lisa.horton@kirkland.com,kenymanagingclerk@kirkland.com,vikas.didwania@kirkland.co

- **Lloyd Winawer**
  lwinawer@goodwinprocter.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
James M. Ficaro
The Weiser Law Firm, P.C.
22 Cassatt Avenue
Berwyn, PA 19087

Jason J Mendro
Gibson Dunn & Crutcher LLP
1050 Connecticut Ave., N.W.
Washington, DC 20036
```

**David M. Promisloff**
Kessler Topaz Meltzer & Check, LLP
280 King of Prussia Road
Radnor, PA 19087

**Robert Weiser**
The Weisler Law Firm
121 N. Wayne Avenue
Suite 100
Wayne, PA 19087