UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                    :        12 Civ. 2437 (JPO)
IN RE SAIC INC. DERIVATIVE LITIGATION   :
                                                    :        MEMORANDUM AND
                                                    :              ORDER
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

        In this shareholder derivative suit, Plaintiffs allege that a majority of the Board of

Directors of SAIC, Inc. was on actual or constructive notice of significant wrongdoing in relation

to the lucrative contract for a program called CityTime, but nonetheless consciously ignored or

perpetuated that wrongdoing.  Plaintiffs further allege various claims arising from SAIC's

handling of the CityTime program.  The defendants in this case have moved to dismiss on

several distinct grounds.  One such motion was filed by Nominal Defendant SAIC, which objects

to Plaintiffs' efforts to bring suit on its behalf.  Because Plaintiffs did not make a demand on

SAIC's board of directors before filing suit, and have not alleged with sufficient particularity

facts creating a reasonable doubt that a majority of the board is disinterested and independent,

SAIC's motion to dismiss is granted and the complaint is dismissed.

I.      **Background**[1]

        This consolidated action includes four lawsuits relating to a program called CityTime,

which SAIC developed for New York City ("the City").  These shareholder derivative lawsuits

were filed between February and May of 2012.  On May 15, 2012, Plaintiffs Welch and

Stellini—current SAIC shareholders who have held stock in SAIC continuously since at least

---

[1] "In deciding a motion to dismiss for failure to satisfy Rule 23.1's particularity requirement, the Court must accept as true all well-pleaded allegations and reasonable inferences drawn therefrom."  *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Lundgren*, 579 F. Supp. 2d 520, 527-28 (S.D.N.Y. 2008).  Because all pending motions are decided on demand futility grounds, allegations irrelevant to that legal issue are excluded from this background section.

2000—moved to consolidate these actions, appoint lead plaintiffs, and appoint lead counsel.  On July 12, 2012, the Court ordered consolidation, appointed co-lead plaintiffs, and set a briefing schedule.  Plaintiffs filed the operative Verified Consolidated Shareholder Derivative Complaint ("the Complaint") on September 10, 2012.

Nominal Defendant SAIC, a Delaware corporation headquartered in Virginia, provides defense, intelligence, homeland security, logistics, energy, environment, and health solutions and services to federal, state, and local government agencies, foreign governments, and customers in select commercial markets.  In each of the last three fiscal years, SAIC generated over 90% of its total revenues from government contracts.  Accordingly, SAIC has relied almost exclusively throughout the relevant period—and continues to rely heavily—on revenues generated from government contracts.  All defendants were aware of this fact throughout the relevant period and consistently warned SAIC stockholders that SAIC's compliance with laws and regulations relating to the administration and performance of government contracts was (and is) critical to SAIC's business.

The following defendants have all served as directors of SAIC since the time indicated and on any noted committees during the relevant period:  Young (July 1995); Córdova (February 2008) (Ethics Committee); Drummond (July 2003) (Ethics Committee); Frist (September 2009) (Audit Committee); Hamre (June 2005); John (June 2007); Jones (January 1998) (Ethics and Audit Committees); Jumper (June 2007) (Audit Committee); Kraemer (April 1997) (Audit Committee); Nussdorf (September 2010) (Audit Committee); Sanderson (October 2002); Simpson (July 2006 through April 2012).[2]  The Ethics and Audit Committees, among other

---

[2] Jumper has served as SAIC's Chairman, President, and CEO since March 1, 2012.  Nussdorf has served as the Board's Lead Independent Director since June 2012.  Members of the Ethics and Audit Committee bear particular duties, as set forth in ¶¶ 61-64 of the Complaint.

entities organized by the Board, constituted a system of internal controls, practices, and procedures at SAIC.

Defendant Havenstein served as CEO of SAIC and as a director from September 2009 until his retirement took effect on March 1, 2012.  Defendant Sopp has served as CFO and Executive Vice President of SAIC since November 2005.  Defendant Kenneth Dahlberg served as CEO of the Company from November 2003 through September 2009, and as Chairman of the Board from July 2004 to June 2010.  Defendant Denault served as the Vice President and Operations Manager of SAIC from October 22, 2002 until he was placed on administrative leave in December 2010; Denault's employment was terminated on May 25, 2011 and he was arrested on charges involving illegal kickbacks on May 27, 2011.  Defendant Bell served as SAIC's Chief Systems Engineer during the relevant period; on June 14, 2011, Bell pleaded guilty in this District to multiple criminal charges arising from the CityTime billing scheme.  Defendant Alderson served as SAIC's Group President from 2005 until 2011.

All named defendants are referred to collectively as "Defendants."  Defendants who served as directors of SAIC at any point during the relevant period are referred to as "Directors." The Board of Directors at the time this suit was initiated is referred to as "the Board."  By reason of their positions as officers, directors, managers, and/or fiduciaries of SAIC, and because of their ability to control SAIC's business and corporate affairs, all defendants other than SAIC owed SAIC and its shareholders certain fiduciary obligations.

The allegations in this case arise from misconduct in connection with SAIC's billing on a contract with the City to develop and implement CityTime: an automated time, attendance, and workforce management system for certain City agencies.  In 2001, the City's contract with SAIC was budgeted to cost the City a total of $63 million.  By April 2010, however, the City had paid SAIC more than $600 million.  In 2006, mid-way through the CityTime project, the City and

SAIC entered into a contract that, among other things, had the effect of transferring the risk of future cost overruns and any expansion of the CityTime project from SAIC to the City. CityTime was intended to serve as a model and prototype that SAIC could then market to other municipalities.  At several points during the relevant period, SAIC publicly touted CityTime as an example of its high-quality work.

From 2003 through 2010, Denault served as SAIC's Program Manager on CityTime and Bell was responsible for developing software for CityTime.  During that period, there existed an elaborate scheme organized by Denault, Bell, and other non-SAIC co-conspirators to defraud the City in connection with CityTime through material misrepresentations to the City, omissions of material fact in communications with the City, the payment of millions of dollars in kickbacks to participants in the scheme (including Denault and Bell), and the laundering of ill-gotten proceeds through shell companies and bank accounts.[3]  In addition to Bell and Denault, co-conspirators in this scheme included City employees and employees of certain subcontractors and sub-subcontractors.

On December 15, 2010, the United States Attorney for the Southern District of New York ("U.S. Attorney") filed a criminal complaint against four consultants to the City's Office of Payroll Administration in connection with CityTime.  On February 10, 2011, the U.S. Attorney issued a press release announcing that it was unsealing a superseding indictment that added Denault, among others, as a defendant.  In that same press release, the U.S. Attorney also announced that Bell had pleaded guilty to multiple charges arising from the CityTime scheme. Denault and Bell were charged with defrauding both the City and SAIC.  U.S. Attorney Preet Bharara stated that "since the first announcement of arrests and seizures, we have developed evidence that the corruption on the CityTime project was epic in duration, magnitude and scope."

---

[3] The Complaint sets forth more detailed allegations concerning this scheme at ¶¶ 73-85.

In June 2011, *The New York Times* and *The Wall Street Journal* quoted Bharara as saying that most of the money paid for CityTime had been tainted by the fraud that permeated the deal.

On March 14, 2012, SAIC announced that it had entered into a deferred prosecution agreement ("DPA") with the U.S. Attorney in relation to the CityTime project.  In the DPA, SAIC admitted "that it, through the conduct of certain managerial employees and others, defrauded the City into significantly overpaying for CityTime."  SAIC also agreed to disgorge the profits of the offense, totaling $500,392,977 for restitution and a penalty, and to undertake certain corporate reforms to reduce the likelihood of such fraud in the future.

As part of the DPA, SAIC issued a statement of responsibility ("SOR").  In the SOR, SAIC stated that "[i]n 2005, a whistleblower within SAIC had filed an anonymous ethics complaint" regarding the scheme, that "SAIC failed to properly investigate the complaint and did not notify the City that a complaint had been made," and that "the complaint also was not brought to the attention of SAIC's Board of Directors."  SAIC "accept[ed] responsibility for the illegal conduct alleged against Denault and admitted by Bell during the course of the CityTime project," "acknowledge[ed] that the conduct and managerial failures described herein contributed to the ability of Denault and Bell to commit the alleged crimes against the City," and admitted that "the City was defrauded by SAIC as a result."  The SOR contained other admissions by SAIC of failures at the level of staff and management.

Plaintiffs allege that "Defendants were undeniably aware of numerous 'red flags' concerning the massive overbilling for the CityTime project for years."  The Complaint alleges, among other things, that a series of news articles concerning CityTime supports the conclusion that the Directors were aware of misconduct throughout the relevant period:

- On March 2, 2008, *CityLimits* published an article entitled "A Show of Hands: City Workers Resist Tracking."  The article noted that CityTime was far over

budget and that SAIC had previously experienced "high-profile problems over the years," gesturing to a number of scandals in the 1990s and early 2000s.

- On April 12, 2008, *The Daily News* published an article entitled "Big Brother System for Keeping Eye on City Workers at $410 Million and Rising," which questioned cost overruns on the CityTime project and noted that New York State Senator Joseph Addabbo, Jr. planned to hold a hearing in May 2008 concerning CityTime's skyrocketing costs.

- On May 18, 2008, *CityLimit* published an article entitled "Time-Out Proposed for CityTime System," highlighting numerous criticisms of CityTime's cost, duration, and efficacy at a May 8, 2008 City Council hearing.  The article also noted that Senator Addabbo had called for the CityTime project to be halted in light of its "undetermined duration and inflated cost," and that he had stated "there's enough evidence or inefficiency or questionable facts to justify further investigation" of CityTime.

- On December 3, 2009, *The Daily News* published an article entitled "High-Tech Computerized Payroll System for City Employees Costs Taxpayers Big," criticizing cost overruns, noting high salaries paid to consultants, and pointing out that Mayor Michael Bloomberg's administration had amended the CityTime contract's limits "every six months."

- On March 29, 2010, *Risk Factor* published an article entitled "Can You Top This? $68 Million New York City Project is Now $722 Million and Counting."  The article stated that "if anyone knows of an IT project over $50 million that has exceeded its budget by more than 10 times and still hasn't been canceled, let me know.  I can't find any in my archives."  The article described and criticized cost

overruns, noted that the contract had been amended eight times since its original

signing, referenced criticism of the project by Mayor Bloomberg, and reported

that City Comptroller John Liu had announced in February that his office would

audit the CityTime contract.

Plaintiffs also rely upon certain articles published after the U.S. Attorney first announced

CityTime-related indictments on December 15, 2010:

- On December 19, 2010, *The Daily News* published an article entitled "As Scandal

  Erupts and Arrests Are Made, Warning Signs for CityTime Fraud Were There All

  Along," opining that *The Daily News* had "first raised questions about CityTime

  in April 2008, when it was a $410 million project."

- On December 30, 2010, after the U.S. Attorney first announced CityTime-related

  indictments, *Lost in the Ozone* published an article discussing statements by

  Senator Addabbo, who reflected back on the 2008 hearing concerning cost

  overruns and noted that he had worried at the time that the City was "throwing

  good money at a bad program."

- On April 21, 2012, *The Washington Post* published an article entitled "How

  Could SAIC Miss This?"  That article, published after SAIC had entered into the

  DPA, argued that "[w]hat is fascinating about the CityTime debacle is how many

  times SAIC was warned about irregularities and potential fraud without ever

  doing anything about it . . . there were plenty of warning signs for anyone with

  even a passing familiarity with the government contracting business, which

  includes almost everyone at SAIC."

At a hearing held in May 2008, Addabbo—then-Chairman of the Civil Service and Labor

Committee of the New York City Council—called for a moratorium on CityTime expenditures

pending an investigation into cost overruns, the program's duration, and its efficacy.  At a second

hearing, held on December 18, 2009, Chairperson Letitia James of the Committee on Contracts

criticized CityTime's spiraling costs.  In support of her concerns, James cited critical coverage in

*The Daily News* and an e-mail from an anonymous individual, who claimed to have been paid

$120,000 for work on CityTime over an eight-month period even though he or she "probably did

real work for approximately two weeks."

CityTime was not the first SAIC project to encounter cost overruns.  Plaintiffs allege that

Defendants "were likewise on notice of numerous other 'red flags' concerning the Company's

overbilling practices and other misconduct in the administration and performance of government

contracts."  The Project on Government Oversight's *Federal Contractor Misconduct Database*

identifies thirteen "instances of misconduct," at least two of which involved claims for

overbilling on government contracts brought pursuant to the False Claims Act ("FCA").  These

incidents of misconduct non-exhaustively include the following:

- In 1995, SAIC was charged with defrauding the government over its efforts to
  design a flat panel screen for fighter jets; this claim was settled, subject to SAIC
  paying a fine of $2.5 million.

- In 2004, SAIC agreed to settle claims arising from alleged FCA violations
  involving a contract to design a computer program for the Department of Defense.

- In 2006, a review of SAIC's subcontractor labor charges found that the Federal
  Bureau of Investigation had been billed twice for the same subcontractor invoice.

- In July 2008, after trial on claims first brought in 2004, a jury found that SAIC
  had knowingly submitted 60 false claims for payment to the Nuclear Regulatory
  Commission and knowingly made 17 false statements to get claims paid on two
  NRC contracts.

Plaintiffs allege other instances of misconduct from 2004 to 2009 at ¶ 184 of the Complaint.

At the time this action was initiated, SAIC's Board consisted of 13 directors: Havenstein, Young, Córdova, Drummond, Frist, Hamre, John, Jones, Jumer, Kraemer, Nussdorf, Sanderson, and Simpson.  Plaintiffs have not made any demand on the Board to institute this action and allege that any such demand would be a futile, wasteful, and useless act.  Plaintiffs allege that "every member of the Board faces a substantial likelihood of liability" and that the Directors did not exercise business judgment.  Plaintiffs further allege that Havenstein lacks independence from interested directors due to his job as President and CEO of SAIC.

## II.    Discussion

### A.    Legal Standard

"The derivative form of action permits an individual shareholder to bring 'suit to enforce a *corporate* cause of action against officers, directors, and third parties.'"  *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95 (1991) (quoting *Ross v. Bernhard*, 396 U.S. 531, 534 (1970)) (emphasis in original).  "Devised as a suit in equity, the purpose of the derivative action was to place in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of 'faithless directors and managers.'"  *Id.* (quoting *Cohen v. Beneficial Loan Corp.*, 337 U.S. 541, 548 (1949)).

"Equity courts [have] established as a precondition 'for the suit' that the shareholder demonstrate 'that the corporation itself [has] refused to proceed after suitable demand.'"  *Id.* at 96 (quoting *Ross*, 396 U.S. at 534).  "Thus, in the usual case, a shareholder seeking to assert a claim on behalf of the corporation must first exhaust intracorporate remedies by making a demand on the directors to obtain the action desired."  *Scalisi v. Fund Asset Mgmt., L.P.*, 380 F.3d 133, 138 (2d Cir. 2004) (quotation marks and citation omitted).  "The purpose of this demand requirement in a derivative suit is to implement 'the basic principle of corporate

governance that the decisions of a corporation—including the decision to initiate litigation—should be made by the board of directors or the majority of shareholders.'" *In re Pfizer Inc. S'holder Derivative Litig.*, 722 F. Supp. 2d 453, 458 (S.D.N.Y. 2010) (quoting *Kamen*, 500 U.S. at 101); *see also In re Oxford Health Plans, Inc.*, 192 F.R.D. 111, 115 (S.D.N.Y. 2000) ("The purpose of the demand requirement is to 'afford the directors an opportunity to exercise their reasonable business judgment and waive a legal right vested in the corporation in the belief that its best interests will be promoted by not insisting on such right.'" (citation omitted)).  In accord with the limits of that underlying purpose, "demand may be excused where a shareholder is able to show that demand would be futile." *Scalisi*, 380 F.3d at 138 (citation omitted).

Procedurally, Federal Rule of Civil Procedure 23.1 requires that the plaintiff in a shareholders' derivative action state with particularity "(A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort."  "In contrast to a motion to dismiss pursuant to Rule 12(b)(6), a Rule 23.1 motion to dismiss for failure to make a demand is not intended to test the legal sufficiency of the plaintiffs' substantive claim.  Rather, its purpose is to determine who is entitled, as between the corporation and its shareholders, to assert the plaintiff's underlying substantive claim on the corporation's behalf." *In re Veeco Instruments, Inc. Sec. Litig.*, 434 F. Supp. 2d 267, 273 (S.D.N.Y. 2006).  "'Because Rule 23.1 requires that plaintiffs make particularized allegations, it imposes a pleading standard higher than the normal standard applicable to the analysis of a pleading challenged under Rule 12(b)(6).'" *In re Am. Int'l Grp., Inc. Derivative Litig.*, 700 F. Supp. 2d 419, 430 (S.D.N.Y. 2010), *aff'd*, 415 F. App'x 285 (2d Cir. 2011) (citation omitted) ("*AIG*").

"The substantive law which determines whether demand is, in fact, futile is provided by the state of incorporation of the entity on whose behalf the plaintiff is seeking relief." *Scalisi*,

10

380 F.3d at 138.  SAIC is a Delaware corporation and Delaware law therefore controls analysis

of demand futility.  *See Veeco*, 434 F. Supp. 2d at 273 ("Because Veeco is a Delaware

corporation, Delaware's demand futility jurisprudence is controlling.").  Delaware provides that

"[a] shareholder's right to bring a derivative action does not arise until he has made a demand on

the board of directors to institute such an action directly, such demand has been wrongfully

refused, or until the shareholder has demonstrated, with particularity, the reasons why pre-suit

demand would be futile."  *Khanna v. McMinn*, 2006 WL 1388744, *11 (Del. Ch. May 9, 2006).

Relying on Rule 23.1, Defendants have moved to dismiss the Complaint on the grounds

that Plaintiffs did not present their claims to the Board and have failed to allege with particularity

reasons that would excuse them from doing so.  Plaintiffs retort that their claims are saved by

futility doctrine as espoused by the courts of Delaware.

"Under Delaware law, when a shareholder's derivative action challenges *a decision* of

the board of directors, the court determines whether pre-suit demand is required using the test

described in *Aronson v. Lewis*, 473 A.2d 805 (Del. 1984)."  *Pirelli Armstrong Tire Corp. Retiree*

*Med. Benefits Trust v. Lundgren*, 579 F. Supp. 2d 520, 528 (S.D.N.Y. 2008) (emphasis added).

"The first prong of the [*Aronson*] futility rubric is 'whether, under the particularized facts

alleged, a reasonable doubt is created that . . . the directors are disinterested and independent.'

The second prong is whether the pleading creates a reasonable doubt that 'the challenged

transaction was otherwise the product of a valid exercise of business judgment.'"  *Brehm v.*

*Eisner*, 746 A.2d 244, 256 (Del. 2000) (citing *Aronson*, 473 A.2d at 814).  "[I]f either prong is

satisfied, demand is excused."  *Id.* at 256 (citation omitted).

As this description suggests, "[a]n essential predicate of the *Aronson* test is that a

*decision* of the board of directors is being challenged in the derivative suit."  *Veeco*, 434 F. Supp.

2d at 274 (emphasis in original).  "The absence of board action . . . makes it impossible to

perform the essential [business judgment] inquiry contemplated by *Aronson*."  *Id.*  Accordingly,

"[w]hen a shareholder's derivative action does not challenge a particular business decision made

by the board as a whole, the court applies the test for demand futility described in *Rales v.*

*Blasband*, 634 A.2d 927 (Del. 1993)."  *Pirelli*, 579 F. Supp. 2d at 528 (collecting cases).  *Rales*

anticipates three "principal scenarios" of this sort:

> (1) where a business decision was made by the board of a
> company, but a majority of the directors making the decision have
> been replaced; (2) where the subject of the derivative suit is not a
> business decision of the board; and (3) where . . . the decision
> being challenged was made by the board of a different corporation.

634 A.2d at 934 (footnotes omitted).  *Rales* requires courts to "determine whether or not the

particularized factual allegations of a derivative stockholder complaint create a reasonable doubt

that, as of the time the complaint is filed, the board of directors could have properly exercised its

independent and disinterested business judgment in responding to a demand."  634 A.2d at 934.

"To satisfy the *Rales* test, the complaint must contain particularized allegations that give rise to a

reasonable doubt that *a majority of the board* can exercise its independent and disinterested

business judgment in responding to a demand."  *In re Citigroup Inc. S'holder Derivative Litig.*,

788 F. Supp. 2d 211, 215 (S.D.N.Y. 2011) (quotation marks and citations omitted) (emphasis in

original); *see also id.* (dismissing a derivative complaint on grounds of demand futility where

Plaintiffs alleged only that eight directors on a seventeen-person board were not impartial).

   Both *Aronson* and *Rales* call upon courts to ascertain whether directors were disinterested

and independent.  Whether plaintiffs have alleged facts sufficient to create a reasonable doubt

concerning the disinterestedness and independence of a majority of the board must be

determined from the accumulation of all the facts taken together.  *See McCall v. Scott*, 239 F.3d

808, 816 (6th Cir. 2001) (applying Delaware law); *AIG*, 700 F. Supp. 2d at 430 ("The existence

of reasonable doubt must be decided by the trial court on a case-by-case basis and not by any

rote and inelastic criteria." (quotation marks and citations omitted)).  "[F]utility is gauged by the circumstances existing at the commencement of a derivative suit and such reasonable doubt must be raised as to a majority of the board of directors sitting at the time the complaint is filed."  *Id.* (quotation marks and citation omitted).  Plaintiffs are entitled to reasonable factual inferences that flow logically from the particularized facts alleged.  *Brehm*, 746 A.2d at 255.

Here, Plaintiffs focus almost exclusively on interestedness, not independence; indeed, they allege only that a single director lacked independence.[4]  Therefore, as to *Rales* and the first prong of *Aronson*, Plaintiffs can survive a Rule 23.1 motion only by showing that a majority of the board was interested.  "A director is interested if he will be materially affected, either to his benefit or detriment, by a decision of the board, in a manner not shared by the corporation and the stockholders."  *Veeco*, 434 F. Supp. 2d at 274 (citing *Seminaris v. Landa*, 662 A.2d 1350, 1354 (Del. Ch. 1995)).  "Directors who are sued have a disabling interest for pre-suit demand purposes when 'the potential for liability is not a mere threat but instead may rise to a substantial likelihood.'"  *Ryan v. Gifford*, 918 A.2d 341, 355 (Del. Ch. 2007) (quoting *In re Baxter Int'l, Inc. S'holders Litig.*, 654 A.2d 1268, 1269 (Del. Ch. 1995)).  Because this is the only theory of interest advanced by Plaintiffs, they must allege particularized facts creating reasonable doubt as to whether a majority of the SAIC board faced a substantial likelihood of liability.

Delaware law imposes three fiduciary duties on the directors of corporations: the duty of care, the duty of loyalty, and the duty of good faith.  *Emerald Partners v. Berlin*, 787 A.2d 85, 90 (Del. 2001).  Acknowledging that SAIC has adopted a provision in its certificate of incorporation pursuant to 8 Del. C. § 102(b)(7) that exculpates directors from personal liability for violations of fiduciary duty—except for, *inter alia*, breaches of the duty of loyalty or actions or omissions

---

[4] Plaintiffs allege that Havenstein is not independent, but do not offer similar allegations as to any other director.  Nor do they adopt a director-by-director account of independence.

13

not in good faith or that involve intentional misconduct or a knowing violation of law—Plaintiffs acknowledge that they cannot allege a claim for breach of the duty of care.  *See In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 124 (Del. Ch. 2009).  Rather, they style their claims as based on breaches of the duties of loyalty and good faith.

       The parties' first point of disagreement in this case centers on whether *Aronson* or *Rales* governs analysis of demand futility.  This dispute reflects a measure of confusion about the nature of Plaintiffs' claims.  In Defendants' view, *Rales* applies because "the Complaint does not contest any specific board decision."  Rather, according to Defendants, the Complaint alleges that the Board *failed* to take action and therefore registers as an oversight claim.  Read in Defendants' chosen light, the Complaint implicates *In re Caremark Int'l Inc. Derivative Litig.*, which held that "a sustained or systematic failure of the board to exercise oversight—such as an utter failure to attempt to assure a reasonable information and reporting system exists—will establish the lack of good faith that is a necessary condition to liability."  698 A.2d 959, 971 (Del. Ch. 1996).  As Defendants observe, Plaintiffs *do* allege that SAIC maintained a system of internal controls and *do not* allege any conscious failure to monitor or oversee those controls.  In the usual course, one or the other is required for a *Caremark* claim.  *See Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006) ("*Caremark* articulates the necessary conditions predicate for director oversight liability: (a) the directors utterly failed to implement any reporting or information system or controls; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention.").  Defendants hasten to add that, if this is a *Caremark* case, it must be dismissed.

       On that point, at least, Plaintiffs appear to agree with Defendants.  As counsel to Plaintiffs explained at oral argument, "[t]his case is not about failing to monitor or oversee the

operations [and] [it's] not about disabling themselves from being informed of risks that they

otherwise would have been informed of through the internal controls."  Plaintiffs' counsel later

doubled down on this bright-line argument by affirming that if "the case is a *Caremark* case"

then "it should be dismissed."  These statements in open court reflect Plaintiffs' papers, which

state that "[u]nlike in *Caremark*, Plaintiffs have not sought to base the Director Defendants'

liability for being ignorant 'of liability creating activities,' but for time and again being placed on

notice of them, and either perpetuating or turning a deliberate blind eye to them."

      Building on this position, Plaintiffs argue that Defendants have missed the mark by

failing to recognize that Plaintiffs' claims—which rest on alleged breaches of the duties of

loyalty and good faith—actually implicate board action, not inaction, and thus call for

application of the *Aronson* test.  As counsel for Plaintiffs stated their position at oral argument:

"[T]here's one question before the Court today.  That question is whether the Court can

reasonably infer, based on the facts that have been alleged in the complaint, that a majority of

SAIC's directors were on notice of potential wrongdoing in connection with the CityTime

contract sometime prior to 2011."  By "notice," he added, Plaintiffs mean to allege that the

Board "knew or had reason to know."  In other words, also borrowed from Plaintiffs' counsel,

"this is a breach of loyalty and good faith case because the Court can infer that the directors

knew or should have known or were on notice of potential wrongdoing in connection with

CityTime."  As Plaintiffs state the law, notice of wrongdoing—coupled with deliberate

inaction—bespeaks a violation of the duties of loyalty and good faith.  Relying on this theory,

Plaintiffs argue that a demand would have been futile and that the Board cannot claim the

protections of the business judgment rule.  *See, e.g.*, *Metro Commc'n Corp. BVI v. Advanced

Mobilecomm Technologies Inc.*, 854 A.2d 121, 131 (Del. Ch. 2004) ("[A] fiduciary may not

choose to manage an entity in an illegal fashion, even if the fiduciary believes that the illegal activity will result in profits for the entity.").

Plaintiffs' interpretation of the Complaint attempts to collapse the choice between *Aronson* (designed for board action) and *Rales* (designed for board inaction) into the question whether a Board majority is interested because it faces a substantial likelihood of liability due to its conscious decision to remain inactive.  At both levels of analysis—the choice between *Aronson* and *Rales*, and reasonable doubt as to a substantial likelihood of liability—Plaintiffs' proposed inquiry focuses on whether the Board's apparent inaction should be treated as a form of board action.  Plaintiffs argue that the distinction pivots on whether the Board was "on notice"— that it "knew or should have known"—of illegality at SAIC pertaining to the CityTime project. In their view, "[t]his case is about [the Board] actually being placed on notice of potential wrongdoing in connection with the CityTime contract," and about the Board then taking a form of action by deciding to perpetuate, conceal, or ignore the wrongdoing.  Needless to say, the question of when behavior that some perceive as *inaction* should be understood to constitute a legally significant form of *action* does not, in general, lend itself to easy resolution.  *See generally Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566 (2012).

A recent series of Delaware precedents and opinions from this district applying Delaware law offers helpful clarity.  To return to first principles, the duty of loyalty—as a general matter— "mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."  *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993).  As the Delaware Supreme Court explained in *Guth v. Loft, Inc.*:

> Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests. While technically not trustees, they stand in a fiduciary relation to

the corporation and its stockholders. A public policy, existing through the years, and derived from a profound knowledge of human characteristics and motives, has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers. The rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest. The occasions for the determination of honesty, good faith and loyal conduct are many and varied, and no hard and fast rule can be formulated. The standard of loyalty is measured by no fixed scale.

5 A.2d 503, 510 (Del. 1939).  A breach of the duty of loyalty is classically demonstrated where a director "appear[s] on both sides of a transaction or a director receiv[es] a personal benefit from a transaction not received by the shareholders generally."  *Cede*, 634 A.2d at 362.

Plaintiffs' claims, however, implicate a different theory of breach of the duty of loyalty. In 2005, Chancellor Chandler sought to clarify the duty of good faith.  He concluded:

Upon long and careful consideration, I am of the opinion that the concept of *intentional dereliction of duty,* a *conscious disregard for one's responsibilities,* is an appropriate (although not the only) standard for determining whether fiduciaries have acted in good faith.  Deliberate indifference and inaction *in the face of a duty to act* is, in my mind, conduct that is clearly disloyal to the corporation.  It is the epitome of faithless conduct. To act in good faith, a director must act at all times with an honesty of purpose and in the best interests and welfare of the corporation.

*In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 755 (Del. Ch. 2005), *aff'd,* 906 A.2d 27 (Del. 2006) (citations omitted).  Affirming this ruling, the Delaware Supreme Court noted that "[a] failure to act in good faith" may be shown "where the fiduciary . . . intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties."  *Disney*, 906 A.2d at 67.  The court added that this example "[e]cho[es] pronouncements our courts have

made throughout the decades"—citing, *inter alia*, *Caremark*'s holding that "only a sustained or systematic failure of the board to exercise oversight—such as an utter failure to attempt to assure a reasonable information and reporting system exists—will establish the lack of good faith that is a necessary condition to liability." *Id.* (citing *Caremark*, 698 A.2d at 971).

Relying in part on *Disney*, the Delaware Supreme Court then held in *Stone v. Ritter* that liability for a "a sustained or systematic failure of the board to exercise oversight" is "fully consistent with[] the lack of good faith conduct that the *Caremark* court held was a 'necessary condition' for director oversight liability." 911 A.2d at 369. Thus, under *Caremark*, "[w]here directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith." *Id.* at 370 (citations omitted). *Stone* also clarified the relationship among good faith, loyalty, and *Caremark* claims:

> The phraseology used in *Caremark* and that we employ here—describing the lack of good faith as a "necessary condition to liability"—is deliberate. The purpose of that formulation is to communicate that a failure to act in good faith is not conduct that results, *ipso facto*, in the direct imposition of fiduciary liability. The failure to act in good faith may result in liability because the requirement to act in good faith "is a subsidiary element[,]" i.e., a condition, "of the fundamental duty of loyalty." It follows that because a showing of bad faith conduct, in the sense described in *Disney* and *Caremark,* is essential to establish director oversight liability, the fiduciary duty violated by that conduct is the duty of loyalty.

*Id.* at 369-70 (footnotes and citations omitted).

As the Court of Chancery has since recognized, "[t]he essence of a *Caremark* claim is a breach of the duty of loyalty arising from a director's bad-faith failure to exercise oversight over the company," *Rich ex rel. Fuqi Int'l, Inc. v. Yu Kwai Chong*, 2013 WL 1914520, at *12 (Del. Ch. Apr. 25, 2013), and bad faith "in the corporate fiduciary duty of loyalty context [includes]

18

(among other things) a failure to act in the face of a known duty to act, which demonstrates a conscious disregard of one's duties," *Gatz Properties, LLC v. Auriga Capital Corp.*, 59 A.3d 1206, 1216-17 (Del. 2012) (quotation marks omitted).  A plaintiff can thus show bad faith by "properly alleging particularized facts that show that a director *consciously* disregarded an obligation to be reasonably informed about the business and its risks or *consciously* disregarded the duty to monitor and oversee the business."  *Citigroup*, 964 A.2d at 125.

Of course, even "directors' good faith exercise of oversight responsibility may not invariably prevent employees from violating criminal laws, or from causing the corporation to incur significant financial liability, or both."  *Stone*, 911 A.2d at 373.  For that reason, "[s]uch a finding of bad faith requires a showing of scienter, or that defendants had actual or constructive knowledge of failure to act as the law requires."  *Rahbari v. Oros*, 732 F. Supp. 2d 367, 383 (S.D.N.Y. 2010); *see also Desimone v. Barrows*, 924 A.2d 908, 935 (Del. Ch. 2007) ("*Stone* clarified one of the most difficult questions in corporate law—when directors with no motivation to injure the firm can be held responsible if the corporation incurs serious harm as a result of its failure to obey the law . . . .  For reasons *Caremark* well-explained, to hold directors liable for a failure in monitoring, the directors have to have acted with a state of mind consistent with a conscious decision to breach their duty of care."); *Guttman v. Huang*, 823 A.2d 492, 506 (Del. Ch. 2003) (noting that *Caremark* "premises liability on a showing that the directors were conscious of the fact that they were not doing their jobs").  Even a showing of gross negligence by a majority of the Board will not suffice.  *See Stone*, 911 A.2d at 369.

As *Stone* highlighted, where no red flags put the board on notice of wrongdoing, "good faith in the context of oversight must be measured by the directors' actions to assure a reasonable information and reporting system exists and not by second-guessing after the occurrence of employee conduct that results in an unintended adverse outcome."  911 A.2d at 373 (quotation

marks and citations omitted).  In contrast, where plaintiffs *do* allege red flags that may have put

directors on notice of illegal activity, courts have insisted on particularized factual allegations

demonstrating bad faith by the directors.  *See S. v. Baker*, 62 A.3d 1, 6 (Del. Ch. 2012) ("[A]

plaintiff asserting a *Caremark* claim must plead facts sufficient to establish board involvement in

conscious wrongdoing.").  As the Court of Chancery explained in *Citigroup*:

> The allegations in the Complaint amount essentially to a claim that
> Citigroup suffered large losses and that there were certain warning
> signs that could or should have put defendants on notice of the
> business risks related to Citigroup's investments in subprime
> assets.  Plaintiffs then conclude that because defendants failed to
> prevent the Company's losses associated with certain business
> risks, they must have consciously ignored these warning signs or
> knowingly failed to monitor the Company's risk in accordance
> with their fiduciary duties.  Such conclusory allegations, however,
> are not sufficient to state a claim for failure of oversight that would
> give rise to a substantial likelihood of personal liability, which
> would require particularized factual allegations demonstrating bad
> faith by the director defendants.

964 A.2d at 126-27; *see also Rahbari*, 732 F. Supp. 2d at 383 ("[I]t is only if plaintiff can plead

particularized facts that show a non-exculpated breach of loyalty for failure to act in good faith

that she can demonstrate a likelihood of liability such that the failure to make a demand is

excused.").  At the demand futility stage, the requirement of particularized allegations in support

of this theory of *Caremark* liability imposes a weighty burden on plaintiffs.  *See Caremark*, 698

A.2d at 967 (describing a failure of oversight theory as "possibly the most difficult theory in

corporation law upon which a plaintiff might hope to win a judgment").

    In these cases, all of which rest ultimately on a theory of oversight liability, Delaware

courts have consistently held that *Rales*—not *Aronson*—governs demand futility analysis.  *See,*

*e.g.*, *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008); *S. v. Baker*, 62 A.3d 1, 14 (Del. Ch. 2012);

*In re Goldman Sachs Grp., Inc. S'holder Litig.*, 2011 WL 4826104, at *7 (Del. Ch. Oct. 12,

2011); *see also Fink v. Weill*, No. 02 Civ. 10250, 2005 WL 2298224, at *3 n.6 (S.D.N.Y. Sept.

19, 2005) ("*Aronson* is clearly inapposite to the inaction claim as pled in the instant case."). That said, the difference between *Rales* and *Aronson* may blur in cases like this one, since the particularized allegations essential to creating reasonable doubt as to a substantial likelihood of personal liability for breach of fiduciary duties may also implicate the question whether the Board can avail itself of business judgment protections. *See, e.g.*, *Guttman*, 823 A.2d at 501 (examining this overlap and concluding that when "there are allegations that a majority of the board that must consider a demand acted wrongfully, the *Rales* test sensibly addresses concerns similar to the second prong of *Aronson*"); *see also AIG*, 700 F. Supp. at 431 ("[C]onsiderations of the business judgment rule inform the *Rales* analysis as well. Plaintiffs frequently argue that there is reason to doubt that a majority of directors are disinterested because the complaint alleges director conduct 'so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists.' There is presumptively a reason to doubt that a director who faces a substantial likelihood of liability could be disinterested when responding to a demand." (citations omitted)).

### B. Plaintiffs' Alleged "Red Flags"

Notwithstanding Plaintiffs' protestations to the contrary, Plaintiffs have alleged a *Caremark* claim. This claim, moreover, requires that they allege particularized facts showing that the directors consciously acted in bad faith by failing to take action despite actual or constructive knowledge of illegal activity at SAIC in relation to the CityTime project. Plaintiffs have not, however, alleged with particularity that any directors had direct knowledge of inside information about CityTime-related wrongdoing. *See In re Forest Laboratories, Inc. Derivative Litig.*, 450 F. Supp. 2d 379, 390 (S.D.N.Y. 2006) ("The Complaint does not identify any types of reports, studies, or analyses made available to the Board, or board meeting minutes reflecting conversations from which the Court may infer that the Outside Directors had actual knowledge

of the Danish Study or any other alleged inside information."). Rather, Plaintiffs argue that they

satisfy this requirement because they have identified a number of red flags that either *did* or

*should have* put the Directors on notice of wrongdoing in the CityTime project.[5] These red flags

do not satisfy the requirements of Delaware law or Rule 23.1.

### 1.    SAIC's Statements in the SOR

Plaintiffs' first point to the "stunning admissions" in the SOR, which, in their view, prove

that the Board "knew or should have known of the CityTime overbilling scheme." On close

examination, however, all of these "admissions" address corporate and managerial responsibility

for SAIC's actions, not actual or constructive knowledge of wrongdoing on the part of any of the

Directors. For example, the SOR describes SAIC's "*[corporate] conduct and managerial*

*failures*," acknowledges that "*[s]ome SAIC managers* failed to perceive or ignored significant

and pervasive irregularities with the SAIC-Technodyne relationship," and notes that "SAIC's

failures resulted, in part, from an overemphasis on the financial and operational success of the

CityTime project *by those assigned to manage the Project*." (emphasis added). The SOR also

notes that the CityTime project had been staffed "*under the direction of Denault*" and states that

"*management employees* responsible for directly overseeing Denault and the Company's

performance of the CityTime contract failed to adequately supervise his activities . . . ."

In response to Defendants' observation that these quotes indicate managerial failure

rather than Board malfeasance, Plaintiffs describe the SOR as riddled with "self-serving

statement[s] by the Board," which "insisted on its making this representation in a settlement-

related document." Of course, this settlement-related document was also approved by the U.S.

---

[5] To the extent that Plaintiffs rely on the generalized allegations of knowledge and intent in the
Complaint, such as the allegation that the Board "adopted, implemented, and/or condoned a
business strategy based on criminal violations of law," ¶ 211(a), these allegations do not satisfy
the particularity requirements imposed by Rule 23.1 and Delaware law.

Attorney.  In any event, while Plaintiffs are entitled to all reasonable inferences in their favor,

there is nothing here from which to infer Plaintiffs' preferred conclusion.  Plaintiffs cannot seek

to rely on parts of the SOR that describe managerial issues and then, without any factual basis,

ask the Court to infer a settlement-related cover-up that conceals Board knowledge of

wrongdoing in relation to CityTime.  Such a general allegation does not satisfy Rule 23.1.

### 2. Core Operations

Plaintiffs' second argument is that "it is reasonable to infer that a director is aware of

information relating to the core operations of the company for which he or she serves."  The

Complaint alleges that revenue from government contracts accounted for over 90% of SAIC's

revenues during the last three fiscal years, and for more than 87% of its revenues in the three

preceding years.  Plaintiffs also allege that SAIC touted CityTime as a shining example of its

work in the 2009 Annual Report and looked to CityTime as a high-profile, bellwether contract

designed to produce a product that SAIC could offer to a significant market.

The so-called "core operations" doctrine is principally associated with securities law and

provides that "[k]nowledge of the falsity of a company's financial statements can be imputed to

key officers who should have known of facts relating to the core operations of their company that

would have led them to the realization that the company's financial statements were false when

issued."  *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 490

(S.D.N.Y. 2004); *see also, e.g.*, *In re Reserve Fund Sec. & Derivative Litig.*, 732 F. Supp. 2d

310, 322-23 (S.D.N.Y. 2010) ("Once a plaintiff has adequately alleged that a defendant made

false or misleading statements about the core operations of a company, however, an inference

arises that the defendant knew or should have known the statements were false when made.

Indeed, if facts that contradict a high-level officer's public statements were available when the

statements were made, it is reasonable to conclude that the speaker had intimate knowledge of

those facts or should have known of them." (quotation marks and citations omitted)).  In the

securities context, courts have questioned the continued vitality of this doctrine under the

PSLRA.  *See Wallace v. IntraLinks*, No. 11 Civ. 8861, 2013 WL 1907685, at *8 (S.D.N.Y. May

8, 2013) ("The passage of the PSLRA has threatened the validity of this doctrine."); *Shemian v.

Research In Motion Ltd.*, No. 11 Civ. 4068, 2013 WL 1285779, at *18 (S.D.N.Y. Mar. 29, 2013)

("[T]his Court has carefully considered the continued viability of the 'core operations' inference

in light of the PSLRA's heightened pleading requirement and found it lacking.").  While Rule

23.1 and the PSLRA create different pleading requirements, they both demand atypically

rigorous pleading by plaintiffs.  *See Forest*, 450 F. Supp. 2d at 391-92 ("Assuming, for purposes

of discussion, that Rule 9(b)'s heightened pleading standard is equivalent, or at least analogous,

to that of Rule 23.1 in this context, the *significance* of the information at issue in [another case]

is readily distinguishable from the information at issue here." (emphasis in original)).

    This argument faces several insurmountable difficulties.  As Judge Holwell has explained

in an analogous context, "the cases charging top officers with knowledge of negative information

by reason of their status—keeping in mind that a top officer clearly has more direct access to

information than an outside director—typically 'involved circumstances far more suggestive of

their direct access to such information.'"  *Forest*, 450 F. Supp. 2d at 391 (quoting *In re Keyspan

Corp. Secs. Litig.*, 383 F. Supp. 2d 358, 388 (E.D.N.Y. 2003) (noting that many such cases have

imputed knowledge of falsity of statements regarding core operations to CEOs, vice-presidents,

and others who hold "top corporate positions")); *see also id.* at 391-92 (distinguishing *Cosmas v.

Hassett*, 886 F.2d 8, 13 (2d Cir. 1989), the leading Second Circuit case to impute knowledge to

an entire board of directors).  Plaintiffs' general claim that the Board, or the subset of its

members who sat on the Ethics or Audit Committees, should have known about this information

falls far short of circumstances that suggest direct access to the relevant data.

Moreover, Plaintiffs have not adequately alleged facts demonstrating that CityTime qualified as a "core operation." Rather, Plaintiffs refer in broad and unspecified terms to the importance of government contracts in SAIC's business, and then allege that CityTime was an especially important prototype that could have resulted in significant future business with other cities. Absent any allegations that would indicate CityTime's relative importance to SAIC—as opposed to the importance of *all* government contracts—Plaintiffs simply are not entitled to the inference that this project qualifies as a "core operation." Otherwise, the particularized pleading requirements imposed by Rule 23.1 would too readily dissipate in the face of any allegation that wrongdoing in a seemingly important project implicates the "core operation" principle. Indeed, there is particularly good reason to be skeptical of Plaintiffs' argument here: according to SAIC filings of which the Court may take judicial notice, SAIC maintained approximately 10,000 active contracts around the time it oversaw the CityTime Project.[6] While CityTime appears to have been an important and up-and-coming project for SAIC, there are simply no allegations in the Complaint establishing that it was of such unique, critical, or existential importance to SAIC that knowledge about its inner workings can be fairly attributed to the Board. *See Forest*, 450 F. Supp. 2d at 392 ("[W]hile off-label sales and potential label expansion for pediatric use of Celexa and/or Lexapro are certainly not unimportant considerations for Forest, there are simply no allegations establishing that either off-label sales or label expansion for pediatric use was of such critical importance to Celexa and Lexapro's continued viability that all information relating

---

[6] *See* SAIC Nov. 9, 2009 Letter to the SEC re: Form 10-K for the Fiscal Year Ended January 31, 2009, *available at* http://www.sec.gov/Archives/edgar/data/1336920/000119312509229656/filename1.htm ("[W]e are a provider of scientific, engineering, systems integration and technical services and solutions to all branches of the U.S. military, agencies of the U.S. Department of Defense, the intelligence community, the U.S. Department of Homeland Security and other U.S. government civil agencies, and other customers. We perform this work under approximately 10,000 active contracts.").

to such sales or efforts ought to be reasonably imputed to Outside Directors . . . [T]here are no allegations that Forest's failure to achieve label expansion for Celexa or Lexapro has had, or was thought likely to have, catastrophic consequences for Forest's primary sources of revenue or put the company's primary product . . . in jeopardy." (quotation marks and citations omitted)).

### 3.   Public Reports and Investigations

Plaintiffs third argument is that "public reports and/or investigations of wrongdoing also served as 'red flags' that weigh heavily in favor of a reasonable inference that directors knew or should have known of the CityTime misconduct."  Specifically, Plaintiffs point to two public hearings and a number of newspaper articles published in *CityLimits*, *The Daily News*, *IEEE Spectrum Risk Factor*, and *Lost in the Ozone*.  In Plaintiffs' view, this coverage of CityTime-related issues was "massive" and "virtually unprecedented."  This argument does not succeed.

Plaintiffs do not allege that any member of the Board actually read, or learned the contents of, any of these articles.  Nor do they allege that any member of the Board actually attended, or learned about, either of these hearings.  There is no allegation that any kind of report was submitted to the Board concerning these articles and hearings, or that it would have fallen within the usual course of an SAIC director's obligations to examine these materials.

As a result, Plaintiffs' argument boils down to the implausible claim that a majority of the Board was on constructive notice of wrongdoing in the CityTime project because of a series of articles in *The Daily News* and certain other publications.  Even assuming these articles had reported illegality in the CityTime Project—and, as explained *infra*, that assumption does not withstand scrutiny—it would turn *Caremark* on its head to impose on directors an obligation to review every national (and local) blog, newspaper, Twitter feed, and televised news program for evidence of potential illegality in their corporate operations.  Not only would this create severe line-drawing difficulties (which papers, which headlines, what degree of specificity), but the

correspondingly massive expansion of knowledge that would be imputed to directors could leave

them vulnerable to a finding of bad faith in contexts far beyond the narrow scope contemplated

by applicable Delaware law.  Indeed, the creation of such an extensive information-acquisition

duty for directors with respect to information out in the wider world—as opposed to information

possessed by the company—is simply incompatible with the duties of information acquisition

articulated in *Caremark* and its progeny.  *See Caremark*, 698 A.2d at 971; *see also Stone*, 911

A.2d at 370; *Disney*, 906 A.2d at 67.  While there may well be exceptional cases where news

coverage of corporate illegality is so intense, widespread, and unavoidable that no member of the

business public could credibly claim to have missed it, this case falls far short of that high mark.

Plaintiffs' arguments must also fail on a different ground: the materials to which they

refer do not convey, or at least do not convey without the clarity bestowed by hindsight, any

impression of fraud on the part of SAIC.  Rather, the articles and hearings invoked by Plaintiffs

focus almost exclusively on cost overruns.  They also criticize high salaries paid to CityTime

employees, a lack of accountability in management of the CityTime project, the threat posed to

privacy rights by CityTime, and the City's repeated decisions to expand the CityTime contract to

encompass more municipal agencies.  From the perspective of a contemporaneous observer,

none of these pieces would have necessarily raised alarms about fraudulent billing or kickbacks.

While James did mention an anonymous e-mail from a subcontractor who stated that he was

being paid for work he had not performed, poor subcontractor supervision—in the absence of

other signs of wrongdoing—is a far cry from claims of fraud.[7]  Plaintiffs rely on a *Washington

Post* editorial published *after* the CityTime fraud came to light in which the author opines that

"there were plenty of warning signs for anyone with even a passing familiarity with the

---

[7] There is no evidence that any SAIC director was ever made aware of these remarks.

government contracting business, which includes almost everyone at SAIC," but this opinion concerning the strength of Plaintiffs' evidence does not count as a particularized allegation that SAIC's directors knew or should have known of the CityTime fraud when it was occurring.[8]

In sum, there is no evidence that any director actually knew about these materials, the Directors were under no obligation to review them, and a close reader of these documents in the relevant time period would not have understood them to raise alarms about potential illegality.

### 4.    Magnitude and Duration

Plaintiffs' fourth argument is that the "magnitude and duration" of the CityTime scheme bears on the inquiry regarding whether it was reasonable to infer that a director knew or should have known of it.  Plaintiffs allege that the CityTime project ballooned from $63 million in 2001 to $700 million by 2010.  In their view, "[a]n increase of such extraordinary magnitude and historic significance, uninvestigated by Director Defendants, supports the more than reasonable inference that the Board 'conscientiously permitted' the occurrence of the scheme."

To be sure, magnitude and duration may be *probative* of whether the Board knew or should have known about a violation of the law, *see Pfizer*, 722 F. Supp. 2d at 460; *Veeco*, 434 F. Supp. 2d at 278, though these factors will rarely suffice in their own right to satisfy Rule 23.1's requirement in this context that plaintiffs allege with particularity actual or constructive board knowledge.  In *Veeco*, for example, magnitude was relevant because the plaintiffs alleged that Veeco's Audit Committee had disregarded—or failed to create adequate procedures in

---

[8] At oral argument, Plaintiffs submitted several additional articles from *The Daily News* and *Crain's New York Business*, as well as a *New York Times* article from 2007 focused entirely on privacy concerns and political opposition relating to CityTime.  The Court hereby takes judicial notice of these articles.  None of these articles, however, alters the Court's analysis.  While one of these articles—a *Daily News* piece dated December 18, 2009—does add a bit more specificity to the claim that some subcontractors working at CityTime were billing for the "hours [they] showed up, not the work [they] did," this statement again falls short of the kind of information about illegal activity that would trigger a duty for the Board to have taken action.

response to—a whistleblower report alerting it to violations that could lead to suspension of

export privileges, implicating 70% of Veeco's total revenues. *Id.* at 277-78.  In that scenario,

there was already a powerful argument for actual board knowledge of wrongdoing, and that

argument was bolstered by the manifest significance of the illegality to which the directors had

been alerted. *See id.* at 278.  So too in *Pfizer*: where there was substantial independent evidence

that the board had learned of ongoing violations that were significant in scope and duration,

those features of the violations made it all the more apparent that the directors had acted in bad

faith by failing to take responsive action. *See* 722 F. Supp. 2d at 460.

### 5.      Similar Misconduct by SAIC

Finally, Plaintiffs argue that SAIC "has come under fire in a multitude of instances both

before and during the Relevant Period for very similar misconduct."  In the Complaint, Plaintiffs

refer to a number of incidents in the 1990s and 2000s.  Nowhere, however, do Plaintiffs explain

how problems on these apparently unrelated programs could have alerted the Board to issues in

the CityTime project.  Nor do they identify any other connection between CityTime and these

projects than the ultimate discovery that SAIC had broken the law.  Rather, Plaintiffs suggest

that knowledge of wrongdoing in other transactions should have put the Board on a heightened

state of alert.  This argument has been rejected by the courts of Delaware and must be rejected in

this case.  *See, e.g.*, *In re Dow Chem. Co. Derivative Litig.*, 2010 WL 66769, at *13 (Del. Ch.

Jan. 11, 2010) ("Plaintiffs argue that because bribery may have occurred in the past (Dow paid a

fine to the SEC in January 2007), by different members of management, in a different country

(India), and for a different transaction (pesticide registrations), the board should have suspected

similar conduct by different members of management, in a different country, in an unrelated

transaction.  This argument is simply too attenuated to support a *Caremark* claim." (footnote

omitted)); *Citigroup*, 964 A.2d at 129 ("[Plaintiffs] have utterly failed to show how Citigroup's

involvement with the financial scandals at Enron has any relevance to Citigroup's investments in subprime securities.").

### 6.    Examining the Alleged "Red Flags" in Combination

Plaintiffs do not discuss each of these red flags in isolation.  Rather, they argue that the combination of these signals put the Board on actual or constructive notice of wrongdoing in relation to CityTime.  To that end, Plaintiffs rely on three other decisions, two from this District and one from the Seventh Circuit.  An examination of these cases, however, reveals that the red flags here are much weaker than necessary to demonstrate demand futility.

Plaintiffs first cite *In re Abbott Laboratories Derivative Shareholders Litig.*, 325 F.3d 795, 802 (7th Cir. 2003).  In *Abbott*, Defendant Abbott Laboratories contained a division that manufactured diagnostic kits and devices—a process subject to heavy FDA regulation.  *Id.* at 799.  From 1993 until 1999, the FDA had conducted 13 inspections and identified significant non-compliance with federal rules.  *Id.*  As a result, the FDA sent a series of Form 483s noting deviations from the applicable regulations, met repeatedly with Abbott officials, and mailed four Warning Letters to senior Abbott officials, including the chairman of the board.  *Id.* at 799-800. *The Wall Street Journal* also published an article in 1995 noting that the FDA had "uncovered a wide range of flaws in Abbott Laboratories' quality-assurance procedures used in assembling medical-diagnostic products."  *Id.* at 800.  That same year, the FDA and Abbott entered into a comprehensive Voluntary Compliance Plan to resolve the issues, though in 1998 the FDA closed out the plan and sent Abbott a letter noting continued deviations from the regulations.  *Id.*  In 1999, the FDA levied a $100 million fine and derivative suits quickly followed.  *Id.* at 801.

Invoking a theory grounded in *Caremark*, *Abbott* explained:

> Delaware law states that director liability may arise for the breach
> of the duty to exercise appropriate attention to potentially illegal
> corporate activities from "an *unconsidered failure of the board to*

*act* in circumstances in which due attention would, arguably, have prevented the loss." *In re Caremark*, 698 A.2d at 967 (citation omitted) (emphasis in original) . . . Given the extensive paper trail in *Abbott* concerning the violations and the inferred awareness of the problems, the facts support a reasonable assumption that there was a "sustained and systematic failure of the board to exercise oversight," in this case intentional in that the directors knew of the violations of law, took no steps in an effort to prevent or remedy the situation, and that failure to take any action for such an inordinate amount of time resulted in substantial corporate losses, establishing a lack of good faith.

*Id.* at 808-09 (emphasis added). Specifically, *Abbott* based its finding of conscious inaction on a set of facts indicating actual board knowledge: "six years of noncompliance, inspections, 483s, Warning Letters, and notice in the press, all of which then resulted in the largest civil fine ever imposed by the FDA and the destruction and suspension of products which accounted for approximately $250 million in corporate assets."[9] *Id.*

Citing *Abbott*, Judge McMahon adopted a similar approach in *Veeco*. The plaintiffs in *Veeco* alleged that Veeco Instruments, Inc. had failed to create internal compliance mechanisms for a major new acquisition and that the Audit Committee "abdicated its responsibility to monitor legal compliance and investigate whistleblower claims relating to the Company's allegedly

---

[9] Unlike most courts to consider these sorts of claims, including many Delaware courts, the Seventh Circuit declined to apply *Rales* because "members of the board . . . were aware of" serious problems and had declined to take action. 325 F.3d at 806. Examining the totality of the circumstances, it concluded that this was not "unconsidered" inaction and that "[t]he facts in *Abbott* do not support the conclusion that the directors were 'blamelessly unaware of the conduct leading to the corporate liability.'" *Id.* (quoting *Caremark*, 698 A.2d at 969). Undertaking *Aronson* analysis, *Abbott* first found that the plaintiffs had not adequately alleged interestedness or dependence. *Id.* at 807. It reached this conclusion without even discussing the potential for interestedness due to a substantial likelihood of liability under a theory similar to that advanced by Plaintiffs in this case. *Id.* Then, it addressed the matter of potential liability in the context of deciding whether Abbott could benefit from the business judgment rule. *Id.* at 808. While it structured its analysis differently than courts in this District and differently than most Delaware courts, *Abbott* is still relevant by virtue of its consideration of when considered action states a claim for breach of the duties of loyalty and good faith.

flagrant, systematic and repeated violations of export controls laws."  434 F. Supp. 2d at 277-78.

The core of these allegations concerned a failure to respond to direct signals of wrongdoing:

> The complaint asserts that, upon a report by a Veeco employee that the Company had shipped a restricted item to Malaysia, Veeco conducted an audit which revealed that at least nine other shipments—worth a total of $15 million—also had violated federal export control laws.  Because a single violation of federal export laws can lead to fines and suspension of export privileges, and because approximately 70% of Veeco's revenues are derived from export sales, the reported violations threatened to jeopardize the future viability of Veeco.  Nevertheless, seven months after these alleged violations were discovered and brought to the Company's attention, the same employee reported a second set of export violations.  Plaintiffs assert that, in light of the second report, the Audit Committee permitted additional violations to occur, either by completely disregarding the first report, or by establishing procedures that were wholly inadequate and ineffective and that failed to protect the Company from potentially enormous liability.

*Id.* at 278.  Considering these allegations, Judge McMahon concluded that "[t]his is precisely the type of case the Delaware Chancery Court was contemplating when it recently held, 'A claim that an audit committee or board had notice of serious misconduct and simply failed to investigate, for example, would survive a motion to dismiss, even if the committee or board was well constituted and otherwise functioning.'"  *Id.* (quoting *David B. Shaev Profit Sharing Account v. Armstrong*, 2006 WL 391931, *5 (Del. Ch. Feb. 13, 2006)).

Plaintiffs also rely on *Pfizer*.  In that case, Pfizer, Inc., a drug company, had been made aware of the need to identify and prevent illegal kickback and off-label marketing schemes through a series of prior settlements with the Government attributing just such misconduct to various Pfizer subsidiaries shortly prior to their acquisition by Pfizer.  722 F. Supp. 2d 455.  In 2002, 2004, and 2007, Pfizer had paid millions in criminal fines.  *Id.* at 455-56.  Notwithstanding these warnings, Pfizer engaged in the same misconduct.  *Id.* at 456.  The FDA discovered the

scheme and fined Pfizer $2.3 billion; shareholder derivative suits followed almost immediately.

*Id.* at 457.  Pfizer moved to dismiss on grounds of demand futility.  *Id.* at 459.

Judge Rakoff denied Pfizer's motion.  He noted that *Abbott* had "distinguished the plaintiffs' claim from the typical *Caremark* theory, which is predicated on the directors' ignorance of the illegality," and that "[o]ther cases involving similar allegations that the directors knowingly or recklessly disregarded illegal activity have likewise held demand to be futile, especially when the alleged wrongdoing is of substantial magnitude and duration."  *Id.* at 459-60 (quotation marks and citations omitted).  Looking to the factual record, he noted:

> [T]he Complaint details at great length a large number of reports made to members of the board from which it may reasonably be inferred that they all knew of Pfizer's continued misconduct and chose to disregard it.  These include, for example, the reports to the board of the Neurontin and Genotropin settlements, a large number of FDA violation notices and warning letters, several reports to Pfizer's compliance personnel and senior executives of continuing kickbacks and off-label marketing, and the allegations of the *qui tam* lawsuits.  Many of these disturbing reports were received during the same time that the board was obligated by the 2002 and 2004 CIAs to pay special attention to these very problems . . .
>
> As illustrated by the sheer size of the 2009 fines, the wrongdoing here alleged was not only pervasive throughout Pfizer but also was committed in the face of the board's repeated promises to closely monitor and prevent such misconduct, as required by the 2002 and 2004 CIAs.  These CIAs, which were part of larger settlements approved by the Pfizer board, imposed affirmative obligations on Pfizer's board that went well beyond the basic fiduciary duties required by Delaware law.  Among other things, these agreements obligated Pfizer's chief Compliance Officer to report directly to the board the allegations of misconduct here at issue so that the board could deal with them directly, rather than relying on management.  There is no reason to believe this reporting requirement was not fully complied with, thus guaranteeing that each member of the board was bombarded with allegations of continuing misconduct of the very kind that the prior settlements looked to the board to prevent.

*Id.* at 460-61 (citations and footnote omitted).

33

In *Abbott*, *Veeco*, and *Pfizer*, the plaintiffs alleged with particularity facts supporting the inference that a majority of each board of directors had learned of the relevant wrongdoing. In *Abbott*, the board was bombarded with letters and warnings, several board members met with the FDA, and the company had entered into a compliance plan. In *Veeco*, the Audit Committee had been warned on multiple occasions about wrongdoing with potentially devastating implications for the company. And in *Pfizer*, the board had been fully aware of the illegal conduct and had entered into agreements designed to ensure that it learned of continued wrongdoing.

Here, in contrast, Plaintiffs do not allege any direct path by which information about the CityTime fraud actually reached the Board, nor do they allege sufficiently clear and prominent red flags. *See In re Citigroup Inc. Shareholders Litig.*, 2003 WL 21384599, at *2 (Del. Ch. June 5, 2003) ("How, exactly, a member of the Citigroup board of directors was supposed to be put on inquiry notice by something he or she never saw or heard of is not explained. The answer to the question is obvious. 'Red flags' are only useful when they are either waived [sic?] in one's face or displayed so that they are visible to the careful observer."); *see also Ash v. McCall*, 2000 WL 1370341, at *15 (Del. Ch. Sept. 15, 2000) ("Plaintiffs have not . . . alleged facts that HBOC's directors had actual knowledge of these events and, therefore, possessed actual knowledge of potential accounting irregularities."). Indeed, on Plaintiffs' account, a majority of the Board supposedly inferred (or should have inferred) the need for investigation and action from some combination of CityTime's importance, reports of cost overruns and political conflict in *The Daily News*, the size of the cost overruns, and some unrelated misconduct in other projects. Even taken together and viewed in a light favorable to Plaintiffs, these allegations do not support an inference of actual or constructive knowledge on the part of the Board, such that failure to act qualified as a form of bad faith action. *See Forest*, 450 F. Supp. 2d at 395 ("Plaintiffs have failed to plead with particularity what obvious danger signs were ignored . . . ." (quotation marks

and citations omitted)); *Dow*, 2010 WL 66769, at *13 ("With neither knowledge of bribery, nor any reason to suspect such conduct, the defendant directors could not 'conscious[ly] disregard' their duty to supervise against bribery.").

As a result, Plaintiffs' allegations do not create reasonable doubt as to a substantial likelihood of liability.  *See Stone v. Ritter*, 2006 WL 302558, at *2 (Del. Ch. Jan. 26, 2006), *aff'd sub nom. Stone v. Ritter*, 911 A.2d 362 (Del. 2006) ("Plaintiffs fail to point to any facts either showing how the Hamric and Nance scheme, or any other problems at AmSouth, waved a 'red-flag' in the face of the board.  Nor do plaintiffs point to facts suggesting a conscious decision to take no action in response to red flags.  Without these well-pled allegations, there is no possibility the defendants faced a substantial likelihood of liability.").

Because this theory of interestedness on the part of the Board is Plaintiffs' only argument in support of a finding of demand futility under *Rales*, it follows that the Complaint must be dismissed due to failure to comply with the demand requirement.[10]

## III.    Leave to Replead

Plaintiffs request leave to address any pleading deficiencies in an amended complaint, in the event the Court finds the Complaint deficient.  "While Rule 15(a) provides that leave to amend shall be freely given when justice so requires, the Court has broad discretion in deciding whether or not to grant such a request."  *St. Clair Shores Gen. Employees Ret. Sys. v. Eibeler*, 745 F. Supp. 2d 303, 316 (S.D.N.Y. 2010) (Sullivan, J.) (citations and quotation marks omitted).  "Factors that are relevant to the exercise of the Court's discretion include: (1) the presence of bad faith, dilatory motives, or undue delay on the part of the movant; (2) the potential for prejudice to

---

[10] Even if the Court were to apply *Aronson*, however, the same reasoning that leads the Court to conclude that Plaintiffs have failed to show interestedness would control the conclusion of business judgment rule analysis, since Plaintiffs' only basis for arguing that business judgment does not apply is the very same theory of bad faith action discussed and rejected *supra*.

an opposing party; and (3) whether the sought-after amendment would be futile." *Id.* (citations

omitted). "An amendment to a pleading is futile if the proposed claim could not withstand a

motion to dismiss." *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 258 (2d Cir. 2002). As

Judge Sullivan has explained:

> Some courts in this District have required a plaintiff to file a copy
> of the proposed amended pleading in order to demonstrate that
> Rule 15(a) relief is appropriate. At the very least, a party seeking
> leave to amend must provide some indication of the substance of
> the contemplated amendment in order to allow the Court to apply
> the standards governing Rule 15(a). Put simply, in the absence of
> any identification of how a further amendment would improve
> upon the Complaint, leave to amend must be denied as futile.

*St. Clair Shores*, 745 F. Supp. 2d at 316.

Here, Plaintiffs filed a lengthy and detailed complaint. They chose not to amend their

pleadings at any prior point in this litigation. And they have requested leave to amend without

any suggestion of what changes such amendment might effect.[11] *See In re Goldman Sachs*

*Mortgage Servicing S'holder Derivative Litig.*, No. 11 Civ. 4544, 2012 WL 3293506, at *11

(S.D.N.Y. Aug. 14, 2012) ("Here, Plaintiffs failed to advise this Court of how an amendment

would cure defects in the Complaint. And they provide no suggestion that they can plead

demand futility."). As a result, the Court has "no inkling of what [their] amendment might look

like or what additional facts may entitle [them] to relief." *St. Clair Shores*, 745 F. Supp. 2d at

316. "Rule 15(a) is not a shield against dismissal to be invoked as either a makeweight or a

fallback position in response to a dispositive motion." *DeBlasio v. Merrill Lynch & Co., Inc.*,

No. 07 Civ. 0318, 2009 WL 2242605, at *41 (S.D.N.Y. July 27, 2009). Therefore, the Court

concludes that granting leave to amend the Complaint is inappropriate on grounds of futility.

Plaintiffs' request for leave to amend is denied.

---

[11] Plaintiffs referred to several articles first presented to the Court at oral argument, but the Court
has taken judicial notice of those articles and concluded that they do not alter the outcome.

**IV.      Conclusion**

For the foregoing reasons, Nominal Defendant SAIC's motion to dismiss is GRANTED. All other motions to dismiss are DENIED as moot.  The Clerk of Court is directed to close the motion entries at Dkt. Nos. 38, 39, 43, 45, 48, and 53, and to close this case.

SO ORDERED.

Dated: New York, New York
       June 10, 2013

_____
             J. PAUL OETKEN
        United States District Judge